UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYON STAFFORD, Individually and on Behalf of All Others Similarly Situated,<br><br>                           Plaintiff,<br>v.<br>RITE AID CORPORATION,<br>                          Defendant. | Case No.: 17-cv-1340-AJB-JLB<br><br>**ORDER DENYING DEFENDANT RITE AID CORPORATION'S MOTION TO COMPEL ARBITRATION (Doc. No. 78)** |

Presently before the Court is Defendant Rite Aid Corporation's ("Rite Aid") motion to compel arbitration. (Doc. No. 78.) Plaintiff Bryon Stafford ("Plaintiff") opposed the motion, (Doc. No. 86), and Defendant replied, (Doc. No. 88.) For the reasons set forth below, the Court **DENIES** Rite Aid's motion to compel arbitration.

**I.  BACKGROUND**

Plaintiff brings a putative class action against Rite Aid for an alleged deceptive and unfair pricing scheme involving Rite Aid's Rx Savings Program. (Second Amended Complaint ("SAC"), Doc. No. 30.)

As general background, the overwhelming majority of Rite Aid's clients are enrolled in either a private or public health care plan that covers some or all medical and pharmaceutical expenses. (*Id.* ¶ 5.) In almost every one of these plans, the cost of prescription drugs is shared between the third-party payor (i.e., the health insurance plan)

and the actual user of the drug (i.e., the plan participant). (*Id.*) When a plan participant fills a prescription at a pharmacy under a third-party health care plan, the plan pays a portion of the cost, and the plan participant pays the remaining portion of the cost directly to the pharmacy as a copayment. (*Id.* ¶ 6.) Because of the cost savings associated with generic drugs as opposed to brand name, third-party payors incentivize plan participants to purchase generic drugs by offering a lower price, which in turn, results in a lower copayment. (*Id.*) By law, Rite Aid cannot charge a copayment that exceeds its "usual and customary" price, which is generally defined within the pharmaceuticals industry. (*Id.* ¶ 7.)

The process by which financial responsibility between third-party payors and plan participants is determined is called "adjudication." Rite Aid contracts with pharmacy benefit managers ("PBMs") and third-party payors ("TPPs") to "adjudicate" the claims of customers for prescription drug coverage. (Doc. No. 78-1 at 7.) The contracts specify Rite Aid's obligations to the TPP or PBM when submitting claims for prescription coverage at the point of sale, as well as the amount Rite Aid will receive as payment when filling prescriptions. (*Id.* at 8.) Generally, the TPP or PBM determines the amount of reimbursement according to those contracts as well as the copayment or deductible amount. (*Id.*) The TPP or PBM then transmits the information back to Rite Aid, instructing Rite Aid on the amount to collect from the customer. (*Id.*)

Plaintiff alleges Rite Aid overcharges customers for generic prescription drugs by submitting to TPP/PBMs claims for payment at prices that Rite Aid has inflated above its "usual and customary" prices. (SAC ¶ 8.) As a result, Plaintiff claims customers who purchase generic prescription drugs through third-party plans pay copayments that are significantly higher than Rite Aid's "usual and customary" prices for those same drugs. (*Id.*) Central to this scheme, according to Plaintiff, is the Rx Savings Program. (*Id.* ¶ 9.) The Rx Savings Program allows cash-paying customers (customers who pay for prescription drugs without using insurance) to buy the most commonly prescribed generic drugs at significantly discounted prices. (*Id.*) The Rx Savings Program prices, as contended by Plaintiff, are often significantly lower than the prices Rite Aid reports to health

insurance companies as Rite Aid's "usual and customary" prices. (*Id.*) Plaintiff claims Rite Aid was required by law to report to the TPP/PBMs the Rx Savings Program prices as Rite Aid's "usual and customary" prices for the prescription generic drugs. (*Id.* ¶ 11.) The failure to do so distorted the overall prescription calculations, resulting in higher copays to customers. (*Id.*) Based on this alleged scheme, Plaintiff brings claims against Rite Aid for: (1) negligent misrepresentation, (2) unjust enrichment, (3) violation of the Consumer Legal Remedies Act ("CLRA"), (4) and violation of the California Unfair Competition Law ("UCL").

