# EXHIBIT 2



**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph P. Guglielmo (*pro hac vice*)
Erin Green Comite (*pro hac vice*)
Carey Alexander (*pro hac vice*)
Ethan S. Binder (*pro hac vice*)
Amanda M. Rolon (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
jguglielmo@scott-scott.com
ecomite@scott-scott.com
calexander@scott-scott.com
arolon@scott-scott.com
ebinder@scott-scott.com

[Additional Counsel on Signature Page]

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYON STAFFORD and ELIZABETH DAVIS, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br> v.<br><br>RITE AID CORPORATION,<br><br>      Defendant. | Lead Case No.: 3:17-cv-01340-AJB-JLB (Consolidated with No. 3:18-cv-00152-TWR-AHG)<br><br>Applicable to: *Stafford v. Rite Aid Corporation*, Case No. 3:17-cv-01340-TWR-AHG<br><br>FOURTH AMENDED CLASS ACTION COMPLAINT FOR:<br><br>(1) VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW;<br>(2) VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT;<br>(3) UNJUST ENRICHMENT; AND<br>(4) NEGLIGENT MISREPRESENTATION.<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Bryon Stafford and Elizabeth Davis ("Plaintiffs"), by their~~his~~ undersigned attorneys, individually and on behalf of all others similarly situated, based on personal knowledge as to themselves~~himself~~ and upon information and belief and the investigation of his counsel as to all other matters, for this Fourth~~Third~~ Amended Class Action Complaint, brings~~this~~ this consumer class action against Defendants Rite Aid Corporation ("Rite Aid Corp.") and Rite Aid Hdqtrs. Corp. ("Rite Aid HQ") (collectively, "Defendants" or "Rite Aid"), and alleges~~s~~ the following:[1]

## NATURE OF THE ACTION

1. This action concerns Rite Aid's deceptive and unfair pricing scheme to overcharge customers with third-party health care plans on their purchases of generic prescription drugs at Rite Aid pharmacies.

2. Rite Aid is currently the third largest retail pharmacy chain in the United States, with more than 4,500 stores in thirty-one states and in the District of Columbia.[2] For the fiscal year ending March 4, 2017, Rite Aid had over $18 billion in pharmacy sales.

3. In fiscal year 2017, Rite Aid filled approximately 302 million prescriptions and served, on average, two million customers per day. Prescription drugs accounted for approximately 68% of those sales, and like other major retail pharmacies, generic drugs accounted for the vast majority of the total prescriptions dispensed by Rite Aid. According to the Association for Accessible Medicines'

---

[1] Because the Court dismissed causes of action that seek equitable relief (*see* ECF No. 287) Plaintiff Davis seeks to join this action only to the extent the claims seek damages. Nevertheless, all of the claims previously alleged by Plaintiff Stafford are being included in this amended complaint to preserve for appeal any issues related to the dismissal of the claims for equitable relief.

[2] In June 2017, a deal was announced between Walgreen Co. ("Walgreen") and Rite Aid, whereby Walgreen will purchase 2,186 stores and three distribution centers from Rite Aid. This deal has yet to be consummated.

(formally known as the Generic Pharmaceutical Association) *2016 Generic Drug Savings and Access in the United States Report*, generic drugs accounted for 89% of prescriptions dispensed in the United States.

4. A generic drug is a pharmaceutical drug that is the equivalent of a brand-name drug in dosage, strength, route of administration, quality, performance, and intended use. Generic drugs typically cost less than their brand-name counterparts and have saved both consumers and health care plans hundreds of billions of dollars over the last decade.

5. Approximately 98% of Rite Aid's clients are enrolled in a private or public health care plan that covers some or all medical and pharmaceutical expenses. In almost every one of these plans, the cost of prescription drugs is shared between the third-party payor (*i.e.*, the health insurance plan) and the actual user of the drug (*i.e.*, the plan participant).

6. When a plan participant fills a prescription at a pharmacy under a third-party health care plan, the plan pays a portion of the cost, and the plan participant pays the remaining portion of the cost directly to the pharmacy, either as a copayment, coinsurance, or contracted rate towards the plan's deductible ("copayment"). Because of the potential cost savings associated with the purchase of generic drugs, third-party payors incentivize plan participants to purchase generic drugs (if available) instead of their brand-name drug equivalents by offering a lower price, which in turn, results in a lower copayment.

7. Rite Aid pharmacies collect the copayment from the plan participant at the time the prescription is filled at a pharmacy. Importantly, by law, Rite Aid cannot charge a copayment that exceeds its "usual and customary" price, which is generally defined within the pharmaceuticals industry as the cash price most commonly charged

FOURTH AMENDED CLASS ACTION COMPLAINT
LEAD CASE NO.: 3:17-CV-01340-TWR-AHG

to the general public by the pharmacy for the same drug.[3]  Rite Aid, however, engages in a false, deceptive, and unfair pricing scheme that does exactly what the law prohibits.

8.      At bottom, this action concerns Rite Aid's illegal practice of overcharging customers enrolled in public or private health care plans for generic prescription drugs by submitting to third-party payors claims for payment at prices that Rite Aid has knowingly and intentionally inflated above its "usual and customary" prices.  As a result, customers who purchase generic prescription drugs through third-party plans pay copayments that are significantly more than Rite Aid's "usual and customary" prices for those same drugs.

9.      The lynchpin of Rite Aid's scheme is its Rx Savings Program ("RSP"), a prescription savings program that allows cash-paying customers—those who pay for drugs without using insurance—to purchase 350 of the most commonly prescribed generic drugs listed on Rite Aid's special formulary (attached hereto as Exhibit A) at price levels, generally, of only $9.99 for a thirty-day supply and $15.99 for a ninety-day supply (the "RSP Prices").[4]  The RSP Prices, however, are often significantly lower than the prices that Rite Aid reports to health insurance companies as Rite Aid's "usual and customary" prices, and thus, the amounts that individuals using insurance must pay for the drugs in the form of a copayment.

10.      Any member of the general public is eligible to participate in the RSP. Rite Aid does not limit eligibility for, or duration of the availability of, the RSP Prices for the prescription generic drugs at issue.  The Seventh Circuit's decision in *Kmart* makes clear that under these circumstances the RSP Prices fit squarely within the

---

[3] The Seventh Circuit Court of Appeals recently affirmed this definition in the case of *United States ex rel Garbe v. Kmart Corp.*, 824 F.3d 632, 643 (7th Cir. 2016) ("*Kmart*").

[4]   This copy of Rite Aid's RSP formulary was obtained by Plaintiff's counsel in May 2017, and as explained herein, Plaintiffs were not aware of the RSP or the formulary prior to that date.

accepted industry meaning of "usual and customary" prices, and thus, represent Rite Aid's actual usual and customary prices for the drugs. *See id.* at 645.