## II. PROCEDURAL HISTORY

Plaintiff's complaint was first filed in June 30, 2017. (Doc. No. 1.) A First Amended Complaint was filed on July 28, 2017, (Doc. No. 18), and Rite Aid moved to dismiss for failure to state a claim on Plaintiff's four claims for relief. (Doc. No. 19.) In that motion, Rite Aid also argued that Plaintiff's claims were time-barred. (*Id.* at 31.) The Court granted Rite Aid's motion to dismiss without prejudice, holding that Plaintiff's claims were time-barred by their respective statutes of limitations. (Doc. No. 29.) The Court granted Plaintiff leave to amend to provide further factual allegations to demonstrate that equitable tolling applied to Plaintiff's four causes of action. (*Id.*) Plaintiff filed a Second Amended Complaint on January 9, 2018. (Doc. No. 30.) On January 23, 2018, Rite Aid moved to dismiss the Second Amended Complaint for failure to state a claim. (Doc. No. 32-1.) On September 28, 2018, the Court denied Rite Aid's motion to dismiss, holding that Plaintiff plausibly stated a claim on all four causes of action. (*Id.*) On June 17, 2019, Ride Aid filed a motion to compel arbitration. (Doc. No. 78.) Plaintiff opposed, (Doc. No. 86), and Rite Aid replied, (Doc. No. 88). This order follows.

## III. LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs the enforcement of arbitration agreements involving interstate commerce. *See* 9 U.S.C. § 2. Pursuant to § 2 of the FAA, an arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* The FAA permits "[a]

party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in [the] agreement." *Id.* § 4.

Given the liberal federal policy favoring arbitration, the FAA "mandates that district courts shall direct parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). Thus, in a motion to compel arbitration, the district court's role is limited to determining "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank Nat'l Ass'n*, 673 F.3d 947, 955–56 (9th Cir. 2012) (citing *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). If these factors are met, the court must enforce the arbitration agreement in accordance with its precise terms. *Id.*

While generally applicable defenses to contract enforcement, such as fraud, duress, or unconscionability, may invalidate arbitration agreements, the FAA preempts state law defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). There is generally a strong policy favoring arbitration, which requires any doubts to be resolved in favor of the party moving to compel arbitration. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). However, where a party challenges the existence of an arbitration agreement, "the presumption in favor of arbitrability does not apply." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014).

## IV. DISCUSSION

Despite the absence of an arbitration agreement between Rite Aid and Plaintiff, Rite Aid urges the Court compel arbitration of Plaintiff's claims against Rite Aid based on the doctrine of equitable estoppel. (Doc. No. 78-1.) In opposition, Plaintiff argues equitable estoppel does not apply because his claims are not intimately intertwined with any contract.

4

(Doc. No. 86.) Both parties also raise the issue of waiver of the right to arbitration. The Court will first address whether the right to arbitrate exists. Afterwards, the Court will turn to whether Rite Aid has waived its right to arbitrate, if any.

### A. Whether a Valid Agreement to Arbitrate Exists

The Court's first task in determining whether this action should proceed to arbitration is whether a valid agreement to arbitrate exists. *Kilgore*, 673 F.3d at 955–56. Here, it is undisputed that there is no agreement to arbitrate between Plaintiff and Rite Aid. However, Rite Aid points to the contracts between Rite Aid and the TPP/PBMs—which *do* contain arbitration provisions—and argues that those arbitration agreements may be enforced against Plaintiff, even as a nonsignatory, under the equitable estoppel doctrine. (Doc. No. 78-1 at 16.)

"Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) (internal quotations and citations omitted). Courts must apply state law in determining whether equitable estoppel applies to compel arbitration of a dispute.[1] *Dylag v. W. Las Vegas Surgery Ctr., LLC*, 719 F. App'x 568, 570 (9th Cir. 2017). Under equitable estoppel, as applied in "both federal and California decisional authority, a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract obligations." *JSM Tuscany, LLC v. Superior Court*, 193 Cal. App. 4th 1222, 1237 (2011) (internal citations and quotations omitted). In *JSM Tuscany, LLC*, the California appellate court additionally addressed the question of "whether the *nonsignatory* plaintiffs [] can also be required to arbitrate their claims which are dependent upon, or inextricably intertwined with, the obligations imposed by the [contracts]." *Id.* at 1239 (emphasis added). The court

---

[1] Here, neither party disputes that California law should apply.

concluded "there is no reason why [the equitable estoppel] doctrine should not be equally applicable to a nonsignatory plaintiff." *Id.* "When that plaintiff is suing on a contract—on the basis that, even though the plaintiff was not a party to the contract, the plaintiff is nonetheless entitled to recover for its breach, the plaintiff should be equitably estopped from repudiating the contract's arbitration clause." *Id.* However, the equitable estoppel doctrine does not apply where a plaintiff "would have a claim independent of the existence of the" agreement containing the arbitration provision. *Yang v. Majestic Blue Fisheries, LLC*, 876 F.3d 996, 1002 (9th Cir. 2017).