11.    Accordingly, Rite Aid was required by law to report to third-party payors the RSP Prices as Rite Aid's usual and customary prices for the prescription generic drugs. However, since the RSP was created in 2008, and unbeknownst to Plaintiffs until May 2017, Rite Aid has purposefully disregarded the RSP Prices in setting its "usual and customary" prices for the drugs when they are sold to customers using insurance for their purchase. Instead, Rite Aid has submitted falsely inflated "usual and customary" prices for the drugs to third-party payors, and in the process, overcharged customers paying for the drugs with insurance by collecting falsely inflated copayments.

12.    Thus, using the RSP as its vehicle, Rite Aid has effectively created a discriminatory pricing scheme, whereby members of the general public enrolled in the RSP who are not using insurance when purchasing a prescription generic drug from Rite Aid are able to pay the lower RSP Price, while those customers using insurance must pay the higher and artificially inflated "usual and customary" price.

13.    Therefore, the RSP not only allows Rite Aid to maintain and increase its market share by fending off discounted prices from its competitors, but more importantly, it provides a mechanism for Rite Aid to hide its actual "usual and customary" prices from third-party payors so that it can continue to collect higher reimbursement payments from third-party payors and higher copayments from plan participants, such as Plaintiffs, who fill their prescriptions at Rite Aid pharmacies.

14.    Indeed, although any member of the general public is eligible to participate in the RSP, Rite Aid does not advertise the RSP in its pharmacies, including at the point of purchase. Furthermore, while Rite Aid pharmacists often advise customers who ***do not*** have insurance of the availability of the RSP, they do not advise customers ***using insurance*** that the drug being purchased may be cheaper if they paid

- 4 -

with cash through the RSP, a program that Rite Aid touts as being helpful for people who do not have insurance or who are uninsured.  Moreover, upon information and belief, many pharmacies are prohibited by pharmacy benefit managers ("PBMs")[5] to disclose such information to customers using insurance to purchase their drugs.

15.    Even with knowledge of the RSP and its prices, customers using insurance still may not be able to ascertain that they are being charged inflated copayments.  For example, while the "usual and customary" price Rite Aid reports to a third-party payor may exceed the RSP price for the same drug, the copayment paid by the customer may ultimately be lower than the RSP price.  However, because copayments are usually calculated based on the "usual and customary" price Rite Aid reports to third-party payors, the customer would have paid a lower copayment but for Rite Aid's practice of reporting inflated "usual and customary" prices to third-party payors.  The complex and involved analysis needed to ascertain Rite Aid's illegal scheme requires both access to information that customers do not have and deduction beyond that expected of a lay customer.

16.    By charging amounts for prescription generic drugs that are above the RSP Prices for those same drugs, Rite Aid is unlawfully overcharging and discriminating against plan participants and third-party payors.  Accordingly, Rite

---

[5]    PBMs are basically middle men that go between the third-party payors and everyone else in the healthcare industry.  PBMs' technical function is to administer health coverage providers' prescription benefit programs.  PBMs develop coverage providers' formularies (the list of prescription benefits included in coverage at various pricing "tiers"), process claims, and negotiate with manufacturers.  PBMs also contract with retail and community pharmacies.  Pharmacies agree to dispense covered prescription products to insured customers.  Contracts between PBMs and pharmacies provide for a payment rate for each prescription, plus a dispensing fee kept by the pharmacies.  Pharmacies are also responsible for collecting patient cost-sharing payments (co-payments) and sending those to the PBMs or reducing the PBMs' or plans' share owed by that amount.

1  Aid's misconduct has caused Plaintiffs and the other Class (as defined herein) members

2  to suffer significant monetary damages.

3  **JURISDICTION AND VENUE**

4      17.    This Court has jurisdiction over this action pursuant to 28 U.S.C.

5  §1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy

6  exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more

7  than 100 putative Class members, and at least one Class member is of diverse

8  citizenship from Rite Aid.  In addition, because more than two-thirds of the members

9  of the Class are citizens of states other than California and Rite Aid is not a citizen of

10  California, the exceptions to jurisdiction under 28 U.S.C. §1332(d) do not apply.

11      18.    Venue is proper in this Court pursuant to 28 U.S.C. §1391, because each

12  Plaintiff resides and suffered injury as a result of Rite Aid's acts and omissions in this

13  District, many of the acts and transactions giving rise to this action occurred in this

14  District, Rite Aid conducts substantial business in this District, it has intentionally

15  availed itself of the laws and markets of this district, and Rite Aid is subject to personal

16  jurisdiction in this District.

17  **THE PARTIES**

18      19.    Plaintiff Bryon Stafford ("Plaintiff Stafford") is, and at all times relevant

19  hereto has been, a citizen of and domiciled in San Diego, California.  Plaintiff Stafford

20  purchased prescription generic drugs from Rite Aid pharmacies located in California

21  beginning in or around January 2015 through December 2017.  Plaintiff Stafford

22  carried private health insurance at the times that he purchased the prescription generic

23  drugs from the Rite Aid pharmacies at issue.

24      20.    Plaintiff Elizabeth Davis ("Plaintiff Davis") is, and at all times relevant

25  hereto has been, a citizen of and domiciled in West Hollywood, California from

26  approximately 2012 to 2015 and in North Hollywood, California from 2015 to the

27  present.  Plaintiff Davis purchased prescription drugs that Rite Aid included in its RSP

28

formulary from Rite Aid pharmacies located in West Hollywood and North Hollywood, California beginning in or around January 2012 through the present. Plaintiff Davis carried private health insurance from approximately 2013 to December 31, 2019 at the times that she purchased the prescription drugs at issue from Rite Aid.

20.21. Although the prescription generic drugs that each Plaintiff purchased were contained on the RSP formulary, at no point in time when these purchases were made was either Plaintiff aware of the RSP, that the drugs they purchased were on the RSP formulary, or that the prices of the drugs under the RSP were cheaper than what they paid, or otherwise less than the amount Rite Aid submitted to his insurance. Moreover, because each Plaintiff's insurance covered the drugs they purchased, they had no reason to conduct an investigation to determine whether they could purchase the drugs at a lower price through an alternative means.

21.22. Rite Aid charged its cash-paying customers its "usual and customary" prices of $9.99 for a thirty-day supply of the same prescriptions that each Plaintiff purchased. However, because Rite Aid submitted to each Plaintiff's insurance a purported "usual and customary" price fraudulently inflated above its true "usual and customary" price—the price Rite Aid charges under the RSP—each Plaintiff paid copayments that were either substantially higher than the price of $9.99 for a thirty-day supply, or significantly more than the copayment would have been, had Rite Aid reported the true "usual and customary" price for all the drugs to each Plaintiff's insurance. Thus, each time Rite Aid charged each Plaintiff's insurance a price for a drug that was higher than the price listed on the RSP for that same drug, each Plaintiff suffered a separate and independent injury.