Rite Aid has not adequately shown that equitable estoppel should apply. First, Plaintiff's claims are not "dependent upon, or inextricably intertwined" with the contract between Rite Aid and the TPP/PBMs. *JSM Tuscany, LLC*, 193 Cal. App. 4th at 1237. Rite Aid characterizes Plaintiff's claims as turning on Rite Aid's contractual obligations to the TPP/PBMs to report a "usual and customary price." (Doc. No. 78-1 at 18.) As a result of Rite Aid allegedly reporting an inflated "usual and customary" price to the TPP/PBMs, Plaintiff claims he paid a higher copayment than he otherwise should have paid. (*Id.*) There is no doubt that there is *some* relation between Plaintiff's claims and the contracts between Rite Aid and the TPP/PBMs. But the pertinent question is whether Plaintiff's claims are "dependent upon, or inextricably intertwined" with Rite Aid's contractual obligations to the TPP/PBMs. And as the Court previously held in its order denying Rite Aid's motion to dismiss the SAC, the answer to that question is no. Plaintiff's claims do not necessarily depend upon the contracts between Rite Aid and the TPP/PBMs. (Doc. No. 41 at 8.) Rather, as the Court has already stated, Plaintiff's claim is dependent on the theory that Rite Aid "orchestrated a fraudulent scheme that violated industry standards" and created the Rx Savings Program—"[t]he lynchpin of the scheme"—to report "falsely inflated 'usual and customary' prices for the drugs to third-party payors. . . ." (SAC ¶¶ 9, 11.) That this litigation might involve reference to the contracts between Rite Aid and the TPP/PBMs is not enough to find dependence or inextricable intertwinement with the contracts.

6

Second, as the Court has previously concluded, Plaintiff has alleged a claim against Rite Aid independent of the existence of the agreements between Rite Aid and the TPP/PBMs. Specifically, the Court rejected the contention that Plaintiff's "claims are grounded only in contract law." (Doc. No. 41 at 14 n.1.) Even more, the face of Plaintiff's SAC demonstrates that Plaintiff's claim does not sound entirely in contract law. Plaintiff alleges in the SAC, "Rite Aid tried to avoid ***complying with its contractual obligations and accepted industry standards (not to mention federal and state law)*** by implementing the RSP, and instead of reporting the lower RSP Prices to third-party payors, knowingly and intentionally reported false and inflated 'usual and customary' prices." (SAC ¶ 52 (emphasis added).) Accordingly, this is not a situation in which Plaintiff is seeking to enforce his rights pursuant to a contract while simultaneously hoping to avoid arbitration. *See Comer v. Micor, Inc.*, 436 F.3d 1098, 1101–1102 (9th Cir. 2006) (refusing to compel a non-signatory to arbitrate his claims when his suit was based on his rights under federal law, rather than on the rights of the parties as defined in related investment agreements); *see also Pullen v. Victory Woodwork, Inc.*, No. 07-CV-00417-WBS-GGH, 2007 WL 1847633, at *3 (E.D. Cal. June 27, 2007) ("When a nonsignatory seeks to enforce provisions of a contract to which it was not a party, equitable estoppel must prevents that entity from avoiding the obligations and burdens that also exist under the contract.").

### B. Whether the Agreement Encompasses the Dispute at Issue

After determining whether a valid agreement to arbitrate exists, the Court's next task is to decide whether the agreement encompasses the dispute at issue. *Kilgore*, 673 F.3d at 955–56. Given that the Court has concluded no valid arbitration agreement exists, and equitable estoppel does not apply, the Court need not address this requirement. Nevertheless, Rite Aid argues that the issue of arbitrability should be delegated to an arbitrator. (Doc. No. 78-1 at 22.) It is well-established that if the existence and making of the arbitration agreement is at issue, "the federal court may proceed to adjudicate it." *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967). Rite Aid also highlights the delegation clause in the arbitration agreements between Rite Aid and