22.23. Plaintiff Stafford anticipates filling future prescriptions for these generic drugs at a Rite Aid pharmacy, and thus, faces the prospect of paying additional inflated copayments in the future if Rite Aid continues its wrongful conduct. Plaintiff Davis also anticipates filling future prescriptions for prescription drugs at a Rite Aid

pharmacy, and thus, would face the prospect of paying additional inflated amounts to the extent she obtains private insurance again in the future to the extent Rite Aid continues its wrongful conduct.

23.24. Each Plaintiff paid the above amounts on the reasonable assumption that the "usual and customary" prices reported by Rite Aid were the actual "usual and customary" prices paid by customers that do not have any form of prescription drug coverage from a third-party payor, and would not have paid those inflated amounts but for Rite Aid's wrongful conduct.

24.25. Defendant Rite Aid Corp. is headquartered in Camp Hill, Pennsylvania, and was incorporated in 1968 in Delaware.

25.26. Defendant Rite Aid HQ is headquartered in Camp Hill, Pennsylvania, and was incorporated in 1984 in Delaware.  Defendant Rite Aid HQ is a wholly-owned subsidiary of Defendant Rite Aid Corp. and does business as Rite Aid Corporation.

26.27. Rite Aid operates a chain of retail drugstores in the United States through two distinct segments: Retail Pharmacy and Pharmacy Services.  The Retail Pharmacy segment sells prescription drugs, as well as a range of other merchandise, such as over-the-counter medications, health and beauty aids, personal care items, cosmetics, household items, food and beverages, greeting cards, seasonal merchandise, and other convenience products.  This segment also operates retail clinics that provide treatment for common conditions and offer a range of preventive services, including screenings, medical tests, immunizations, and basic physical exams.  In addition, this segment provides healthcare coaching and disease management services.  The Pharmacy Services segment provides pharmacy benefit management services and a range of pharmacy-related services.  This segment also performs prescription adjudication services for other PBMs, offers integrated mail-order and specialty and compounding pharmacy services, and provides infertility treatment, as well as drug benefits under the federal government's Medicare Part D program.

27.28. As of March 4, 2017, Rite Aid operated 4,536 stores in thirty-one states of the United States and in the District of Columbia, including more than 580 stores located in California alone.  In addition, Rite Aid operates three distribution centers in California—513,000 and 200,000 square-foot facilities located in Woodland, California, and a 914,000 square-foot facility located in Lancaster, California.  Further, Rite Aid operates a 55,650 square foot ice cream manufacturing facility and a 32,000 square foot storage facility in El Monte, California.

## BACKGROUND

**The Process for Paying for Prescription Drugs**

28.29. The majority of patients in the United States have a health care plan (either private or public) that covers all or a portion of their medical and pharmaceutical expenses, known as a third-party payor.  Most plans require plan participants to pay a portion of their drug costs out-of-pocket.   These out-of-pocket expenses include copayments.

29.30. Even though plan participants cannot and do not negotiate the price charged by pharmacies such as Rite Aid for prescription drugs, and further, do not negotiate the copayment price for the drug in any given transaction, they are required to pay to Rite Aid a copayment amount in order to receive the prescription.

30.31. The National Council for Prescription Drug Programs ("NCPDP")[6] sets the industry standards for the electronic transmission of pharmacy claims to third-party

---

[6] NCPDP is a non-profit organization that develops industry standards for electronic healthcare transactions used in prescribing, dispensing, monitoring, managing, and paying for medications and pharmacy services.  Its membership is made up of approximately 1,500 stakeholders from across the pharmaceutical industry, including pharmacies, pharmacists, health plans, and government agencies.

payors.[7]  Rite Aid follows this uniform process at its pharmacies for each prescription drug transaction.

31.32. When a customer fills a prescription at a Rite Aid pharmacy, anywhere in the United States, the pharmacist or pharmacy technician enters the prescription information and any applicable insurance or benefit information into Rite Aid's computerized claims.  The pharmacist or pharmacy technician also enters in key information about the customer, such as his/her name.  This information is then sent to the customer's third-party payor (or an agent of the third-party payor).  Rite Aid charges the customer the copayment at the time the customer makes the purchase and the third-party payor covers the remaining cost of the prescription.

32.33. NCPDP provides a standardized form for Rite Aid pharmacies to fill out and send to third-party payors when filling prescriptions.  The form includes Transmission Pricing Record Field No. 426-DQ, where Rite Aid is required to report its "usual and customary" price of the prescription being filled.  The NCPDP Reference Manual on Flat File Format defines the term "usual and customary" as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed."  California Welfare and Institutions Code section 14105.455 similarly defines "usual and customary" as the lesser of either the lowest price reimbursed to the pharmacy by other third-party payors in California or the lowest price routinely offered to any segment of the general public.  Further, California's Medi-Cal provider

---

[7] Congress has codified and adopted the NCPDP standards through federal legislation, including the Health Insurance Portability and Accountability Act ("HIPAA"), Medicare Modernization Act, Health Information Technology for Economic and Clinical Health, and Meaningful Use.  For example, HIPAA requires uniform methods and codes for exchanging electronic information with health insurance plans.  These standards are referred to as the NCPDP Telecommunication Standard.  HIPAA also requires prescribers follow the NCPDP SCRIPT Standard when prescribing drugs under Medicare Part D.  *See* 45 C.F.R. §162.1102(a)-(c) (adopting the NCPDP standard for retail pharmacy electronic drug claims under HIPAA).

agreement form DHCS 6208 requires pharmacies to abide by "all federal laws and regulations governing and regulating Medicaid providers" and with all billing and claims requirements in the California Welfare and Institutions Code, as well as its implementing regulations.

33.34. This definition of "usual and customary" price is followed by PBMs.  For instance, Express Scripts, Inc., a PBM that includes Rite Aid in its network, defined the "Usual and Customary Retail Price" in its Pharmacy Network Manual as "[t]he usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, including any discounts or special promotions offered on such date."  Another large PBM, Prime Therapeutics LLC, defined "Usual and Customary Charge" in its Pharmacy Provider Manual as "the lowest price the Participating Pharmacy would charge to a particular [customer] if that customer [were] paying cash for the identical Prescription Drug Services on the date dispensed.  This includes any applicable discounts ***including, but not limited to***, senior discounts, ***frequent shopper discounts*** and other special discounts offered to attract customers."

34.35. Based on the data reported by Rite Aid on NCPDP's standard forms, third-party payors identify the copayment amount that the customer must pay to Rite Aid in a specific prescription transaction.  The copayment amount is a portion of the total drug price and cannot exceed the drug price.  In addition, the copayment cannot exceed Rite Aid's "usual and customary" price of the drug.  After the copayment amount is paid by the customer, the remainder of the drug price is reimbursed to the Rite Aid by the third-party payor.

35.36. In some situations, however, the copayment may only be charged as a percentage of the "usual and customary" price.  For instance, if a third-party payor's negotiated price for a specific drug is $40 with the customer being responsible for 25% of the drug as his or her copayment, but the "usual and customary" price of the drug is

- 11 -

only $20, the $20 price would take the place of the negotiated rate and the customer would only pay a copayment of $5 (25% of $20).