7

the TPP/PBMs, which Rite Aid contends indicates an agreement for the issue of arbitrability to be submitted to an arbitrator. (Doc. No. 78-1 at 22–23.) The issue of Plaintiff's nonsignatory status aside, a delegation clause is only enforceable "when it manifests a clear and unmistakable agreement to arbitrate arbitrability, and is not invalid as a matter of contract law." *Oliver v. First Century Bank, N.A.*, No. 17-CV-620-MMA-KSC, 2017 WL 5495092, at *2 (S.D. Cal. Nov. 16, 2017). Plaintiff, as an unsophisticated consumer, had no opportunity to review or even see any of the agreements between Rite Aid and the TPP/PBMs. (Doc. No. 86 at 20.) No "clear and unmistakable agreement to arbitrate arbitrability" may be found on these facts. Accordingly, issue of whether this dispute is subject to arbitration is for this Court to decide. The decision of the Court is that it is not.

### C. Whether Rite Aid Waived its Right to Arbitration

Even if this Court were to hold that Rite Aid had a right to arbitrate the claims brought by Plaintiff, Rite Aid waived any right it might have had. Although arbitration agreements are subject to general contract principles such as waiver, a "[w]aiver of a contractual right to arbitration is not favored," and "any party arguing waiver of arbitration bears a heavy burden of proof." *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986) (internal quotation marks omitted). "A party seeking to prove waiver of the right to arbitration must show: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration from such inconsistent acts." *Samson v. Nama Holdings*, LLC, 637 F.3d 915, 934 (9th Cir. Feb.11, 2011) (internal quotation marks omitted). The Court will address each prong below.

#### 1. Knowledge of An Existing Right to Compel Arbitration

Rite Aid argues that until recently, it did not have sufficient information to move to compel arbitration. (Doc. No. 78-1 at 25.) First, Rite Aid argues it lacked the information needed to determine the applicability of an arbitration agreement because it did not have a means to confirm Plaintiff's identify. (*Id.*) Specifically, Rite Aid claims it only had in its

8

possession Plaintiff's first and last name, and further needed Plaintiff's full name, address, and date of birth. (*Id.* at 26.) Second, Rite Aid contends it needed to identify through discovery the challenged transactions and corresponding contracts to determine whether Plaintiff's claims were inextricably intertwined with the contracts. (*Id.* at 26–27.) To these points, Plaintiff answers Rite Aid only had one "Bryon Stafford" in its records and so, Rite Aid's failure to act to compel arbitration cannot be excused. (Doc. No. 86 at 24.) The Court agrees with Plaintiff.

First, even if it could not confirm the exact identity of Plaintiff, it was incumbent upon Rite Aid to demonstrate more diligence earlier in the litigation in seeking information regarding Plaintiff's identity. The circumstances indicate that there was enough information for Rite Aid to seriously suspect an arbitration provision. This is true given Plaintiff was the only "Bryon Stafford" in Rite Aid's records, and Rite Aid knew or should have known about a possible arbitration provision *in its own contract* with the TPP/PBMs. And Plaintiff points out that in the parties' joint discovery plan, Rite Aid admitted that "each of the PBM and/or third party payor contracts contains similar arbitration provisions." (Doc. No. 45 at 6.) Given this information, Rite Aid should have questioned its arbitration rights earlier. Rite Aid replies by analogizing this action to *DeVries v. Experian Information Solutions, Inc.*, in which the court held that the defendant was justified in seeking discovery to identify purchases and verify if an arbitration agreement existed. 2017 WL 733096, at *11 (N.D. Cal. Feb. 24, 2017). In *DeVries*, the plaintiff filed suit on June 2, 2016 and by June 17, 2016, counsel for the defendant requested information from the plaintiff to determine whether the plaintiff had entered into an arbitration agreement. *Id.* However, despite repeated requests, counsel for the plaintiff did not provide such information until months later. *Id.* As such, the *DeVries* court held that a delay in seeking arbitration was excusable. *Id.* That is not the case here. There are no similar allegations, and no evidence that Rite Aid's attempts at gathering information to confirm an arbitration agreement was thwarted in any way. Instead, Rite Aid decided to litigate this case in other ways in this Court.

9

Secondly, Rite Aid's argument that it needed to determine whether Plaintiff's claims were intertwined with its agreements is also unavailing because the original complaint gave Rite Aid adequate notice that the allegations involved contractual obligations. Specifically, Plaintiff asserted in its first Complaint, "Rite Aid tried to avoid *complying with its contractual obligations* and accepted industry standards (not to mention federal and state law) by implementing the RSP program. . . ." (Complaint, Doc. No. 1, ¶ 47.) There was sufficient information in the Complaint to alert Rite Aid that perhaps an inquiry into its contracts with the TPP/PBMs would be prudent. Therefore, the Court holds that there is enough to charge Rite Aid with knowledge of an existing right to arbitration.