36.37. Rite Aid is well aware of both the definition of usual and customary, and how the "usual and customary" price of a particular prescription drug is ascertained. Rite Aid owns its own PBM, EnvisionRxOptions ("EnvisionRx").   EnvisionRx includes NCPDP Field No. 426-DQ, Usual and Customary Charge, as a mandatory field that a pharmacy must fill out on its payor sheets.

37.38. Further, EnvisionRx explicitly states in its Provider Portal Supplemental Policies, Procedures, and Regulations manual that pharmacies "may not collect copayments, coinsurances and deductibles that exceed your Pharmacy's [usual and customary price]."

**Big Box Retailers Exert Substantial Price Pressure on Generic Drugs**

38.39. In 2006, large "big box" retailers with pharmacy departments began offering hundreds of generic prescription drugs at significantly reduced prices.   For example, in September 2006, Wal-Mart began charging $4 for a thirty-day supply and $10 for a ninety-day supply of the most commonly prescribed generic drugs.   In November of that same year, Target began charging $4 for a thirty-day supply and $10 for a ninety-day supply of such prescription generic drugs.   Other retailers with pharmacy departments soon followed suit.

39.40. Notably, in the wake of Wal-Mart's decision to substantially reduce the prices of its prescription generic drugs, the Centers for Medicaid and Medicare Services ("CMS") specifically stated that it would treat Wal-Mart's new lower prices as the "usual and customary" prices for those drugs and use the prices as the basis for paying claims for prescription drug benefits.   Upon information and belief, Wal-Mart and Target properly reported to third-party payors these reduced prices as their "usual and customary" prices for the prescription generic drugs.

40.41. On information and belief, in 2008, in response to the big box retailers' decision to reduce the prices of many prescription generic drugs, Rite Aid started the discount drug RSP. Rite Aid does not charge individuals to join the RSP. Rather, the customer will simply provide information to Rite Aid, and, in exchange, Rite Aid, through the RSP, allows cash-paying customers to purchase prescription generic drugs on its formulary list for $9.99 for thirty-day prescriptions and $15.99 for ninety-day prescriptions, with some limited exceptions. There are over 350 generic drugs in various dosages on the formulary list and the list encompasses a number of the most widely prescribed generic drugs.

41.42. The RSP is not a special, limited, or one-time offer. It is also not a third-party plan, insurance, or a substitute for insurance. Rather, Rite Aid has continuously offered the RSP for multiple benefit years. Importantly, *any* cash-paying customer can join the RSP and avail themselves of the discounted prices. However, as stated previously, Rite Aid does not advertise the RSP in its pharmacies, including at the point of purchase, and further, its pharmacists do not advise customers using insurance that the drug being purchased may be cheaper through the RSP.

42.43. Accordingly, the price for prescription generic drugs that those enrolled in the RSP pay is the price that Rite Aid charges its customers (i.e., the general public). The CMS Manual notes that "where a pharmacy offers a lower price to its customers throughout a benefit year" the lower price is considered the "usual and customary" price, rather than a one time "lower cash price," when a customer uses a discount card to make the purchase.[8]

43.44. Accordingly, the RSP Prices are the "usual and customary" prices for the prescription generic drugs on Rite Aid's RSP formulary. Rite Aid's own explanation

---

[8] Centers for Medicare & Medicaid Servs., *Medicare Prescription Drug Benefit Manual*, Ch. 14-Coordination of Benefits, at 19 n.1 (2006), https://perma.cc/MW6A-H4P6.

of the "usual and customary" price, as adopted by EnvisionsRx, mandates this determination.  So too does the NCPDP and California's Welfare and Institutions Code.  And as mentioned above, the Seventh Circuit agrees, explaining that the "'usual and customary' price requirement should not be frustrated by so flimsy a devise as [a pharmacy's] 'discount program[].'"  *Kmart*, 824 F.3d at 645.

## A SPECIAL RELATIONSHIP EXISTS BETWEEN RITE AID AND MEMBERS OF THE CLASS

44.45. The relationship between a pharmacy and its customers is unique, special, and important.  Pharmacists, including those at Rite Aid, do more than just dispense medicine.  Pharmacists discuss with customers how they should take medications, counsel customers on the use of medicine (whether over-the-counter or prescription), and advise customers on general health topics, such as diet and exercise.  Trust is an essential component of the relationship between a pharmacist and a customer.  For instance, a customer needs to trust a pharmacist that a generic drug is just as effective as its brand-name counterpart.  Indeed, customers have come to expect such advice, and further, that pharmacists will provide them with ways to save money, such as using generics when available, without prompting.

45.46. Rite Aid has acknowledged this special relationship.  For instance, in a September 2007 article in *Pharmacy Times*, Michele Belsey, Vice President of College and Professional Recruitment at Rite Aid, stated when discussing pharmacists Rite Aid hires, "[w]e want them placed in a position where they can get to know the store and get to know the customers.  The relationship between patient and pharmacist is very important."

46.47. Rite Aid highlights this special relationship in its marketing.  For example, on its website, Rite Aid states:

> What makes Rite Aid pharmacists unique? For starters, they understand the importance of providing you with personalized care. Not only have our pharmacists received the extensive education necessary to meet

- 14 -

state licensing requirements, all our pharmacists are certified to provide immunizations. But it's their daily interactions with customers like you that matter most. All customers can securely email questions directly to a Rite Aid pharmacist."

47.48. Rite Aid even affirmatively represents to customers that they can rely on its pharmacists to "help [them] save money."

48.49. And Rite Aid encourages customers to develop this special relationship with its pharmacists, stating: "The better your relationship with your pharmacist, the better they can serve you—so stop by your local Rite Aid and get to know your pharmacist today."

## RITE AID ILLEGALLY INFLATES ITS "USUAL AND CUSTOMARY" PRICE

49.50. Although Rite Aid sought to retain and attract cash-paying customers by offering discounted prices on prescription generic drugs through the implementation of the RSP, it did not want to lose revenues by offering those same discounted prices to customers using insurance to make their prescription drug purchases.

50.51. Thus, under the guise that its RSP was not available to the general public, Rite Aid unlawfully continued to report its previous higher "usual and customary" prices to third-party payors. By reporting the artificially inflated "usual and customary" prices to third-party payors, Rite Aid was able to collect artificially inflated copayments from consumers, as well as artificially inflated residual amounts from third-party payors.

51.52. Rite Aid knew that third-party payors calculate the price for prescription drugs to be paid to the pharmacy based on whether the "usual and customary" price submitted is less than or greater than the negotiated price between Rite Aid and the third-party payor. Rite Aid also knew that if the "usual and customary" price for a particular prescription drug is less than the negotiated price, Rite Aid could not charge third-party payors a drug price that was greater than the "usual and customary" price.