### 2. Acts Inconsistent with Right to Arbitration

Next, Rite Aid maintains its litigation conduct was not contrary to its right to arbitration because the acts were limited to securing information to allow it to move to compel arbitration. (Doc. No. 78-1 at 28.) In particular, Rite Aid insists it propounded discovery requests only to obtain information needed for its motion to compel arbitration. (*Id*.) Rite Aid also states its filing of two motions to dismiss was not inconsistent with the right to arbitration because it was not aware of its arbitration rights. (*Id.* at 28 n.11.) In disagreement, Plaintiff points out multiple actions inconsistent with Rite Aid's right to arbitration including: (1) two motions to dismiss for failure to state a claim, (2) negotiating and entering into an ESI protocol and protective order, (3) entering into proposed scheduling orders, and (4) propounding and responding to substantive merits discovery. (Doc. No. 85 at 27.)

There is no "concrete test to determine whether a party has engaged in acts that are inconsistent with its right to arbitrate." *Martin v. Yasuda*, 829 F.3d 1118, 1125 (9th Cir. 2016). However, the Ninth Circuit has stated that a party's extended silence and delay in moving for arbitration may indicate a "conscious decision to continue to seek judicial judgment on the merits of [the] arbitrable claims," which would be inconsistent with a right to arbitrate. *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 759 (9th Cir. 1988).

Here, Plaintiff's action was originally filed on June 30, 2017. (Doc. No. 1.) Rather than expeditiously seeking to assert its arbitration rights, Rite Aid decided to bring two motions to dismiss, on the merits, arguing that all four of Plaintiff's causes of action should be dismissed for failure to state a claim. (Doc. Nos. 19, 32.) Rite Aid's motion to compel arbitration was not brought until *after* its second motion to dismiss was denied by the Court. (Doc. No. 41.) And even if Rite Aid was unaware of its arbitration rights, it was Rite Aid's duty to diligently investigate whether its own contract with a third-party contained an arbitration provision. But instead, Rite Aid decided to diligently litigate in this Court. *See Van Ness Townhouses*, 862 F.2d at 756, 759 (finding waiver when party answered complaints, moved to dismiss the action, and did not claim a right to arbitration in any of the pleadings); *Kelly v. Pub. Util. Dist. No. 2*, 552 Fed. App'x. 663, 664 (9th Cir. 2014) (finding this element satisfied when the parties "conducted discovery and litigated motions, including a preliminary injunction and a motion to dismiss"). As such, the Court concludes Rite Aid acted inconsistently with the right to arbitration. To hold otherwise would allow parties to take a "wait and see approach" and feign ignorance of arbitration rights just until after an unfavorable court ruling is imposed.

### 3. Prejudice to the Plaintiff

Lastly, Rite Aid argues there is minimal prejudice to Plaintiff if this action was compelled to arbitration because it has served little discovery, and the discovery it did seek can be used in an arbitration. (Doc. No. 78-1 at 29.) Naturally, Plaintiff responds by asserting that forcing Plaintiff to arbitration after two years of aggressive litigation in this Court displays obvious prejudice to Plaintiff. The Court agrees with Plaintiff.

"When a party has expended considerable time and money due to the opposing party's failure to timely move for arbitration and is then deprived of the benefits for which it has paid by a belated motion to compel, the party is indeed prejudiced." *Martin*, 829 F.3d at 1127. Plaintiff here has expended considerable costs and energy in prosecuting his case. As Plaintiff points out, "Rite Aid has engaged Plaintiff in case management discussions, including a discovery and class certification schedule, propounded and responded to merits

discovery, and engaged in discovery motion practice and hearings." (Doc. No. 86 at 29.) Requiring Plaintiff to arbitrate its claims after Rite Aid has actively participated in this litigation for two years would certainly be inequitable. Thus, Plaintiff has shown prejudice.

With all three elements satisfied, the Court concludes that even if Rite Aid had a right to arbitrate Plaintiff's claims, Rite Aid waived those rights.

## V. CONCLUSION

In light of the foregoing, the Court **DENIES** Rite Aid's motion to compel arbitration. **IT IS SO ORDERED**.

Dated: February 24, 2020

Hon. Anthony J. Battaglia
United States District Judge