- 15 -

1  Rite Aid's knowledge of these facts cannot be denied given its ownership of

2  EnvisionsRx, who dealt extensively with this issue as Rite Aid's PBM.

3      52.53.Notwithstanding the knowledge garnered through its relationship with

4  EnvisionsRx, Rite Aid knew the prices it could charge to customers using insurance to

5  purchase their prescription medications from its dealings and contractual relationships

6  with the third-party payors itself.  Indeed, third-party payors' pharmacy agreements and

7  manuals state, in detail, how a plan participant's copayment is determined.  These

8  agreements and manuals specifically contemplate a situation where the "usual and

9  customary" price is less than the negotiated amount, and explicitly forbid Rite Aid from

10  charging a copayment in excess of the "usual and customary" price under such

11  circumstances.  Rite Aid is in possession of these documents and is aware of their

12  contents.   Further, Rite Aid's own transaction data contains reimbursements

13  adjudicated under the above formula and other rules imposed by the third-party payors,

14  all which reflect general industry standards.

15      53.54.Moreover, Rite Aid need look no further than to its direct competitors,

16  such as Wal-Mart, Target, and Costco, who all, on information and belief, correctly

17  report the discounted prices offered through their respective prescription drug savings

18  programs as their "usual and customary" prices.

19      54.55.Rite Aid tried to avoid complying with its contractual obligations and

20  accepted industry standards (not to mention federal and state law) by implementing the

21  RSP, and instead of reporting the lower RSP Prices to third-party payors, knowingly

22  and intentionally reported false and inflated "usual and customary" prices.  In doing so,

23  Rite Aid created a new category of cash-paying customers—those purchasing

24  prescription generic medications through the RSP—while avoiding the lowering of

25  drug prices charged to third-party payors and their plan participants.

26      55.56.As previously explained, however, the RSP Prices for the cash-paying

27  customers are the actual "usual and customary" prices charged by Rite Aid for the

28

- 16 -

prescription generic drugs on the RSP formulary.  Nonetheless, Rite Aid conceals the RSP Prices from third-party payors, and instead of submitting the RSP Prices as its "usual and customary," continues to submit the higher prices as its purported "usual and customary" to third-party payors.

56.57.Rite Aid's scheme is made possible because third-party payors are not privy to the prices Rite Aid charges its cash-paying customers, including those using the RSP to purchase their prescription generic drugs.  Thus, third-party payors have no way of determining on their own whether the price Rite Aid submits as its "usual and customary" price is actually the price charged to cash-paying members of the general public, and therefore, are unaware that the price being submitted by Rite Aid is not the actual "usual and customary" price, but rather an artificially inflated amount.

57.58.In failing to report the more common RSP Prices as its "usual and customary" prices, Rite Aid continues to report prices that are significantly higher than the prices it charges the general public.

58.59.Beginning in late 2008, and continuing through the present, Rite Aid has reported to third-party payors artificially inflated "usual and customary" prices for the same prescription generic drugs that Rite Aid offers for lower prices under the RSP. Rite Aid has thereby caused (and continues to cause) plan participants (including each Plaintiff and other Class members) to pay false and inflated copayments for prescription generic drugs.

59.60.Importantly, the inflated "usual and customary" prices that Rite Aid reports to third-party payors do not vary based on any particular third-party plan.  In fact, for the same strength and quantity of a given drug, Rite Aid reports the same "usual and customary" prices to all third-party payors, despite any variations in their respective plans.

60.61.As part of its scheme, Rite Aid has reported "usual and customary" prices for generic prescription drugs that more than double the "usual and customary" prices

- 17 -

reported by some of its most significant competitors and its own RSP Prices.  The table below shows "usual and customary" prices submitted to California's Medicaid program for the purposes of claims adjudication:

| Drug | Discounted Prices Near 92101 Zip Code (Downtown San Diego, CA) | | | | | |
| | Vons | Walmart | Costco | CVS | Rite Aid | Rite Aid (Rx Savings Program Price) |
|---|---|---|---|---|---|---|
| Carvedilol 6.25 mg 60 Tablets | $15.50 | $11.37 | $12.50 | $45.54 | $93.26 | $9.99 |
| Paroxetine HCL 20mg 30 Tablets | $19.33 | $10.78 | $11.27 | $14.12 | $51.12 | $9.99 |
| Lisinopril/HCTZ 20, 12.5 mg 30 Tablets | $10.59 | $8.80 | $8.63 | $20.05 | $21.59 | $9.99 |
| Metformin HCL 1,000 mg 60 Tablets | $15.84 | $10.52 | $9.73 | $13.31 | $14.15 | $9.99 |
| Metoprolol Tartrate 50 mg 60 Tablets | $12.39 | $9.61 | $9.34 | $18.50 | $31.24 | $9.99 |
| Warfarin Sodium 5 mg 30 Tablets | $11.25 | $9.70 | $9.96 | $16.14 | $18.95 | $9.99 |
| Fluoxetine HCL 40 mg 30 Capsules | $17.89 | $14.45 | $13.56 | $52.58 | $58.28 | $9.99 |

61.62. As demonstrated above, the "usual and customary" prices submitted by Rite Aid to third-party payors are undeniably, and unlawfully, inflated.

62.63. But, since the RSP Prices are, in fact, the "usual and customary" prices Rite Aid charges, each Plaintiff and the other members of the Class should have also received these reduced prices when purchasing the prescription generic drugs at issue.

63.64. Rite Aid does not inform customers who use their insurance benefits to purchase generic prescription drugs (including each Plaintiff and the other members of the Class) that, for the drugs, the RSP Prices Rite Aid charges cash-paying customers, are lower than the copayments Rite Aid charges.  Rite Aid either wrongly conceals or omits such information by failing to tell customers using insurance about the RSP, or by misrepresenting to those customers that the RSP would not apply to their purchases.

64.65. For instances where the copayment charged to a customer was lower than the RSP price for the same drug, customers were unaware, and incapable of ascertaining, that their copayment would have been lower but for Rite Aid's practice of illegally submitting inflated "usual and customary" prices to third-party payors.

65.66. On information and belief, there have been millions of instances where Rite Aid intentionally submitted fraudulently inflated "usual and customary" pricing information to third-party payors in connection with prescription generic drug purchases made by each Plaintiff and other members of the Class during the Class Period (as defined below), including the specific transactions by each Plaintiff described herein.

## CLASS ALLEGATIONS

66.67. Plaintiffs brings this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselveshimself and the following national Class and California state Subclass:

CLASS

All persons or entities in the United States and its territories who, between January 2008 and the present ("Class Period"), paid for, in full or in part, a prescription generic drug included on the RSP formulary and were insured for the purchase through a third-party payor.

SUBCLASS

All persons or entities in the state of California who, during the Class Period, paid for, in full or in part, a prescription generic drug included on the RSP formulary and were insured for the purchase through a third-party payor.

The national Class and California state Subclass are collectively referred to as the "Classes."

67.68. Excluded from the Classes are Rite Aid, its officers, and directors.

- 19 -

68.69. The Classes consist of at least hundreds of thousands, and likely millions, of individual Rite Aid customers, making joinder impractical, in satisfaction of Federal Rule of Civil Procedure 23(a)(1).  The exact size of the Classes, and the identities of the individual members thereof, are ascertainable through Rite Aid's records, including, but not limited to, its billing and collection records.

69.70. The claims of each Plaintiff are typical of the Classes.  The claims of each Plaintiff and the Classes are based on the same legal theories and arise from the same unlawful and willful conduct, resulting in the same injury to the each Plaintiff and the Classes.

70.71. The Classes have a well-defined community of interest.  Rite Aid has acted and failed to act on grounds generally applicable to the each Plaintiff and the Classes, thus requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Classes.

71.72. There are many questions of law and fact common to the claims of each Plaintiff and the Classes, and those questions predominate over any questions that may affect only individual members of the Classes within the meaning of Rules 23(a)(2) and 23(b)(2) of the Federal Rules of Civil Procedure.

72.73. Common questions of fact and law affecting members of the Classes include, but are not limited to, the following:

(a)    whether Rite Aid artificially inflated the "usual and customary" prices that it reported to third-party payors pursuant to the  NCPDP reporting standard;

(b)    whether Rite Aid omitted and concealed material facts from its communications and disclosures with third-party payors and plan participants regarding its pricing scheme;

(c)    whether Rite Aid has wrongfully overcharged and continues to overcharge copayments to hundreds of thousands, and likely millions, of plan

1  participants (including each Plaintiff and the Classes) who purchased a prescription

2  generic drug listed on Rite Aid's RSP formulary at its pharmacies around the country;

3       (d)    whether Rite Aid has engaged in unfair methods of competition,

4  unconscionable acts or practices, and unfair or deceptive acts and/or practices in

5  connection with the pricing and sale of prescription generic drugs;

6       (e)    whether, as a result of Rite Aid's misconduct, each Plaintiff and the

7  Classes have suffered damages, and, if so, the appropriate measure of damages to which

8  they are entitled; and

9       (f)    whether, as a result of Rite Aid's misconduct, each Plaintiff and the

10  Classes are entitled to injunctive, equitable, and/or other relief, and, if so, the  nature of

11  such relief.

12      73.74. Absent a class action, most of the members of the Classes would find the

13  cost of litigating their claims to be prohibitive and will have no effective remedy.  The

14  class treatment of common questions of law and fact is also superior to multiple

15  individual actions or piecemeal litigation in that it conserves the resources of the courts

16  and the litigants and promotes consistency and efficiency of adjudication.

17      74.75. Plaintiffs will fairly and adequately represent and protect the interests of

18  the Classes.  Plaintiffs haves retained counsel with substantial experience in

19  prosecuting complex litigation and class actions.  Plaintiffs and his their counsel are

20  committed to vigorously prosecuting this action on behalf of the other respective

21  members of the Classes, and have the financial resources to do so.  Neither Plaintiffs

22  nor his their counsel haves any interests adverse to those of the other members of the

23  Classes.

24  **TOLLING OF THE STATUTE OF LIMITATIONS**

25      75.76. Plaintiffs and the other members of the Classes had neither actual nor

26  constructive knowledge of the facts constituting their claims for relief until recently.

27

28

- 21 -

76.77. As explained previously, Plaintiffs and the other members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conduct alleged herein until recently.

77.78. Rite Aid engaged in a secret scheme that did not reveal facts that would have put Plaintiffs or the other members of the Classes on inquiry notice that Rite Aid was charging inflated prices for prescription generic drugs.

78.79. Because Rite Aid's scheme was kept secret, Plaintiffs and the other members of the Classes were unaware of Rite Aid's unlawful conduct alleged herein and did not know that they were paying artificially inflated prices for prescription generic drugs during the Class Period.

79.80. Rite Aid actively concealed its RSP prescription generic drug pricing scheme from the public, including Plaintiffs and the other members of the Classes (and third-party payors), and failed to disclose the material fact that the prices Rite Aid reported to third-party payors for the prescription generic drugs included on the RSP formulary were far higher than the RSP Prices, and thus, not the actual "usual and customary" prices for those drugs.  Rite Aid charged each Plaintiff and the other members of the Classes copayments for the drugs they purchased that reflected Rite Aid's artificially inflated "usual and customary" prices.  Rite Aid also failed to post drug prices in a clear manner and in a way that would alert Plaintiffs and the other members of the Classes to the artificially inflated prices charged by Rite Aid.  Through its actions, Rite Aid misled Plaintiffs and the other members of the Classes and caused them to pay to Rite Aid inflated copayments for some of the most commonly prescribed generic drugs.

80.81. Rite Aid's affirmative acts alleged herein, including acts in furtherance of its unlawful scheme, were wrongfully concealed and carried out in a manner that precluded detection.

81.82. Rite Aid's unlawful pricing scheme was inherently self-concealing because it involved misrepresenting and falsely reporting the "usual and customary" prices for some of the most commonly prescribed generic drugs.  If Rite Aid had been open and notorious about its deceptive and unfair fraudulent pricing scheme, it would never have succeeded.

82.83. Plaintiffs and the other members of the Classes could not have discovered the alleged unlawful activities at an earlier date by the exercise of reasonable diligence because Rite Aid employed deceptive practices and techniques of secrecy to avoid detection of its activities.  Rite Aid concealed its activities by various means and methods, including affirmative misrepresentations regarding the actual "usual and customary" prices it charged for prescription generic drugs.

83.84. Because Rite Aid affirmatively concealed its scheme, Plaintiffs and the other members of the Classes had no knowledge until recently of the alleged unlawful activities or information which would have caused a reasonably diligent person to investigate whether Rite Aid committed the actionable activities detailed herein.

84.85. As a result of Rite Aid's active concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the other members of the Classes have as a result of the unlawful conduct alleged in this amended complaint.

85.86. Regardless, Rite Aid's illegal scheme is continuous and the pharmacy violates the law each time it charges inflated copayments to both new and repeat customers.

## COUNT I

### Against Defendants, on Behalf of the Subclass, for Violation of California Unfair Competition Law

86.87. Plaintiff Stafford incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.[9]

87.88. Plaintiff Stafford brings this claim individually and on behalf of the members of the Subclass.

88.89. Plaintiff Stafford and other members of the Subclass are "persons" within the meaning of California Business and Professions Code section 17204.

89.90. Rite Aid has unfairly obtained monies from Plaintiff Stafford and the other members of the Subclass through Rite Aid's: (i) unlawful business acts and/or practices; (ii) unfair business acts and/or practices; and (iii) unfair, deceptive, untrue and/or misleading advertising (including violations of California Business and Professions Code section 17500, *et. seq*.), including, among other things:

(a)    reporting to insurance companies, and state and federal health care entities fraudulent "usual and customary" prices for hundreds of generic prescription drugs;

(b)    misrepresenting to insurance companies and state and federal health care entities, Plaintiff Stafford, and the Subclass that the "usual and customary" price was greater than their copayments;

(c)    concealing from Plaintiff Stafford and the Subclass the true "usual and customary" prices of generic prescription drugs; and

(d)    wrongfully obtaining monies from Plaintiff Stafford and the Subclass as a result of Rite Aid's deception.

---

[9] Because the Court dismissed this cause of action (*see* ECF No. 287) Plaintiff Davis is not joining this claim.  The claim is being included in this amended complaint to preserve for appeal any issues related to the dismissal of the claim.

- 24 -

90.91. Rite Aid willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive.

91.92. The facts which Rite Aid misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Plaintiff Stafford and the Subclass' decisions about whether to purchase generic prescription drugs from Rite Aid, in that Plaintiff Stafford and the Subclass would not have purchased generic prescription drugs from Rite Aid for more than the RSP Prices but for Rite Aid's unfair and/or deceptive acts and/or practices.

92.93. As a direct and proximate result of Rite Aid's unfair and deceptive acts and/or practices, Plaintiff Stafford and the Subclass were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged thereby.

93.94. Rite Aid is therefore liable to Plaintiff Stafford and the Subclass for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT II

### Against Defendants, on Behalf of the Subclass, for
### Violation of California Consumer Legal Remedies Act

94.95. Plaintiffs incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.[10]

95.96. Plaintiffs brings this claim individually and on behalf of the members of the Subclass.

---

[10] Because the Court dismissed the portions of this cause of action that seek equitable relief (*see* ECF No. 287), Plaintiff Davis joins this claim only to the extent the claim seeks damages. The equitable portions of this claim are being included in this amended complaint to preserve for appeal any issues related to their dismissal.

- 25 -

96.97. Plaintiffs and other members of the Subclass are "consumers" within the meaning of California Civil Code section 1761(d).

97.98. The generic prescription drugs that Plaintiffs and other members of the Subclass purchased from Rite Aid are "goods" within the meaning of California Civil Code section 1761(a).

98.99. Plaintiffs and the other members of the Subclass' purchases were "transactions" within the meaning of California Civil Code section 1761(e).

99.100.    Rite Aid is a "person" within the meaning of California Civil Code section 1770(a).

100.101.    Plaintiffs and the other members of the Subclass have been damaged by Rite Aid's unfair methods of competition, and/or unfair and/or deceptive practices, in violation of California Civil Code section 1770(a), *et. seq*., which occurred in connection with transactions which resulted in Plaintiffs and the other members of the Subclass' purchase of goods.  These unfair methods of competition, and/or unfair and/or deceptive practices, included, among other things:

(a)    reporting to insurance companies and state and federal health care entities fraudulent "usual and customary" prices for hundreds of generic prescription drugs;

(b)    misrepresenting to insurance companies, state and federal health care entities, Plaintiffs, and the Subclass that the "usual and customary" price was greater than their copayments;

(c)    concealing from Plaintiffs and the Subclass the true "usual and customary" prices of generic prescription drugs; and

(d)    wrongfully obtaining monies from Plaintiffs and the Subclass as a result of Rite Aid's deception.

1   101.102.    Rite Aid willfully engaged in the unfair and/or deceptive acts and/or

2   practices described above and knew or should have known that those acts and/or

3   practices were unfair and/or deceptive.

4   102.103.    Pursuant to section 1782 of the California Consumer Legal

5   Remedies Act ("CLRA"), on June 15, 2017, Plaintiff Stafford sent Rite Aid in writing

6   by certified mail notification of the particular violations of CLRA section 1770

7   described above and requested that Rite Aid rectifies its practices described above and

8   give notice to all affected consumers of its intent to so act.  Rite Aid received the notice

9   on June 19, 2017.

10   103.104.    Rite Aid failed to provide appropriate relief for its violations of

11   CLRA sections 1770(a)(5), (7), (9), and (16) within thirty days of receipt of Plaintiff

12   Stafford's notifications.   In accordance with CLRA section 1782(b), Plaintiffs and the

13   Subclass are entitled, under CLRA section 1780, to recover and obtain the following

14   relief for Rite Aid's violations of CLRA sections 1770(a)(5), (7), (9), and (16):

15        (a)    actual damages under CLRA section 1780(a)(1);

16        (b)    restitution of property under CLRA section 1780(a)(3);

17        (c)    punitive damages under CLRA section 1780(a)(4) because Rite Aid

18   has engaged in fraud, malice or oppression; and

19        (d)    any other relief the Court deems proper under CLRA section

20   1780(a)(5).

21   104.105.    Plaintiffs seeks an award of attorneys' fees pursuant to, *inter alia*,

22   CLRA section 1780(e) and California Code of Civil Procedure section 1021.5.

23   105.106.    The facts which Rite Aid misrepresented and/or concealed, as

24   alleged in the preceding paragraphs, were material to Plaintiffs and the Subclass'

25   decisions about whether to purchase generic prescription drugs from Rite Aid, in that

26   Plaintiffs and the Subclass would not have purchased generic prescription drugs from

27

28

- 27 -

1  Rite Aid for more than the RSP Prices but for Rite Aid's unfair and/or deceptive acts

2  and/or practices.

3      ~~106.~~107.    As a direct and proximate result of Rite Aid's acts described above,

4  Plaintiff~~s~~ and the other members of the Subclass paid more for Rite Aid's products than

5  they would have and/or purchased products they would not have purchased but for Rite

6  Aid's deceptive conduct.  Plaintiff~~s~~ and the other members of the Subclass therefore

7  seek injunctive relief pursuant to CLRA section 1782(d), to enjoin Rite Aid's ongoing

8  wrongful acts described herein.

9                              **COUNT III**

10            **Against Defendants, on Behalf of the Class and Subclass,**
11                    **for Unjust Enrichment**

12      ~~107.~~108.    Plaintiff Stafford incorporates by reference and realleges each and

13  every allegation contained above, as though fully set forth herein.[11]

14      ~~108.~~109.    By means of Rite Aid's wrongful conduct alleged herein, Rite Aid

15  knowingly charges plan participants artificially high copayments for generic

16  prescription drugs included in the RSP in a manner that is unfair and unconscionable.

17      ~~109.~~110.    Rite Aid knowingly received and retained wrongful benefits and

18  funds from Plaintiff Stafford, the Class, and Subclass.  In so doing, Rite Aid acted with

19  conscious disregard for the rights of Plaintiff Stafford, the Class, and Subclass.

20      ~~110.~~111.    As a result of Rite Aid's wrongful conduct as alleged herein, Rite

21  Aid has been unjustly enriched at the expense of, and to the detriment of Plaintiff

22  Stafford, the Class, and Subclass.

23      ~~111.~~112.    Rite Aid's unjust enrichment is traceable to, and resulted directly

24  and proximately from, the conduct alleged herein.

25  _____

26  [11]  Because the Court dismissed this cause of action (*see* ECF No. 287) Plaintiff Davis
27  is not joining this claim.  The claim is being included in this amended complaint to
   preserve for appeal any issues related to the dismissal of the claim.

28                              - 28 -

112.113.    Under the common law doctrine of unjust enrichment, it is inequitable for Rite Aid to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of artificially inflated prices on Plaintiff Stafford, the Class, and Subclass in an unfair and unconscionable manner. Rite Aid's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

113.114.    Plaintiff Stafford, the Class, and Subclass did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Rite Aid to retain these wrongfully obtained proceeds.

114.115.    Rite Aid is therefore liable to Plaintiff Stafford, the Class, and Subclass for restitution in the amount of Rite Aid's wrongfully obtained profits.

## COUNT IV

### Against Defendants, on Behalf of the Class and Subclass, for Negligent Misrepresentation

115.116.    Plaintiffs incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.117.    Under the circumstances alleged, Rite Aid owed a duty to Plaintiffs, the Class, and Subclass to provide them with accurate information regarding the prices of its generic prescription drugs.

117.118.    Rite Aid misrepresented and/or concealed the true "usual and customary" prices of generic prescription drugs that are included in the RSP. Rite Aid made such misrepresentations by reporting artificially inflated "usual and customary" prices for such drugs to third-party payors.

118.119.    Rite Aid had no reasonable grounds to believe that these misrepresentations and/or omissions were true. The prices that Rite Aid reported to

- 29 -

1  third-party payors were substantially (and unjustifiably) higher than the prices it

2  charged under its RSP to cash-paying customers.

3      119.120.     Rite Aid intended to induce Plaintiffs, the Class, and Subclass to

4  rely on its misrepresentations and/or omissions.  Rite Aid knew that Plaintiffs, the

5  Class, and Subclass would rely on its misrepresentations and/or omissions regarding

6  "usual and customary" prices and, as a result, would pay copayments higher than the

7  actual "usual and customary" prices for those generic prescription drugs.

8      120.121.     Plaintiffs, the Class, and Subclass justifiably relied upon Rite Aid's

9  misrepresentations and/or omissions in that Plaintiffs, the Class, and Subclass would

10  not have purchased generic prescription drugs from Rite Aid for more than the RSP

11  Prices but for Rite Aid's misrepresentations and/or omissions.  Plaintiffs, the Class, and

12  Subclass' reliance on Rite Aid's misrepresentations and/or omissions was, thus, to their

13  detriment.

14      121.122.     As a proximate result of Rite Aid's negligent conduct, Plaintiffs, the

15  Class, and Subclass have been damaged because they paid copayments for generic

16  prescription drugs that were far higher than the prices they would have paid but for

17  Rite Aid's misconduct.

18      122.123.     Rite Aid is therefore liable to Plaintiffs, the Class, and Subclass for

19  the damages they sustained.

## PRAYER FOR RELIEF

21      WHEREFORE, Plaintiffs prays for judgment against Rite Aid, and requests as

22  follows:

23      A.     That all Class members are owed at least the difference between their paid

24  copayments and the  "usual and customary" price offered to the general public for all

25  prescriptions purchased during the life of the RSP;

- 30 -

**B.**     That the Court certify this action as a class action, proper and maintainable pursuant to  Rule 23 of the Federal Rules of Civil Procedure, and declare that each Plaintiff is a proper  Class  representative;

**C.**     That the Court award compensatory, consequential, and general damages in an amount to be determined at trial, including under CLRA section 1780(a)(1);

**D.**     That the Court grant permanent injunctive relief to prohibit Rite Aid from continuing to  engage in the unlawful acts, omissions, and practices described herein, including under CLRA section 1780(a)(2);

**E.**     That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Rite Aid as a result of its unlawful acts, omissions, and practices, including under CLRA section 1780(a)(3);

**F.**     That the Court award statutory treble damages, and punitive or exemplary damages, to the extent permitted by law, including under CLRA section 1780(a)(4);

**G.**     That the unlawful acts alleged in this amended complaint be adjudged and decreed to be a violation of the unfair and deceptive business acts and practices in violation of the California Unfair Competition Law and CLRA;

**H.**     That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, including under CLRA section 1780(e);

**I.**     That the Court award pre- and post-judgment interest at the maximum legal rate; and

**J.**     That the Court grant all such other relief as it deems just and proper, including under CLRA section 1780(a)(5).

## <u>JURY DEMAND</u>

Plaintiffs hereby demands a trial by jury on all issues so triable.

Dated: _____, 20230        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                                                  /s/ *DRAFT*

- 31 -

1
2
3
4
5
6
7
8
9
10

Joseph P. Guglielmo (*pro hac vice*)
Erin Green Comite (*pro hac vice*)
Carey Alexander (*pro hac vice*)
Ethan S. Binder (*pro hac vice*)
Amanda M. Rolon (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
jguglielmo@scott-scott.com
ecomite@scott-scott.com
calexander@scott-scott.com
arolon@scott-scott.com
ebinder@scott-scott.com

11
12
13
14
15
16

**SCOTT+SCOTT ATTORNEYS
AT LAW LLP**
Hal D. Cunningham (CA 243048)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
hcunningham@scott-scott.com

17
18
19
20
21
22
23
24
25

**ROBBINS GELLER RUDMAN
 & DOWD LLP**
David W. Mitchell (199706)
Robert R. Henssler, Jr. (216165)
Arthur L. Shingler, III (181719)
655 W. Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619-231-1058
Facsimile: 619-231-7423
davidm@rgrdlaw.com
bhenssler@rgrdlaw.com
ashingler@rgrdlaw.com

26
27

**ROBBINS GELLER RUDMAN &
& DOWD LLP**

28

- 32 -

Stuart A. Davidson (*pro hac vice*)
Mark J. Dearman (*pro hac vice*)
Eric S. Dwoskin (*pro hac vice*)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
Facsimile: 561/750-3364
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com
edwoskin@rgrdlaw.com

**LEVIN SEDRAN & BERMAN, LLP**
Charles E. Schaffer (*pro hac vice*)
David C. Magagna, Jr. (*pro hac vice*)
510 Walnut Street – Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
cschaffer@lfsblaw.com
dmagagna@lfsblaw.com

**ROBBINS LLP**
George C. Aguilar (126535)
Gregory E. Del Gaizo (247319)
5060 Shoreham Place
San Diego, CA 92112
Telephone: 619-525-3990
Facsimile: 619-525-3991
gaguilar@robbinsarroyo.com
gdelgaizo@robbinsarroyo.com

**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
Alfred G. Yates, Jr. (*pro hac vice*)
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
Telephone: 412-391-5164
Facsimile: 412-471-1033
yateslaw@aol.com

- 33 -

1   *Attorneys for Plaintiffs*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOURTH AMENDED CLASS ACTION COMPLAINT
LEAD CASE NO.: 3:17-CV-01340-TWR-AHG

## CERTIFICATE OF SERVICE

I hereby certify that on _____, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

/s/ *DRAFT*_____