# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYON STAFFORD and ELIZABETH DAVIS, Individually and on Behalf of All Others Similarly Situated, | Civil No. 3:18-cv-00152-AJB-JLB |
| Plaintiffs, | The Hon. Todd W. Robinson |
| v. | |
| RITE AID CORPORATION, | |
| Defendant. | |

## REPORT OF KENNETH W. SCHAFERMEYER, PH.D.
## October 6, 2023

## REDACTED

# Table of Contents

I.   INTRODUCTION .................................................................................................... 4

II.  ASSIGNMENT ...................................................................................................... 5

III. SUMMARY .......................................................................................................... 6

IV. BACKGROUND ................................................................................................... 7

V.  BASIS OF OPINIONS ......................................................................................... 8

   A.  Third-Party Prescription Programs ................................................................ 8

      1.  Pharmacy Benefit Managers ..................................................................... 9

      2.  Third-Party Claims Adjudication Process ................................................. 9

   B.  Purpose of the U&C Price Ceiling ............................................................... 12

   C.  Pharmacies, PBMs and the U&C Price Ceiling ........................................... 13

   D.  Pharmacies Have Incentives to aMnipulate U&C Price Reporting ............... 14

   E.  Rite Aid's RSP Cash Discount Program ...................................................... 15

VI. THE INDUSTRY DEFINITION OF "USUAL AND CUSTOMARY PRICE" ................. 18

   A.  National Council for Prescription Drug Programs ("NCPDP") Standards ........ 19

   B.  Medicare Part D is Consistent with Industry Standards .................................... 20

   C.  State Medicaid Programs are Consistent with Industry Standards ................... 22

   D.  Federal Employee Program (FEP) Insurance Benefits are Consistent with Industry Standards ...................................................................................................... 24

   E.  Court and Arbitration Findings Related to U&C Reflect Long-Standing Industry Understanding and Practice ............................................................................... 25

   F.  Summary of U&C Definitions ...................................................................... 28

VII. RITE AID AND THE U&C PRICE .................................................................... 28

VIII. RSP TRANSACTIONS ARE NOT ACTUALLY ADJUDICATED .................................. 33

IX. THE RSP WAS NOT A THIRD-PARTY CASH DISCOUNT CARD PROGRAM .......... 39

X.  THE INDUSTRY STANDARD IS REFLECTED IN PROVIDER MANUAL DEFINITIONS OF U&C ................................................................................................ 41

XI. EVIDENCE INDICATES THAT RITE AID DID NOT INTEND TO DISCLOSE THAT IT WAS NOT REPORTING RSP PRICES AS U&C ..................................................... 43

XII. PBMS HAVE INCENTIVES TO ALLOW RITE AID TO MANIPULATE U&C PRICES 45

## Abbreviations Used in this Report

| | |
|---|---|
| AAC | Actual Acquisition Cost |
| AMCP | Academy of Managed Care Pharmacy |
| AWP | Average Wholesale Price |
| BIN | Bank Identification Number |
| CMS | Centers for Medicare and Medicaid Services |
| DUR | Drug Utilization Review |
| EAC | Estimated Acquisition Cost |
| FEP | Federal Employees Health Benefits Program |
| GAO | Government Accountability Office |
| GHP | Government Health Program |
| HIPAA | Health Insurance Portability and Accountability Act |
| HMO | Health Maintenance Organization |
| MAC | Maximum Allowable Cost |
| MFPC | Missouri Foundation for Pharmaceutical Care |
| NCPDP | National Council for Prescription Drug Programs |
| NDC | National Drug Code |
| OAR | Oregon Administrative Regulation |
| PBM | Pharmacy Benefit Manager |
| PCN | Processor Control Number |
| PPO | Preferred Provider Organization |
| PSAO | Pharmacy Services Administrative Organization |
| RSP | Rx Savings Program |
| SVP | Senior Vice President |
| TPP | Third-Party Payer |
| TrOOP | True Out-of-Pocket (Expense) |
| WAC | Wholesale Acquisition Cost |
| VP | Vice President |

3

## I.     INTRODUCTION

1.  I am currently the owner of Pharmacy Administration Consultants, LLC – a firm that provides consulting and litigation support on topics related to pharmacy operations and managed care coverage of prescription drugs.

2.  I have worked as a professor of pharmacy administration at the University of Health Sciences and Pharmacy in St. Louis, Missouri (formerly known as the St. Louis College of Pharmacy).  In a previous role at the University, I served as the Director of Graduate Studies and headed a master's degree program in Managed Care Pharmacy. I currently hold the title "Professor Emeritus."

3.  I was also the founder and president of The Medical Certification Institute, Inc., an organization that provided training and certification for pharmacy technicians until the company was sold in 2010 to Ascend Learning, a subsidiary of Jones and Bartlett Publishing.

4.  I hold M.S. and Ph.D. degrees in pharmacy administration specializing in health economics and health systems management and earned graduate credits in business.

5.  Since my licensure as a pharmacist in 1976, I have worked with, taught about, and analyzed the operations of pharmacies, their financial performance, their costs of dispensing, and their reimbursement by private and public prescription programs, including government-supported health care programs such as Medicare, Medicaid, TRICARE, and the Federal Employees Health Benefits Program.

6.  I have taught master's-level courses in managed health care and managed care pharmacy, dealing with healthcare policy issues that include Medicare, Medicaid, managed care organizations, and pharmacy benefit managers ("PBMs").  Students enrolled in the program were mostly pharmacists working in middle-management positions for managed care organizations, pharmaceutical manufacturers, and government agencies.

7.  I was the Director of Professional Relations for the Missouri Foundation for Pharmaceutical Care ("MFPC"), a Pharmacy Services Administrative Organization ("PSAO"), starting in 1976.  To the best of my knowledge, I was the first pharmacist in the United States working full time for a PSAO.  MFPC was one of the organizations involved with the work group that created the National Council for Prescription Drug Programs ("NCPDP") in the mid-1970s.  I am familiar with the work that went into adopting the first Universal Claim Form as well as definitions of key terms that NCPDP uses in the standard claims adjudication process.

8.  I represented pharmacists for nine years as a lobbyist in Virginia and Kansas and was intimately involved with public policy issues affecting health care, especially state Medicaid programs.

9.  I also served as Executive Director of the Kansas Pharmacy Service Corporation in the mid-1980s, an organization that managed the Kansas Pharmacy Network – a PSAO that facilitated employer group contracting for prescription benefits, including claims processing.

10. I have also worked in an advisory role for PBMs and state Medicaid programs in Indiana and Missouri, including service as Chair of the Missouri Medicaid Prior Authorization

Task Force. I also participated in numerous research projects involving Medicaid prescription reimbursement issues.

11. I have authored, co-authored, or edited more than 30 books and manuals, including multiple editions of *Healthcare Delivery: A Primer for Pharmacists*. I have also authored chapters in eight other textbooks, mostly covering financial, economic, and systems management issues related to managed care, Medicare, and Medicaid.

12. I have been designated as a Fellow of the Academy of Managed Care Pharmacy, an 8,000+ member organization that has designated a total of only 52 individuals as fellows in its 35-year history. I am also a Fellow of the American Pharmacists Association.

13. Through my education and experience, I have personal knowledge of the practices of PBMs, state and federal healthcare programs, third-party payers ("TPPS"), and pharmacies as they relate to the purchasing, pricing, dispensing, and reimbursement of prescription drugs. My *curriculum vita* is attached as **Exhibit A** and contains a list of all publications I have authored in the last ten years and the cases in which I have testified within the last five years.

14. My report is based on my knowledge of the industry, professional experience, and review of relevant industry publications, statutes, regulations, federal and state regulatory guidance, and relevant case law and pleadings, as well as documents from the evidentiary record in this lawsuit, including deposition transcripts and exhibits, which have been provided to me by Plaintiffs' counsel. A list of the materials I considered in forming my opinions is attached as **Exhibit B**.

15. I am compensated at the rate of $800 per hour for research, review, preparation, and testimony. My colleague, Dr. Scott Griggs, has assisted me in this case with research and other technical matters and is compensated at the rate of $350 per hour. Our compensation is not dependent upon rendering any particular opinion.

16. I reserve the right to amend or update my opinions based on any information that may become available to me or known by me in the future.

## II. ASSIGNMENT

17. Plaintiffs in this case include individual customers who are beneficiaries[1] of private commercial health insurance benefit plans that provide prescription drug benefits.

18. Defendants Rite Aid Corporation and Rite Aid Hdqtrs. Corp. (collectively, "Rite Aid") is a large pharmacy chain that, at times during the relevant period, operated about 2,213 retail pharmacy stores in 17 states, including 474 pharmacies in the state of California.[2] At other times during the relevant time period Rite Aid operated up to roughly 4,500 retail pharmacy

---

[1] Beneficiaries of health insurance plans are often referred to as "members."

[2] Rite Aid website, "2213 Rite Aid Stores in the United States." Retrieved from https://www.riteaid.com/locations/index.html (accessed Jul. 28, 2023).

stores in 31 states and the District of Columbia, including over 580 pharmacies in the state of California.[3],[4]

19.   Plaintiffs in this case allege that Rite Aid operated retail pharmacies and, in so doing, perpetrated a "deceptive and unfair pricing scheme to overcharge customers with third-party health care plans on their purchases of generic prescription drugs at Rite Aid pharmacies."[5]  Specifically, Plaintiffs allege Rite Aid should have included the discounted prices of prescription drugs sold through its Rx Savings Program ("RSP") when reporting its usual and customary ("U&C") prices on insurance reimbursement claims.  Inflating U&C prices allegedly resulted in customers overpaying prescription copayments.  This conduct is alleged to have started in 2008.[6]

20.   I understand that Plaintiffs seek to represent a Class as follows:

> All persons in the state of California who, during the period January 1, 2008 through October 12, 2020, using prescription drug insurance provided by a third-party payer, paid, in full or in part, for a prescription drug available through Rite Aid's Rx Savings Program and the amount paid by the person was inflated because the Rx Savings Program price was not included when determining the usual and customary price to report.[7]

21.   I have been retained by the Plaintiffs to provide testimony regarding the meaning and purpose of the term "usual and customary" ("U&C") in the retail pharmacy industry, and to compare the industry's U&C pricing requirements to the reporting practices of Rite Aid.  I will also address the financial incentives for pharmacies to use and pharmacy benefit managers ("PBMs") to allow inflated U&C prices for third-party prescription drug claims and the adverse impact of such practices on insured customers of Rite Aid, like the Plaintiffs.

22.   To the extent that I refer to court and arbitration opinions, statutes, regulations, government advisory opinions, and other documents in this report, I am not giving a legal opinion, nor should my opinions be construed as such.  Instead, my reliance on such documents serves only to inform, confirm and support my long-held understanding of the issues involved in this case.  In particular, court and arbitration opinions that I reference confirm what industry standards and common sense have long indicated: that Rite Aid should have included its RSP discount prices when determining the U&C prices to report for prescriptions covered by insurance.

## III.   SUMMARY

---

[3] Fourth Amended Class Action Complaint, *Stafford v. Rite Aid* at 28.

[4] Jill Disis, "Walgreens finally buys Rite Aid stores in a diminished deal" https://money.cnn.com/2017/09/19/news/walgreens-rite-aid-deal/index.html (last accessed Sep. 26, 2022).

[5] Fourth Amended Class Action Complaint, *Stafford v. Rite Aid* at 1.

[6] *Id*., at 41.

[7] I have been told to consider the following to be excluded from the Class: (1) Defendants Rite Aid Corporation and Rite Aid Hdqtrs. Corp., their management, employees, subsidiaries, and affiliates; (2) the Court, judicial staff, and members of their immediate families; and (3) beneficiaries of government-funded prescription drug insurance plans.

23. In this report, I demonstrate that the use of "lower of" logic is common and standard throughout the industry and that the industry definition of U&C is common and has been established for decades.

24. I will also explain that Rite Aid should have included its RSP prices when determining the U&C prices to report.

25. Furthermore, I will explain that Rite Aid had financial incentives to manipulate U&C prices and failed to meet the reasonable expectations of TPPs and their insured beneficiaries by failing to include its RSP prices when determining the U&C prices to report. I will further explain that PBMs were incentivized to allow the manipulation,

## IV.   BACKGROUND

26. The U&C concept is fairly simple.  There are two types of prescription transactions: (1) "insured transactions," in which prescription claims are subject to payment in whole or in part by a private or government third-party prescription plans; and (2) "uninsured transactions," in which the customer pays the full amount for a prescription without using an insurance benefit.  The latter, "uninsured transactions," are also known as "cash transactions," because they do not utilize insurance.  Depending on how a prescription drug is purchased, the medication is either paid by an "insured" customer or a "cash" customer.[8]

27. The U&C price sets the ceiling for the amounts charged to third-party prescription plans (and the prices charged to those plans' members or beneficiaries in the form of patient cost sharing).[9]  This is because insurers do not want pharmacy customers paying *without* insurance (*i.e.*, "cash customers") to be charged lower prices than the insurers' own members are being charged for the same drug.  Insurance plans are designed to reduce costs – not make health care more expensive.  Allowing pharmacy customers without insurance to get routinely lower prices than those with insurance would defeat the cost-containment purpose of insurance.

28. To be clear, a "price ceiling" is defined as "the mandated maximum amount a seller is allowed to charge for a product or service."[10]

---

[8] Any prescription that does not involve insurance coverage is referred to as a "cash" prescription whether or not the price is discounted and whether the payment is made by currency, check, credit card, debit card, or other form of payment.

[9] Patient cost sharing effectively decreases third-party plans' costs by shifting some responsibility for payment directly to the patient.  This practice is designed to not only decrease prescription costs, but to also decrease utilization rates. Patient cost sharing can take one of three forms: (1) copayment – a specified dollar amount charged to patients each time they receive a prescription (*e.g.*, $10 per prescription); (2) deductible – a specified amount that patients are required to cover out-of-pocket for certain services before insurance coverage becomes effective (*e.g.*, the first $500 of prescription costs); and (3) coinsurance – a specified percentage of prescription costs charged to patients each time they receive a prescription (*e.g.*, 20% of the price).  Cost-sharing provisions may also include out-of-pocket limits or maximum benefit limits.  While copayments are the most common form of patient cost sharing for prescription drugs, whenever the term "copayment" is used in this report, it is recognized that other forms of patient cost sharing (*i.e.*, deductibles and coinsurance) may apply as well.

[10] *What is a Price Ceiling? available at* https://www.investopedia.com/terms/p/price-ceiling.asp.

29. Decades of industry practice establish that the "U&C price" has consistently been understood in the industry to mean the lowest price that a pharmacy would widely and consistently offer to cash customers (*i.e.*, customers paying without using insurance), including discounts offered by the pharmacy to cash customers for a specific drug product on a particular day at a particular pharmacy.

30. The United States Court of Appeals for the Seventh Circuit, for example, supports my long-held understanding that the U&C serves as a price ceiling. The Court held that:

> The purpose of these regulations [42.C.F.R.] § 447.200 (citing 42 USC § 1396(a)(30))] is clear: state agencies are not to pay more for prescribed drugs than the prevailing market price…. Regulations related to "usual and customary price" should be read to ensure that where the pharmacy regularly offers a price to its cash purchasers of a particular drug, Medicare Part D receives the benefit of that deal.[11]

31. Rite Aid has admitted that the RSP is "not insurance."[12] Rite Aid's RSP prices represented the prices Rite Aid offered to cash customers. By failing to report or otherwise include its RSP prices when determining the U&C price to report, Rite Aid's RSP discount program defeated the reasonable expectations of insured customers, such as Plaintiffs, for whom it would be reasonable to expect to not pay more to receive RSP drugs than the amounts paid by cash customers (*i.e.*, customers not using insurance).

32. When the RSP price for a specified drug was offered to cash customers at any Rite Aid pharmacy and represented the lowest price Rite Aid offered to cash customers for that drug, Rite Aid should have included its RSP price when determining the U&C price for that drug.

## V.   BASIS OF OPINIONS

### A.   Third-Party Prescription Programs

33. There are three major sources of payment for prescription drugs in the United States: (1) private third-party prescription plans; (2) public third-party prescription plans (*e.g.*, Medicaid, Medicare, Federal Employees Health Benefits Program ("FEP") and TRICARE); and (3) cash-pay (or private-pay) customers. In 2008, 44% of independent pharmacies' prescription volume was covered by private insurance, 44% was covered by public funds, and 12% was paid out-of-pocket.[13] By 2018, the proportion changed slightly with 37% covered by private insurance, 54% covered by public funds, and 9% paid out-of-pocket.[14] This action concerns only private third-party prescription plans and the class-member beneficiaries of those private plans.

---

[11] *Garbe*, 824 F.3d at 644.

[12] ███████████████████████████████████████████████████████
███████████████████████████   ███████████████████████████
███████████████████

[13] National Community Pharmacists Association, *NCPA Digest*, 2009, p. 27.

[14] National Community Pharmacists Association, *NCPA Digest*, 2019, p. 6.

34. Third-party prescription plans do not buy drugs.  Instead, they reimburse providers such as pharmacies that dispense covered drugs to program beneficiaries.

### 1.     Pharmacy Benefit Managers

35. Both private commercial insurance plans and public GHPs are usually administered by PBMs that help the plans isolate cost centers and concentrate a workforce of prescription benefit experts to manage the plans' prescription drug benefits.  PBMs provide two basic functions: (1) they serve as brokers for prescription benefits by arranging transactions between payers and providers, and (2) they use databases and various tools to report on and to influence the cost and quality of healthcare services.  The administrative services provided by PBMs include:

- Combining existing pharmacies into large networks
- Communicating with both patients and providers to explain and update administrative policies
- Providing reports to plan sponsors
- Identifying eligible beneficiaries
- Processing claims submitted by pharmacies
- Reimbursing network pharmacies
- Creating and maintaining formulary systems
- Performing disease-management programs
- Conducting drug utilization review (DUR)
- Educating providers
- Auditing pharmacies
- Tracking beneficiaries' out-of-pocket costs, such as deductibles, copayments and coinsurance for purposes of administering cost-sharing provisions.

### 2.     Third-Party Claims Adjudication Process

36. Pharmacies are required to adhere to industry standards for prescription insurance claims transmission and payment (*i.e.*, "claims adjudication").

37. Adjudication of a prescription drug claim is the process of accepting, reviewing, editing, and making judgments regarding the payment of insured prescription drug claims.  It involves not only eligibility and payment determinations, but many other functions, such as "prospective DUR [drug utilization review] edits, drug-to-drug interaction checking, duplicate therapy detection [,] validating the dosage of the drug and duration of therapy [and] evaluation of a drug in relation to the patient's health condition, age, gender or

9

prescription history."[15]   The adjudication process can also involve step-therapy or prior authorization and focusing on guidelines based on specific conditions or disease states.[16]

38.   Two of the claims adjudication basic functions relevant to this case are:

(1) Calculating the division of the purchase price between the insured beneficiary and the third-party plan, including the consideration of any unsatisfied deductibles or caps on out-of-pocket expenditures or benefits. This would be impossible if the system did not store and link data on the insured beneficiary's prior claims activity; and

(2) Committing the third-party plan to pay the pharmacy its share of the drug price together with an agreed upon dispensing fee.  Aggregated insurance billing and prompt payment to the pharmacy would be impossible without this underlying accounting detail.

39.   Adjudication is necessary for insured prescriptions because the pharmacy does not possess the above information; the pharmacy has to obtain it from the PBM.

40.   Prescription drug claims adjudication, by definition, involves insurance.   Claims adjudication functions are not necessary for transactions that do not involve insurance and are paid in full by the customer.

41.   Rite Aid, like most retail pharmacies, submits insured prescription drug claims to PBMs for adjudication using an online, real-time claims adjudication system that typically processes claims within seconds.

42.   This real-time claims adjudication system was the result of industry-wide collaboration.  In the 1970s, pharmacies, insurers and prescribers all recognized the critical importance of arriving at a single, standardized, nationwide system that would result in migration away from paper prescriptions and claims.[17]   The multi-disciplinary National Council for Prescription Drug Programs ("NCPDP") was charged with designing a universal claim form and, eventually, standards for electronic processing of claims that would rely on "Telecommunications."[18]   The development of an electronic messaging protocol and precise data architecture was shared by the entire industry and is referred to generally as an industry standard.[19,20,21]

---

[15] Discussion of prescription benefit management adjudication systems in Black GE and Romza JH, in Robert P. Navarro, *Managed Care Pharmacy Practice*, (Jones and Bartlett Publishers, 2nd ed., 2009) pp. 205-07.

[16] *Id*.

[17] NCPDP, "Pharmacy: A Prescription for Improving the Healthcare System," October 2009, at p.8.

[18] *Id*., at p. 5.

[19] *Id*., at p. 12.

[20] Robert Garis, *et al.*, "Examining the Value of Pharmacy Benefit Management Companies," 61 *Am. J. of Health Sys. Pharmacists* 1, 83 (2004), http://www medscape.com/viewarticle/466688_4 (last accessed Jul. 24, 2021).

[21] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

43. The first set of claims adjudication standards was issued in 1988, and there have since been several comprehensive updates ("versions") as well as a continuous process of minor enhancements and additions.[22]

44. Use of the NCPDP standards for prescription insurance transactions became mandatory under HIPAA regulations in 2003.[23,24]  Version D.0 has been in effect since 2010.[25]

45. The participants in the pharmacy supply chain, including insured beneficiaries and third-party plans, rely on the accurate reporting of data in accordance with NCPDP standards in order for the telecommunications architecture to function.  Without reporting of accurate data, the HIPAA-mandated telecommunications infrastructure cannot function as the participants in the pharmacy supply chain expect.

46. Each participant that reports data is expected to report data accurately, pursuant to these industry standards, and the very fact of reporting using NCPDP standards signals to other participants in the pharmacy supply chain, including insured beneficiaries and third-party plans, that the data is being reported accurately pursuant to industry standards.

47. When a pharmacy submits prescription drug claims through a PBM's online adjudication system, NCPDP standards specify that the pharmacy must submit its U&C prices in the U&C Pricing Segment Field 426-DQ.[26,27]  Only one value can be added to the field, which is unique to a particular prescription drug product, strength, and dosage form identified by a national drug code ("NDC") number.

48. Once the prescription drug information is submitted by a pharmacy and is accepted for reimbursement by the adjudication system (*i.e.*, the claim is eligible for reimbursement), PBMs and their claims adjudication systems rely upon the information submitted by the pharmacy to determine both the amount that third-party plans and insured beneficiaries must pay for a given prescription drug.  If pharmacies like Rite Aid do not submit accurate U&C price information, then the prescription drug adjudication system will not function

---

[22] NCPDP, "Pharmacy: A Prescription for Improving the Healthcare System," October 2009, at pp. 1 & 12-13.

[23] 45 CFR §162 (2003).

[24] *Federal Register*, August 17, 2000 (Volume 65, Number 160), at pp. 50311-50372.  *See also* NCPDP, "*Pharmacy: A Prescription for Improving the Healthcare System*," October 2009, at p. 14.

[25] NCPDP, *Telecommunication Standard: Implementation Guide Version D.0*, August 2010 (ANSI approved in August 2007). NCPDP has published updates of the *Telecommunication Standard* since Version D.0, but D.0 is still the version mandated by HIPAA (Centers for Medicare & Medicaid Services (CMS), "Adopted Standards and Operating Rules," accessed September 15, 2021 at https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/HIPAA-ACA/AdoptedStandardsandOperatingRules html).

[26] *NCPDP Data Dictionary* (Sep. 1999) at 71. Available at: http://www.hosinc.com/products/ascend/help/billing/EDI%20Manuals/data%20dictionary%20september%2099.pdf (accessed Aug 16, 2022).  This same definition appears in the current version of the *Data Dictionary* (2007) and remains in effect today.  *See also* https://ushik.ahrq.gov/ViewItemDetails?system=sdo&itemKey=62832000 (Last accessed June 17, 2022).

[27] The term "other amounts claimed" refers to costs such as sales tax, shipping, delivery, postage, etc., that are not considered part of the U&C price.  NCPDP, *External Code List* (Jan. 2017) App'x Z – Other Amount Values).

as intended and TPPs and their insured beneficiaries may be overcharged for prescriptions. The claims submission and adjudication process is common among insured prescription drug programs.

> ### 3. Third-Party Prescription Programs and Private Commercial Insurance Plans

49. Private commercial health insurance is usually provided as an employment benefit to employees and their dependents or is purchased be consumers directly. Funding is provided through premiums, which may be paid in part by the beneficiaries, as well as through patient cost sharing in the form of deductibles, coinsurance, and copayment. Individuals can also purchase health insurance in the private marketplace. These plans take a variety of forms, including PPOs, HMOs, high-deductible health savings plans, and traditional indemnity plans. Prescriptions are dispensed by community pharmacies through a PBM network or through a mail-order plan. PBMs administer the plan and typically reimburse for prescriptions based on the lesser of: (1) the plans' determination of acquisition cost for drug ingredients plus a specified dispensing fee; or (2) the pharmacy's U&C charge.

> ### B. Purpose of the U&C Price Ceiling

50. The U&C price serves as a "ceiling" or "cap" on what a pharmacy can charge for prescription drugs paid for by health insurance where those claims are adjudicated pursuant to a "lesser of" logic.

51. "Lesser of" logic means just that: the amount that can be charged for reimbursement is the *lesser* of two or more potential prices, one of which is the U&C price. The use of "lesser of logic" in the adjudication process is common and standard throughout the industry.[28]

52. Where the "lesser of" logic is employed, the U&C price serves as a "ceiling" or "cap" on prescription drug prices for third-party plans and their insured members.

53. The U&C price ceiling is effectuated through the use of "lesser of" logic that is used throughout the pharmacy industry. Under "lesser of" logic, plans and insured customers pay the lower of the (1) the price charged to customers with insurance – which might be determined by reference to, among others, the Maximum Allowable Cost ("MAC"), Actual Acquisition Cost ("AAC"), Wholesale Acquisition Cost ("WAC"), or Average Wholesale Price ("AWP");[29] *or* (2) the U&C price the pharmacy offers to those customers paying without using insurance (*i.e.*, "cash customers").

54. The U&C price ceiling is meant to ensure that third-party plans and their insured beneficiaries do not pay more for a particular drug than the price offered to cash-paying

---

[28] "Lesser of" logic is also referred to as "lower of" logic; both refer to the same concept.

[29] AAC is the price that pharmacies pay for drug products after subtracting all discounts. AWP is a list price for a drug product established by the manufacturer. Pharmacies receive discounts off AWP and third-party reimbursement is often based on a percentage of AWP. WAC is a manufacturer's list price for drug products sold to wholesalers or direct purchasers and third-party reimbursement may be based on a percentage of WAC. MAC is a price set by the PBM for multiple-source drug products and applies to all generic equivalents of that product regardless of the acquisition cost by the pharmacy.

customers (*i.e.*, customers not using a prescription insurance benefit).  Indeed, this is the only purpose of U&C – a U&C price serves no purpose outside the context of an insurance reimbursement formula that employs "lesser of" logic.

55. ███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████

56. The PBM's adjudication system is programmed to compare the U&C price submitted by the pharmacy to the negotiated rate.  The PBM pays the pharmacy the lower of the two rates (by reference to lesser of logic), minus the cost sharing amount paid by the insured member.  When the U&C price is less than the negotiated rate, the U&C price is the amount reimbursed to the pharmacy. Pharmacies, accordingly, prefer to set their U&C price above any negotiated rate to increase their profits.

57. Third-party plans have generally long been aware and reasonably understand that they pay based on the lower of the pharmacy's U&C price or a negotiated price.  As a general rule, it is reasonable for TPPs to expect that they would not have to pay more for prescriptions than individuals not using an insurance benefit. It is similarly reasonable for insured customers to expect that they will not pay more than customers without insurance.  Said differently, TPP's don't expect to pay more for prescriptions than the prices generally offered to cash-paying customers.

### C.      Pharmacies, PBMs and the U&C Price Ceiling

58. Third-party prescription plans typically provide prescription drug benefits to their insured beneficiaries through pharmacies, such as Rite Aid.  These pharmacies typically form a network in order to service the members of the third-party prescription plans throughout the country.   Network pharmacies are expected to maintain the integrity of the reimbursement process by accurately and correctly submitting claims to PBMs.

59. The amount that a PBM will pay a pharmacy for prescription drugs dispensed to its payer clients' members is generally based on a formula derived from the cost of the drug plus a fee for dispensing the drug. These measures for drug costs include, among others, Actual Acquisition Cost ("AAC"), Estimated Acquisition Cost ("EAC"), Wholesale Acquisition Cost ("WAC"), and Average Wholesale Price ("AWP").[31]

---

[30] ██████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

[31] Federal Medicaid regulations now mandate that payments for drugs under the program not exceed the *lower of* (1) the Actual Acquisition Cost plus reasonable dispensing fees established by the agency; *or* (2) the *Providers' usual and customary charges to the general public*. 42 *CFR* § 447.512(b) (2016) (emphasis added). Actual Acquisition Cost (AAC) means the agency's determination of the pharmacy's actual prices paid to acquire drug products from manufacturers after all discounts have been deducted and is derived from actual audits of pharmacy invoices. The Estimated Acquisition Cost (EAC) was a state Medicaid agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers." *Id.* § 447.502 (2006). Medicaid regulations were amended in 2016 to substitute the Estimated Acquisition Cost standard with the Actual Acquisition Cost standard because CMS concluded that the AAC standard more accurately reflects the actual prices that pharmacies pay to acquire drugs.

60.     In addition to any negotiated price between the PBM and its pharmacy provider, reimbursement amounts paid to pharmacies are subject to a strict cap, which is the "U&C price" charged by that pharmacy for the specific drug being reimbursed. As demonstrated in more detail elsewhere in this report, long-standing industry definitions of "U&C price" equate "cash customers" with "customers paying without use of insurance," and the "U&C price" is the lowest cash price widely and consistently offered by the pharmacy to such individuals.

61.     Regardless of the specific formulation, all "lesser of" reimbursement formulas that include a U&C pricing term share a common feature: *payers generally should not pay more than a pharmacy's U&C price – i.e., the price widely and consistently available to cash-paying customers.* In short, the U&C price operates as a "ceiling" on the amount pharmacies will be reimbursed for drugs dispensed to customers paying with an insurance benefit. This feature is there to ensure the integrity of the PBM reimbursement transactions, allowing PBMs' payer clients and their beneficiaries to rest assured that they will not be expected to pay more than what is usually and customarily offered by the pharmacy as the price to a cash-paying customer.

### D.      Pharmacies Have Incentives to aMnipulate U&C Price Reporting

62.     As far back as the 1970s, when prescription insurance programs were growing, payers had set reimbursement rates (*i.e.*, the "negotiated price") at a level lower than pharmacies' U&C prices to cash customers. To be sure, pharmacies still had a significant number of cash prescriptions and, while they sometimes offered prices to cash customers for certain items (such as oral contraceptives) that were lower than the insurance reimbursement price, these lower cash prices were required to be submitted by the pharmacy as the U&C price for such items. PBMs also understood that such prices, if the lowest price offered to cash-paying customers (*i.e.*, those not using insurance) for that product, would be the pharmacy's U&C price and enforced, through desk and field audits, the requirement that such prices be reported as such.

63.     As the percentage of prescriptions covered by public and private payers increased to about 90 percent by 2006,[32] the percentage of "cash customers" decreased. Pharmacies continued to set prices offered to cash customers (*i.e.*, customers who paid without insurance) above their PBM "negotiated" reimbursement rates and, therefore, relatively few claims were adjudicated at the U&C price.

64.     This changed in 2006 when Walmart implemented its generic discount program and advertised a $4 charge for 30-day supplies of about 300 drug products. Walmart correctly submitted insurance claims reflecting its discount prices as its U&C price for these drugs. Other national pharmacy chains, such as Target and Costco, subsequently implemented similar discount programs specifically to compete with Walmart, and also reported these discounted prices as the U&C price.[33]

65.     At about the time Walmart, Target, and Costco were scrambling to compete with each other using these new discount programs, other pharmacies, including Rite Aid, began to worry

---

[32] National Association of Chain Drug Stores, *The Chain Pharmacy Industry Profile* (2006), at 64–65.

[33] Pharmacies such as CVS, Kmart, Kroger, Rite Aid, Safeway, and Walgreens (among others) did not.

that if they implemented similar discounts, they would jeopardize their reimbursement amounts from third-party payers because they would have to submit the reduced U&C prices on insurance claims.

66.    A solution for some pharmacies, including Rite Aid, was to contrive discount schemes they could use to conceal their U&C prices.  The pharmacies implemented these schemes by promoting the false pretense that "membership club" discounts or price-match discounts are not really "cash transactions" even though such prices are not paid using insurance. Rite Aid's RSP is just such a scheme.  Despite offering deep discounts to cash customers, Rite Aid failed to report these discounted prices as their U&C prices.  Rather, as discussed herein, Rite Aid continued to submit prescription insurance claims with artificially high U&C prices, reasoning that the discounted pricing offered to cash customers was something *other than a cash transaction*.  However, the discounted prices offered to these customers who paid for their prescriptions without using insurance (*i.e.*, "cash customers") should have been submitted as the U&C price for the drug when purchased by a customer who *was* using insurance to pay for the drug.

67.    There is no dispute that pharmacies make more money by submitting artificially high U&C prices, than if they submitted discounted prices for reimbursement.  If all discounts were considered properly when setting pharmacies' U&C prices (as Walmart, Target and Costco had done), Rite Aid's charges for prescription drug coverage would have been significantly lower.   Failing to report these discounts as the pharmacy's U&C price benefits the pharmacy financially.

68.    Before Walmart disrupted the retail pharmacy industry with the launch of its $4 generic discount pricing in 2006, there was no dispute about the definition of U&C – it was universally understood to be the lowest price offered by a pharmacy to customers paying without insurance. Walmart, and other pharmacies that immediately followed suit by offering discounted generic drugs like Target and Costco, continued the long-standing industry practice of submitting the discount prices it offered as their U&C prices.  But several of the large retail pharmacies like Rite Aid invented so-called "membership clubs" or price-matching to circumvent the U&C price limits.

   **E.    Rite Aid's RSP Cash Discount Program**

69.    ██████████████████████████████████████████████
       ██████████████  Rite Aid also offered or accepted several types of discounts to these headquarters-established prices including, as relevant in this action, discounts pursuant to a Rite Aid discount program known as the Rx Savings Program ("RSP").

70.    I understand that Rite Aid launched the RSP in 2008 and have been told to assume it was discontinued it around October 2020.

---

[34] ████████████████████████████████████████████████
██████████████████████████████████████

71.   Rite Aid has admitted that the RSP was not insurance.[35]



41 Johnsen M, Rite Aid adds RX Savings Card discount program chain wide.  *Drug Store News* (Sep. 24, 2008). Retrieved from https://drugstorenews.com/pharmacy/rite-aid-adds-rx-savings-card-discount-program-chain-wide.

75. The "terms and conditions" for participation cover nothing more than a standard HIPAA (*i.e.*, confidentiality) waiver and an optional and revocable offer to receive other promotional discounts.[46]  Nothing in these terms and conditions gives any indication that the discounts offered are for anyone other than cash customers.

76. Nothing in these terms and conditions addresses the fact that the RSP prices would not be submitted to insurance companies as Rite Aid's usual and customary price.

77. In my opinion, the demographic information requested to sign up is nothing more than what would already be in Rite Aid's records for prescription customers. Furthermore, an individual is allowed to enroll family members without the family members' consent or assent.  These individuals can participate without agreeing to the "terms and conditions."

78. My opinion is in accordance with that of Arbitrator Lewis in the *Humana v. Rite Aid* arbitration that found that:

> [Rite Aid's] enrollment process [ ] has been categorically rejected as an artifice by all courts and arbitrators who have addressed this issue.  I do not disagree with the rational undergirding these determinations.  Accordingly, I find that Rite Aid has not established this as a sufficient basis upon which to remove members from a "cash customer" designation.[47]

79.



80.

81.



---

[46] See discussion of the RSP enrollment requirement in Opinion and Final Award, *Humana Health Plan, Inc. v. Rite Aid Headquarters* (Apr. 22, 2022) (AAA No. 01-19-0000-4057) at 23.

[47] *Id.* (Emphasis added.)



82. In my experience, some pharmacy chains excluded beneficiaries of government health programs from participating in their membership discount programs because of regulatory concerns.

83. Customers could enroll in the RSP at the prescription counter and receive RSP discount prices immediately.

84.

85. As shown herein, it is my opinion that Rite Aid's RSP prices represented prices Rite Aid offered cash customers and that they should have been included in the calculation of U&C.

86. By excluding its RSP prices when determining the U&C price to report, Rite Aid failed to honor the reasonable expectation that the Plaintiffs would not pay more than the discounted cash prices that were widely and consistently available to the general public.

87. Although the RSP prices for a specified drug were offered to cash customers at any Rite Aid pharmacy and often represented the lowest price Rite Aid offered to cash customers for that drug on that day at that pharmacy, Rite Aid did not report or otherwise include its RSP prices when determining the U&C price for that drug.[59]

## VI.   THE INDUSTRY DEFINITION OF "USUAL AND CUSTOMARY PRICE"

88. For decades, there was no dispute about the definition of U&C – it was universally understood to mean the lowest price that a pharmacy makes widely and consistently available to its cash-paying customers (*i.e.*, customers who do not present an insurance benefit at the point of sale, whether or not they actually have insurance).

89. Consequently, certain written agreements did not even bother to define U&C price because the meaning of U&C price was understood, as was the expectation that third-party payers

---



and insureds, like Plaintiffs, would be entitled to a "lower of" requirement that limited charges to the U&C price.

90. Accordingly, to be the U&C price, two conditions must be satisfied: (i) the price applies to customers paying with cash, not insurance; and (ii) that price is made widely and consistently available to customers paying with cash (in other words, it is not a one-time pharmacist's discretionary offer for a particular customer).[60]

91. Thus, the longstanding industry understanding of U&C price is the price that a pharmacy offers to a cash-paying member of the general public (*i.e.*, those who are not using an insurance benefit), for a given drug on a given day at a particular location, inclusive of any discounts. This industry understanding and expectation is reflected in numerous sources as set forth below.

### A.    National Council for Prescription Drug Programs ("NCPDP") Standards

92. NCPDP is an accredited, not-for-profit organization designated to standardize how electronic payment data is transferred between pharmacies, PBMs, and third-party plans.[61] In other words, NCPDP is the authority setting standards for electronic payment of prescription insurance claims.[62]

93. Standards for the electronic transmission of prescription claims established by the NCPDP define "U&C price" as "[the] [a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed."[63] NCPDP standards elaborate that the U&C price "represents the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a cash-paying customer."[64] In my opinion, "total reimbursement" in this context connotes the total price is paid by the cash customer and no third-party payer (*i.e.*, insurer) is involved.

94. NCPDP does not distinguish between different types of cash-paying customers or recognize that membership discount programs like the RSP are different from other cash prescriptions. NCPDP's definition of U&C has remained unchanged since 1996 and predates Medicare Part D and membership discount programs, like the RSP program. If membership discount programs like RSP were to be excluded from the NCPDP definition,

---

[60] I understand one exception to the U&C definition is for "one-time individual pharmacist's discretionary offers." As the term suggests, these are for one-time discounts provided by the pharmacist. These could include, for example, offering a one-time discount for indigent person who is unable to pay the full price for a life-saving medication. Discounts offered to the general public would not fit this definition. Since any member of the general public can qualify for membership program discounts, they represent cash prices that are "routine" discounts and, therefore, are not exempt from U&C.

[61] "Who We Are," NCPDP, https://www ncpdp.org/Who-We-Are.aspx (last accessed June 1, 2021).

[62] ███████████████████████████████████████████████ *See also* Stanic DJ, et al., "The National Council for Prescription Drug Programs: Setting Standards for Electronic Transmission of Pharmacy Data." *Drug Benefit Trends* 1997;9:29-32,35.

[63] *NCPDP Data Dictionary* (Sep. 1999) at p. 71.

[64] NCPDP *Telecommunications Version 5: Questions, Answers and Editorial Updates* (Nov. 2010) at 39. https://www.ncpdp.org/NCPDP/media/pdf/Version5-Editorial.pdf

it would have been necessary for NCPDP to revise its definition to accommodate this new understanding.  It has not done so.

### B.    Medicare Part D is Consistent with Industry Standards

95.    Consistent with long-standing industry understanding of U&C, the Centers for Medicare and Medicaid Services ("CMS")[65] issued specific regulatory guidance more than a decade ago in response to the introduction of various cash discount programs at retail pharmacies.[66]  The guidance, contained in a CMS memorandum from Cynthia Tudor, then Director of Medicare Drug Benefit Group, dated October 11, 2006, referenced the Walmart $4 discount program as an example of a program that offered customers reduced prices (*e.g.*, $4.00) for many generics and directed that the discounted price, in turn, established the pharmacy's U&C price for those drugs.  The memorandum explained that, when a discounted price is offered to customers generally, that discounted price becomes the pharmacy's U&C price.  Such discounts are considered U&C prices rather than "one-time lower cash prices."[67]

96.    This policy was also included in the CMS *Medicare Prescription Drug Benefit Manual* and posted on the "Frequently Asked Questions" section of the CMS website.  The CMS guidance stated:

> Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's "usual and customary" price, and is not considered a one-time "lower cash" price. Part D sponsors consider this lower amount to be "usual and customary" and will reimburse Wal-Mart on the basis of this price. To illustrate, suppose a Plan's usual negotiated price for a specific drug is $10 with a beneficiary copay of 25% for a generic drug. Suppose Wal-Mart offers the same generic drug throughout the benefit for $4. The Plan considers the $4 to take the place of the $10 negotiated price. The $4 is not considered a lower cash price, because it is not a one-time special price. The Plan will adjudicate Wal-Mart's claim for $4 and the beneficiary will pay only a $1 copay, rather than a $2.50 copay. This means that both the Plan and the beneficiary are benefiting from the Wal-Mart "usual and customary" price, and the discounted Wal-Mart price of the drug is actually offered within the Plan's Part D benefit design. Therefore, the beneficiary can

---

[65] CMS is a Department of Health and Human Services agency that oversees the Medicare and Medicaid programs.

[66] Memorandum from Cynthia Tudor, Director of the CMS Medicare Drug Benefit Group and CMS (Oct. 11, 2006), ("Tudor Memo"). https://www.cms.gov/Medicare/Medicare-Drug-Coverage/PrescriptionDrugCovContra/Downloads/QADiscountsandTrOOP_100606.pdf; *Medicare Prescription Drug Benefit Manual*, Ch. 14 – Coordination of Benefits, Section 50.4.2., https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/Chapter-14-Coordination-of-Benefits-v09-17-2018.pdf.

[67] *Id.*

access this discount at any point in the benefit year, the claim will be adjudicated through the Plan's systems, and the beneficiary will not need to send documentation to the plan to have the lower cash price count toward TrOOP.[68,69]

97. A careful reading of the Tudor Memo reveals that CMS advice was not about Walmart's program specifically; it used Walmart only as an example of how discount prices are subject to being reported as a pharmacy's U&C.[70] The CMS memo, therefore, indicates that cash discounts offered by *any* pharmacies are reportable as U&C if the discounts are "made available throughout the benefit year."

98. The memo explains that Medicare Part D expects claims to be adjudicated at the discounted price and that beneficiaries would pay a lower copayment so that both the TPP and the beneficiary benefit from the pharmacy's U&C price.[71]

99. The CMS memo was written October 11, 2006, which was well *before* Walmart's competitors, including Rite Aid, had devised their "membership club" program schemes.[72] CMS later incorporated the advisory memo into its *Prescription Drug Benefit Manual*[73] and has not given any guidance contrary to that in the memo, which advised that discount program prices are reportable as U&C prices.

100. The Seventh Circuit in *Garbe* relied upon this CMS guidance by stating:

> The *CMS Manual* has long noted that "where a pharmacy offers a lower price to its customers throughout a benefit year" the lower price is considered the "usual and customary" price rather than "a one-time 'lower cash' price," even where the cash purchaser uses a discount card. [Centers for Medicare & Medicaid Servs.,] Chapter 14 – *Coordination of Benefits*, in [Medicare Prescription Drug Benefit Manual] 19 n.1 (2006), https://perma.cc/MW6AH4P6.[74]

---

[68] Tudor Memo. The "one-time 'lower cash' price" mentioned in the second sentence refers to non-routine discounts provided at the discretion of the dispensing pharmacist. For example: a one-time discount for an indigent person who is unable to pay the full price for a life-saving medication. It does not refer to prices offered to customers throughout a benefit year, such as PSC discount prices.

[69] The acronym "TrOOP" means "true out-of-pocket" and represents the amount that Medicare Part D recipients pay in the form of deductibles, coinsurance and copayment. CMS requires pharmacies to submit claims for all prescription expenditures – whether paid by insurance or not – so that patients' TrOOP can be used to determine which coverage phase the beneficiary is in (i.e., deductible phase, donut hole, catastrophic coverage phase, etc.).

[70] "*For example*, Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers." Tudor Memo.

[71] *Id.*

[72] The terms "membership club," "club discount program" and similar terms are used interchangeably to denote cash discount programs that circumvent the U&C requirement.

[73] CMS, Medicare Prescription Drug Benefit Manual, Chapter 14 - Coordination of Benefits, (2006), https://perma.cc/MW6AH4P6.

[74] *Garbe*, 824 F.3d at 644.

101. In the context of Medicare Part D, PBMs are thus required to ensure that the government pays no more for prescription drugs than what cash customers (*i.e.*, those paying without insurance) pay for the same drug on the same day.

### C.    State Medicaid Programs are Consistent with Industry Standards

102. Also consistent with long-standing industry understanding of U&C, State Medicaid programs incorporate the "lesser of" U&C requirements embodied in 42 C.F.R. §447.512, which provides that payment for drugs should not exceed pharmacies' usual and customary charges to the general public.[75]   As with other public and private prescription insurance programs, a key price component in these state Medicaid reimbursement formulas is the U&C price.

103. Although the Class does not involve Medicaid claims, I believe that an understanding of Medicaid programs' understanding of U&C is relevant to this case because:

(1) Medicaid prescriptions are a large and important part of the industry; knowing Medicaid's understanding of U&C informs us of the industry understanding.

(2) Medicaid programs are overseen by the Centers for Medicare and Medicaid Services (CMS), the same division of the U.S. Department of Health and Human Services that oversees the Medicare program.   The Medicaid programs' understanding of U&C, therefore, must be consistent with that of Medicare.

(3) State Medicaid programs must operate within Federal (CMS) guidelines and CMS must approve state Medicaid programs' annual plans that outline pharmacy reimbursement parameters, including the "lesser of" requirement.   Medicaid program annual plans likely would not be approved if they misapplied the U&C price ceiling.

(4) Medicaid programs' definitions of U&C are compatible with those of both private prescription insurance programs and other GHPs (*e.g.*, Medicare and the Federal Employee Health Plan ("FEP")) and reinforce the long-held industry understanding that U&C includes widely and consistently available discounts, such as those offered by Rite Aid's Rx Savings Club.

104. In Table 1 below, I set forth examples of ten state Medicaid programs' definitions of U&C and note that these U&C definitions are compatible with those of both private prescription insurance programs and other GHPs (*e.g.*, Medicare and the FEP).[76]   As with other public and private prescription insurance programs, these state Medicaid programs consider the U&C price to be the lowest price offered by the pharmacy to members of the general public, inclusive of discounts.

---

[75] *See* 42 CFR §447.512.

[76] These ten states represent a convenience sample.  While not exhaustive, this sample demonstrates that state Medicaid programs and CMS enforced the long-held industry understanding that U&C does not exclude "membership club" or price-match discounts.

105. It should be noted that Rite Aid now reports RSP prices as U&C for all state Medicaid fee-for-service programs and the FEP,[77] but not for Medicare Part D and other private prescription insurance programs. It is nonsensical to suggest that U&C should be reported accurately for some, but not others.

**Table 1. Definitions of "U&C Price" for Ten State Medicaid Programs**

| State | U&C Definition | Source |
|-------|----------------|--------|
| **Alaska** | The lowest amount a provider charges to the general public and reflects all advertised savings, discounts, special promotions, or other programs. | *Alaska Admin. Code* tit. 7 §145.400 (h). |
| **Arizona** | [The] amount charged cash customers for the prescription exclusive of sales tax or other amounts claimed. | AHCCCS Companion Document for NCPDP Post Adjudication History (PAH) 2.2 Companion Guide Encounter Transactions (2009-2016 Version 1.3) |
| **California** | [When reporting U&C] no provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service. | ¶(a) of the Cal. Code Regs. Title 22, Division 3, Subdivision 1, Ch. 3, Art. 6, Sec. 51480 |
| **Colorado** | The reimbursement amount the provider charges the general public to pay for a drug. | 10 *Colo. Code Regs.* §2505-10 8.800.10.B (2014). |
| **Idaho** | A pharmacy's billed charges are not to exceed the usual and customary charges defined as the lowest charge by the provider to the general public for the same service, including advertised specials. | IDAPA 16.03.09.665.03 |
| **Illinois** | The amount a provider would charge cash customers for a prescription, exclusive of sales tax. | Illinois Department of Healthcare and Family Services, *Handbook for Providers of Pharmacy Services*, Chapter P-200, at vii (Nov. 2010). |
| **Oregon** | The amount an individual without prescription drug coverage would pay at a retail pharmacy.  The usual and customary | OAR 410-121-0000 (3)(ee) (eff. 07/01/10). |

---

[77] ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

| | price may also be referred to as the retail price. | |
|---|---|---|
| **Pennsylvania** | The pharmacy's lowest net charge an MA recipient would pay for a prescription as a non-Medicaid patient at the time of dispensing for the same quantity and strength of a particular drug or product, including applicable discounts, such as special rates to nursing home residents, senior citizens, or other discounts extended to a particular group of patients…. | 55 Pa. Code §1121.1 |
| **Tennessee** | The reasonable, usual and customary fees charged by the Pharmacy which do not exceed the fees the Pharmacy would charge any other person regardless of whether the person is a TennCare enrollee, inclusive of any special marketing or prescription drug programs offered by the Pharmacy. | *Network Participation Agreement for Ambulatory and Long Term Care Pharmacy Providers* § 1.27. |
| **Washington** | The fee that the provider typically charges the general public for the product or service. | *Wash. Admin. Code* §388-530-1050 (Definitions) (2003), which became *Wash. Admin. Code* §182-530-1050 (Definitions) (2018). |

106. Accordingly, it is my opinion that the "U&C price" definitions used by most state Medicaid programs reinforce the long-held industry understanding that U&C includes widely and consistently available discounts, such as those offered by Rite Aid's RSP and price-matching programs.

**D.    Federal Employee Program (FEP) Insurance Benefits are Consistent with Industry Standards**

107. The FEP defines U&C as:

> [T]he lowest price Provider would charge to a particular customer if such customer were paying cash or utilizing a Promotional Pricing program for an identical prescription or on that particular day at that particular location.  For the purposes of this definition "Promotional Pricing" means any discounts given or offered to the general public by Provider including but not limited to:
>
> - Discounts given or offered through membership, club, subscription programs;
> - Cash rebates;
> - Coupons; and

24

- Other promotional or price discounts including free medications."[78]

108. As it does for Medicaid programs, Rite Aid now complies with industry standards and reports or otherwise considers U&C when submitting claims for FEP beneficiaries.

109. I have not seen a rational explanation as to why Rite Aid complies with industry standards and reports correct U&C prices for some third-party programs but not for those in which Plaintiffs participate.

### E. Court and Arbitration Findings Related to U&C Reflect Long-Standing Industry Understanding and Practice

110. My understanding of industry practice regarding U&C pricing accords with decisions made by various court and arbitration decisions on the issue. Following is a brief description of these findings. Note that this discussion should not be construed as a legal opinion on my part. These court and arbitration decisions did not inform my opinion – they only confirmed what I have long understood.

#### 1. United States ex rel. Garbe v. Kmart

111. The United States District Court for the District of Southern Illinois determined in *Garbe* that the "standard across the pharmacy industry for U & C price falls in line with [the] NCPDP definition" and is "generally referred to within the industry as the '***cash price to the general public***,' which is the amount charged cash customers for the prescription, exclusive of sales tax or other amounts claimed."[79] The District Court articulated what may be referred to as a "default rule":

> Ultimately, the Court holds that the NCPDP definition (which reflects the industry standard) of "cash price to the general public" controls, unless further defined by an individual state statute or relevant contract and/or payer sheet.[80]

112. The District Court further held that "the members of Kmart's generic discount programs are part of the 'general public' (as opposed to a private group or club) because of the open eligibility of the programs, *i.e.*, *anyone* was allowed to join the program. Further the Court finds Kmart's argument that its enrollment process took customers outside of the general public to be skeptical due to the basic demographic information that was required to enroll (which included name, date of birth, address), as well as the rudimentary (and sometimes verbal) enrollment process that actually took place."[81]

113. The Seventh Circuit later affirmed the District Court's holding in *United States ex rel. Garbe v. Kmart Corporation*, 824 F.3d 632 (7th Cir. 2016). My understanding of industry practice regarding U&C pricing accords with the District Court's and the Seventh Circuit's

---

[78] CVS Caremark Network Update (Jul. 12, 2011) RiteAid00218632.

[79] *United States ex rel. Garbe v. Kmart Corp.*, 73 F. Supp. 3d 1002 (S.D. Ill. 2014) at 1014-15 (emphasis in original).

[80] *Id.* at 1016.

[81] *Id.* at 1017.

reasoning in *Garbe*.[82] In my opinion, *Garbe* presents a clear and accurate explanation of how U&C pricing practices should be applied in the pharmaceutical industry, as well as the policies supporting and necessitating that application.  As also noted accurately in *Garbe*, the U&C price is not simply a price arbitrarily set by a pharmacy, but is a price based on the prices ***offered by the pharmacy to the general public, namely to its cash customers***.[83]

114.   The *Garbe* Court noted that its reading of "general public" is "consistent with the regulatory structure that gave rise to the 'usual and customary' price term, citing to both 42 C.F.R. 423.100 and 447.512(b).[84]   The *Garbe* Court also stated that "Medicare, Medicaid, and their corresponding regulations mandate that state plans ensure that 'payments for services be consistent with efficiency, economy, and quality of care," citing to 42 C.F.R. 447.200.[85]   According to *Garbe*, "[t]aken together, 'the purpose of these regulations is clear: state agencies are not to pay more for prescribed drugs than the prevailing retail market price."[86]   Moreover, "[r]egulations related to 'usual and customary' price should be read to ensure that where the pharmacy regularly offers a price to its cash purchasers of a particular drug, Medicare Part D receives the benefit of that deal."[87]

115.   Specifically, the *Garbe* decision found that the U&C price is the ***lowest price offered or available to the general public***.[88],[89] It also stated that "where the pharmacy regularly offers a price to its cash purchasers for a particular drug, Medicare Part D receives the benefit of that deal."[90]   *Garbe* also observed that "[t]he CMS Manual has long noted that 'where a pharmacy offers a lower price to its customers throughout a benefit year' the lower price is considered the 'usual and customary' price rather than 'a one-time lower cash price'[ ]"[91]

116.   The Seventh Circuit's observation in *Garbe* that "[c]ash customers walking into Kmart ***do not cease to be members of the general public the minute they are offered—or pushed***

---

[82] *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632-645 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 627 (2017).

[83] *Id.*

[84] *Id.* at 644.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] "Because Kmart offered the terms of its "discount programs" to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart "discount" prices at issue represented the "usual and customary" charges for the drugs." *Id.* at 632, 645.

[89] "Unless state regulations provide otherwise, the "usual and customary" price is defined as the "cash price offered to the general public." *Id.* at 643.

[90] *Id.* at 644.

[91] *Id.* at 644-45.

*into — 'membership'* in Kmart's 'discount program'"[92] accords with my understanding that discount programs like Rite Aid's are offered to members of the general public.

117. Because Kmart offered the terms of its "discount programs" to the general public and made them the lowest prices for which its drugs were widely and consistently available, Kmart's available "discount" prices represented the "usual and customary" charges for the drugs.[93] The Court did not say that the lowest price had to actually be charged – only that it be *offered or available.* This comports with my understanding of U&C.

118. A key principle of *Garbe* is that a pharmacy cannot hide U&C prices under the guise of "membership club" prices merely with a label. Regardless of whether a pharmacy could create a "membership club" in theory that might provide exclusivity from the general public, programs like the RSP come nowhere close to being that because they lack any meaningful barriers to entry. As with the "club" examined in *Garbe*, the RSP was available to everyone who walked into a Rite Aid store. There were no barriers to entry, not even the nominal (and therefore meaningless) "fee" that existed for the Kmart program at issue in *Garbe*.

119. Additionally, courts have made clear that the decision in *Garbe* applies broadly to a wide array of discounts offered by pharmacies. For example, the U.S. District Court for the Central District of Illinois in *U.S. ex. rel. Schutte v. SuperValu, Inc.*, essentially reaffirmed the holding in *Garbe* in another case alleging that a pharmacy chain improperly inflated its U&C prices by not reporting its price-matching discounts as U&C. The Court, citing the Seventh Circuit's decision in *Garbe*, ruled that:

> The Defendants' actual usual and customary price can be determined by noting the discount lower cash prices that were ***offered*** to the general public and ***accepted*** over the years. As in *Garbe*, those were the lowest prices for which the drugs were ***widely and consistently available*** . . . . The ***offer to the general public*** determines the usual and customary price – not whether the offer was couched as a discount club or whether the majority of people accepted it.[94]

### 2. Connecticut Medicaid

120. The Connecticut Medicaid program informed Rite Aid in 2010 that it considered RSP prices to be U&C. As demanded by Connecticut, ***Rite Aid subsequently included RSP prices in its calculation of U&C for Connecticut and other state Medicaid programs***.[95]

121. 

---

[92] *Id.* at 645 (emphasis added).

[93] *Id.* at 645.

[94] *United States v. SuperValu, Inc.*, No. 11-3290, 2019 WL 3558483, at *6 (C.D. Ill. Aug. 5, 2019) (emphasis added).

[95] Opinion and Final Award, *Humana Health Plan, Inc. v. Rite Aid Headquarters* (Apr. 22, 2022) (AAA No. 01-19-0000-4057) at 28.

[96] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

███████████████████████████████████████████████
███████████████████   █████████████████████████
███████████████████████████████████████████████
███████████████████   █████████████████████████

### 3. Humana Health Plan, Inc. v. Rite Aid

122. My understanding of U&C also comports with findings in the *Humana v. Rite Aid* arbitration matter. In his Opinion and Final Award, Arbitrator Lewis stated that "I believe the evidence demonstrates that Rite Aid sought to conceal this information [that it did not report RSP prices as U&C] from Humana with the intent to realize higher profits."[99]

123. Further, Arbitrator Lewis found that:

> I find that Rite Aid's interpretation of U&C as the "usual and customary *retail* price" or "the shelf or list price paid by a customer who pays without any sort of benefit program, whether insurance or a membership program" is inaccurate, unsupported by the record, and does not provide a justifiable defense for excluding RSP prices from U&C.[100]

> Finally and critically, Rite Aid has failed to demonstrate how its "retail" prices constitute U&C when the evidence establishes that it sold prescriptions at RSP prices five times more often than at retail prices, and in certain years, fourteen to fifteen times more often. [ ] I find that ***Rite Aid's exclusion of RSP data from its U&C price indisputably compromised the accuracy of U&C***.[101]

### F. Summary of U&C Definitions

124. The discussion above summarizes "U&C price" definitions from many sources. While the precise language used may differ marginally, the meaning of "U&C" is commonly used throughout the industry and is very simple – it is the lowest price that a pharmacy would offer to a cash-paying member of the general public (*i.e.*, those who are not using an insurance benefit) for a particular drug on a given day, inclusive of any discounts.

125. Absent the express exclusion of a particular cash price (such as a membership club price) from the definition of U&C, I understand the U&C price to include all cash prices made widely and consistently available by the pharmacy.

## VII. RITE AID AND THE U&C PRICE

126. Pharmacies, like Rite Aid, may have multiple cash prices that are widely and consistently available. The question is, then: which of these prices is the U&C? Obviously, it would

---

[97] ██████████████████████████

[98] █

[99] Opinion and Final Award, *Humana Health Plan, Inc. v. Rite Aid Headquarters* (Apr. 22, 2022) (AAA No. 01-19-0000-4057) at 25.

[100] *Id.*, at 29 (italics in original).

[101] *Id.*, at 29-30 (Emphasis added).

be nonsensical to suggest that the U&C would be the *highest* cash price offered. This would be contrary to the cost-containment objectives of insurance and inconsistent with the "lesser of" logic.

127. A corollary to the "lowest price" provision is that a pharmacy has only one lowest price at a given time and, therefore, one U&C price at a given time. 

128. As indicated earlier in this report, there are two types of prescription transactions: (1) those paid at least in part by insurance and (2) those paid by the customer without the use of insurance.  The latter are known as "cash transactions" whether they are paid by currency, check, credit card, or on account – as long as there is no payment by insurance.  Some cash transactions are discounted, and some are not – either way, they are still cash transactions.

129. Rite Aid admitted in its internal documents and testimony that the RSP is not insurance[104],[105],[106] RSP can thus only be a cash program.

130. 







- 

131. The principal relevant inquiry for purposes of determining a pharmacy's U&C price is whether the price was *offered* or *available* to cash-paying customers. ████████



132. ████████

133. ████████

134. There is no meaningful selectivity that separated Rite Aid's RSP discount customers from any other cash customers purchasing prescriptions without insurance.  There were no restrictions on membership based on any type of demographic variable.  No factual predicate exists to suggest that RSP customers were anything other than members of the general public.

135. Rite Aid's failure to include its RSP cash discounts in the calculation of U&C was inconsistent with its practice of doing so for another Rite Aid cash discount programs that was similar to the RSP in many respects.

136. ████████

137. ████████





142. ████████████████████ the long-standing industry understanding of "U&C price" equates "cash customers" with "customers paying without use of insurance."  As set forth in the following paragraphs, numerous industry sources, have confirmed this point:



- The definitive textbook on managed care pharmacy says that U&C price is "***the cash price normally charged to patients who do not have prescription insurance coverage***."[131]

- The U.S. Government Accountability Office ("GAO") defined the "U&C price" as the ***price an individual without prescription drug coverage would pay*** at a retail pharmacy.[132]

- The Academy of Managed Care Pharmacy ("AMCP") publishes the *AMCP Guide to Pharmaceutical Payment Methods* and defines "usual and customary price" in its glossary as "[t]he price for a given drug or service that a pharmacy ***would charge a cash-paying customer without the benefit of insurance*** provided through a payer or intermediary with a contact with the pharmacy."[133]  Clearly, ***AMCP : (1) differentiates prescriptions as either cash or insurance and (2) equates cash-paying customers with those without benefit of insurance.***  This definition comports with my long-held and the industry understanding of U&C.

143. 

## VIII.   RSP TRANSACTIONS ARE NOT ACTUALLY ADJUDICATED

144. For the reasons set forth below, it is my opinion that RSP transactions are not actually adjudicated, and, in any event, whether or not a prescription is adjudicated does not impact whether the price offered should be reported as U&C.

---

[131] Schafermeyer KW, "Impact of Managed Care on Pharmacy Practice," in Robert P. Navarro, *Managed Care Pharmacy Practice* (Jones and Bartlett Publishers, 2nd ed., 2009), 391.

[132] Government Accountability Office, "Prescription Drugs: Trends in Usual and Customary Prices for Commonly Used Drugs," *GAO Reports*, at 1n.2 (Feb.10, 2011), https://www.gao.gov/assets/gao-11-306r.pdf.

[133] Academy of Managed Care Pharmacy, *AMCP Guide to Pharmaceutical Payment Methods*, (Oct. 2007) at 57.  *See also* the 2013 update to the *AMCP Guide*, which gives the same definition except it substitutes the word "provider" for the last word, "pharmacy." *AMCP Guide to Pharmaceutical Payment Methods*, 2013 Update at 75.



145.

146.

147.

148.



- 
-



- ███████████████████████████████████████████████
  ███████████████████████████████████████████████
  ████████████████████████

149. In the pharmaceutical industry, "adjudication" describes a multi-step process of making decisions or judgments on insurance claims.  These decisions involve issues such as:

- Determining customer eligibility based on information unknown to the pharmacy staff;

- Determining prescription coverage based on information unknown to the pharmacy staff;

- Determining payment based on the "lesser-of" or "lower-of" logic;

- Subjecting the prescription information to various administrative edits (*e.g.*, refill too soon or refill not authorized); and

- Subjecting the prescription information to various safety edits (*e.g.*, contraindications, drug interactions, drug utilization review, or prior authorization requirements).[147]

150. The primary difference between a RSP prescription and other cash prescription transactions is that Rite Aid assigns a Bank Identification Number ("BIN") for RSP transactions.  A BIN is used to identify a particular third-party prescription program for insurance purposes.[148]  In other words, the assignment of a BIN number causes Rite Aid's computer system to route the transaction to an outside processor creating the illusion that the prescription must be processed by a third party and, therefore, something other than a cash discount.

151. Assigning a BIN number is not necessary to offer a discount and appears to be nothing more than an attempt to further disguise these discounts.  To be clear, Rite Aid may have caused RSP "claims" to be "administered" or "processed" unnecessarily by an outside entity, but these transactions certainly were not "adjudicated" as that term is understood in the industry.

152. Despite Rite Aid's using ScriptSave and Envision to process RSP discounts, testimony and Rite Aid's documents confirm that:

---

[147] See discussion of prescription benefit management adjudication systems in Black, G.E. and Romza J.H. in Robert P. Navarro, *Managed Care Pharmacy Practice*, (Jones and Bartlett Publishers, 2nd ed., 2009) pp. 205-07.

[148] Specifically, the BIN number, along with a Processor Control Number (PCN) and Group Number, is "used by pharmacies, switches, and processors to electronically route and adjudicate pharmacy claims for prescriptions ***and typically identify pharmacy insurance programs***."  *See* NCPCP Recommendations for Use of the NCPDP Telecommunication Standard to Prevent Use of Copayment Coupons by Medicare Part D Beneficiaries and Applicability to other Federal Programs, Version 1.1 (May 2017), *available at* https://ncpdp.org/NCPDP/media/pdf/WhitePaper/Recommendations-Telecomm-Standard-Prevent-Copayment-Coupons-by-Part-D.pdf?ext=.pdf  (last accessed Aug. 25, 2022).



153. Most of the typical claims adjudication functions were not provided for RSP transactions. The following table illustrates the differences between adjudicating insurance claims and processing RSP and other cash prescriptions.



**Table 2.  Adjudication of Insurance Claims v. Processing Other Prescriptions**

| | Insurance Transactions | Non-Insurance Transactions | |
| --- | --- | --- | --- |
| | | RSP Transactions | Other Cash Transactions |
| Eligibility determined by PBM | ✔ | ✘ | ✘ |
| ID card necessary to confirm coverage | ✔ | ✘ | ✘ |
| Price determined by PBM | ✔ | ✘ | ✘ |
| PBM payment made on behalf of a TPP | ✔ | ✘ | ✘ |
| Administrative edits by PBM | ✔ | ✘ | ✘ |
| Safety edits by PBM | ✔ | ✘ | ✘ |
| BIN/PCN required for purchase | ✔ | NOT NECESSARY | ✘ |

154.  The supposed "adjudication" requirement for the RSP implies that Rite Aid would have no way of knowing which customers were eligible for RSP discounts when, in fact, Rite Aid set the eligibility criteria and enrolled RSP "members."[160]  Rite Aid could have maintained the "membership" list in its computers just as it did for the participants in the Living More discount program.  Eligibility determination by a third party, therefore, was an unnecessary part of the RSP ruse.

155.  Furthermore, the supposed "adjudication" requirement for the RSP also implies that Rite Aid would have no way of knowing what drugs are covered or what prices would be charged when, in fact, Rite Aid established and maintained the formulary and RSP prices.[161]  Rite Aid's pharmacy system had the drugs and price list and the supposed "adjudication" merely echoed back information that Rite Aid already had.

156.  ███████████████████████████████████████████████████
      █████████████████████████████████████████

157.  ███████████████████████████████████████████████████
      ██████████████     The suggestion that Rite Aid's cash prices was a product of "negotiation" with a party that has no stake in these prices is nonsensical.  According to Investopedia,

---

[160] See paragraph 152 of this report for documentation.

[161] See paragraph 152 of this report for documentation.



"[i]n a negotiation, each party tries to persuade the other to agree with his or her point of view."[164]

158.  ScriptSave merely processed RSP discounts for Rite Aid in exchange for a processing fee. ScriptSave had no stake in those prices and would, therefore, have no financial interest in "negotiating" them.

159.  As discussed previously, the evidence available to me indicates that Rite Aid had complete control of the drugs included in RSP and their discounts. ███████████████████████ ███████████████████████████████████████████ It is ludicrous to suggest that Rite Aid's retail prices were a product of a "negotiation" with ScriptSave, which had no interest or financial stake in these prices.

160.  RSP transactions were not adjudicated in any meaningful sense similar to how claims for insured prescription drug claims are adjudicated.  The RSP involves no actual insurance company and the "membership" or "subscription" plan was simply a Rite Aid discount program for cash customers.

161.  

162.

163.  Nevertheless, whether or not a transaction is "adjudicated" does not impact whether the price offered should be reported as U&C.  In my opinion, the fact that RSP discounts were offered to cash-paying customers (*i.e.*, those not using an insurance benefit) and were

---



[164] "What is Negotiation?"  *Investopedia*, available at: https://www.investopedia.com/terms/n/negotiation.asp (accessed Aug. 26, 2022).

[165] ████████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████

[166] ████████████████████████████████

[167] *Id*.

[168] ████████████████████████████

widely and consistently available determines whether a price should be considered in the calculation of U&C.

164. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████

165. Based in part on Rite Aid's admission, Arbitrator Lewis concluded in the *Humana v. Rite Aid* arbitration that "[a]ccordingly, I do not find this adjudication process to be a characteristic of the RSP that distinguishes its members from ordinary cash customers such that the NCPDP definition of U&C would not apply to the RSP."[170]

166. Furthermore, Arbitrator Lewis noted that:

> Several Rite Aid witnesses [including] Mr. Thompson, Mr. Wolfe, and Ms. Farrell all testified that Rite Aid set the RSP, decided which drugs appeared on the formulary, and maintained eligibility and enrollment information. Tr. 2148:4-2149:20; 1661:8-1662:14, 3007:4-3008:17. I find this testimony to be significant in that *it suggests that Rite Aid's adjudication process was a mere pretense*.

167. I agree that this so-called "adjudication" is not necessary; pharmacies are capable of processing their own discounts, just as Rite Aid did for its own Living More discount program. The RSP is essentially a discount program for cash customers – *i.e.*, those not using an insurance benefit.

168. I also agree with the *Garbe* Court's statement that this so-called "adjudication" is a "*flimsy device*" that frustrates the usual and customary requirement and is "*a sham*."[171]

## IX.   THE RSP WAS NOT A THIRD-PARTY CASH DISCOUNT CARD PROGRAM

169. ███████████████████████████  ████████  ██████████████████
████████████████████████████  █████

170. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████  █████



[169] ██████████████████████████████████████████

[170] Opinion and Final Award, *Humana Health Plan, Inc. v. Rite Aid Headquarters* (Apr. 22, 2022) (AAA No. 01-19-0000-4057) at 25.

[171] *Garbe*, 824 F.3d at 636, 645.

[172] ██████████████████████████████████

[173] ████████████████████████████████████████████████████████████
███████  ███████████  ███████████████████████  ███████  ████████
██████████████████████████████

[174] ████████████████████████████████████████████████████████████
██████████████████████████████████

171. The RSP should not be misrepresented as just another third-party discount card, such as GoodRx. Conflating these programs would be faulty for at least two significant reasons.

172. First, administration of a cash discount does not necessarily remove a cash price from U&C. As the Seventh Circuit emphasized in *Garbe*, if a discount program price is the lowest cash price that the pharmacy makes widely and consistently available, the default industry practice would be to treat it as U&C. To be sure, questions of who actually controls the price (the pharmacy or third party) may bear on whether it is the pharmacy's program, but the concept of "third party cash discount card programs" sweeps in broadly a wide variety of arrangements, so the label alone does not remove a program price from consideration as the U&C price.

173. Second, and in any event, the RSP was not a third-party discount program since it was created and owned by Rite Aid – not a third party. ScriptSave administered RSP under Rite Aid's direction but did not create, own, or control it. ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████         █████████

174. Third-party discount cards, on the other hand, are not owned by Rite Aid and, unlike RSP (which is exclusive to Rite Aid) are offered by both Rite Aid and competing pharmacies.

175. Rite Aid set its own prices for the RSP program while prices for third-party discount cards were the product of negotiation with a third party.

176. Table 3 illustrates the differences between the RSP and third-party discount cards.

177. While Rite Aid determines eligibility criteria for the RSP, establishes the formulary, sets prices, and markets the program, it does not do so for third-party discount cards.

178. Rite Aid used the term "usual and customary" in its RSP to mean the retail price from which WRAP drug prices were discounted. In my opinion, calling a "retail" price the "U&C" price is not meaningful if that so-called "U&C" price is further discounted for cash-paying customers (*i.e.*, customers not paying with insurance) and is widely and consistently available; in that event, the discounted price would be the pharmacy's true U&C price, regardless of whether the pharmacy itself treats it as such.

179. The RSP administrator (whether it be ScriptSave, Envision or Rite Aid itself) does not perform a "lesser of" comparison, in any material sense. For third-party discount cards, U&C is a comparator under the "lesser of" logic while RSP administration lacks any such "lesser of" determination.



**Table 3. Comparison of RSP and Third-Party Discount Cards**

|  | RSP | 3rd-Party Discount Cards |
|---|---|---|
| Created, owned and controlled by Rite Aid? | ✓ | ✗ |
| Eligibility determined by Rite Aid? | ✓ | ✗ |
| Could eligibility be determined from patient records without need for a "membership card"? | ✓ | ✗ |
| Formulary determined by Rite Aid? | ✓ | ✗ |
| Prices determined by Rite Aid? | ✓ | ✗ |
| Exclusive to Rite Aid? | ✓ | ✗ |
| Marketed by Rite Aid? | ✓ | ✗ |
| Meaningful "lesser of" comparison? | ✗ | ✓ |

180. As noted above, Rite Aid defined "U&C" in the RSP to be the original retail price off of which the RSP prices for WRAP drugs were discounted. Thus, because the cash-paying RSP member would always pay either a discounted fixed fee (for certain RSP formulary drugs) for a 30-day or 90-day supply or the WRAP price, the RSP price would be less than the U&C price for any drug. But precisely because that RSP price is a "cash" price, and was widely and consistently offered to Rite Aid customers, it should not have been excluded from the U&C price.

## X.   THE INDUSTRY STANDARD IS REFLECTED IN PROVIDER MANUAL DEFINITIONS OF U&C

181. PBMs typically publish provider manuals that dictate how pharmacies must handle claims for TPPs and their insured members. Provider manuals help ensure that pharmacies submit claims to PBMs in a uniform manner across a PBM's network of pharmacies.

182. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

**Table 4. Examples of Provider Manual Definitions of "U&C Price"**



| Document Title | Definition of U&C |
|---|---|
| MedImpact Healthcare Systems, Inc. | |
| ███████████████ ███████████████ | ████████████████ ████████████████ |
| ███████████ | ████████████████ |
| ███████████████ ███████████████ | ████████████████ ████████████████ |
| ███████ | ███████ |

| Optum Rx, Inc. | |
| --- | --- |
| ███████████████ | ████████████████ |
| ████████████ | ████████████████ |
| ███ | ███████████████ |
| ███████████████ | █████████████ |
| ████████████ | ████████████████ |
| ███ | ██████████████ |
| | █████████████████ |
| | ██████████████████ |
| | █████████████████ |
| | ████ |

| PCS Health Systems and CVS/Caremark | |
| --- | --- |
| ████████████ | ███████████████ |
| ████████████████ | ███████████████ |
| ████████████ | ███████████████ |
| ████████████████ | ████████████████ |
| ███████████████ | █████████████████ |
| ████████████ | |
| ████████████ | ███████████████ |
| ████████████████ | ███████████████ |
| ████████████ | ████ |
| ████████████████ | ███████████████ |
| █████ | ██████████████ |
| ████████████████ | ███████████████ |
| ████████████ | ██████████████████ |
| | ███████████████ |
| | ██████████ |



183. Pharmacies are typically required to adhere to a PBM's provider manual, and some PBMs make clear that the definitions in their provider manuals supersede any other definitions of "U&C price." ████████████████████████████████████ ████████████████████████████████████ ██████████████████████

184. ████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████



---

██████████████████████████████████████
████████

## XI.   EVIDENCE INDICATES THAT RITE AID DID NOT INTEND TO DISCLOSE THAT IT WAS NOT REPORTING RSP PRICES AS U&C

185.   I understand the NCPDP definition of U&C to be the industry standard.

186.   I also understand that U&C can be defined otherwise by statute or between contracting parties, though, as discussed herein, an agreement between two parties does not, in my opinion, change industry norms and standards.[179]

187.   While pharmacies and their PBM partners might agree amongst themselves to exclude a specific discount from the calculation of U&C, neither the payer nor its insured beneficiaries would necessarily be aware of this secret arrangement.  A confidential agreement between a pharmacy and a PBM would not alter the industry definition of U&C, nor would it alter a TPP's (or its insured members') reasonable expectations that a pharmacy's cash discounts would be included in the U&C.

188.

189.

190.



---

[178] ████████████████████████████████████
████████████████████████████████

[179] My long-held understanding of U&C price is supported by the District Court in *Garbe* that "the NCPDP definition (which reflects the industry standard) of 'cash price to the general public' controls, unless further defined by an individual state statute, or relevant contract and/or payer sheet." *United States ex re. Garbe v. Kmart Corp.*, 73 F. Supp. 3d 1002, 1016 (S.S. Ill. 2014).

[180]

[181]

[182]



[183] Opinion and Final Award, *Humana Health Plan, Inc. v. Rite Aid Headquarters* (Apr. 22, 2022) (AAA No. 01-19-0000-4057) at p.28.



191.

192.

193.

194.

195.   Therefore, Rite Aid cannot say that its representation of RSP with respect to U&C reporting requirements was consistent with the industry understanding.



196. 

197. To allow Rite Aid to interpret the U&C price to exclude certain cash discounts would render the term "U&C price" meaningless and negate Rite Aid's obligation to apply the "lower of" provision when submitting third-party claims.

## XII. PBMS HAVE INCENTIVES TO ALLOW RITE AID TO MANIPULATE U&C PRICES

198. PBMs have economic incentives to allow Rite Aid to manipulate U&C price reporting because PBMs make more money when pharmacies submit higher U&C prices. This is true whether the PBM is offering pass-through pricing or spread pricing, although incentives for the latter are even greater.[193]

199. To understand PBMs' incentives to allow pharmacies to manipulate their U&C price reporting, it helps to understand how PBMs make money by adjudicating prescription insurance claims and how spread pricing can create potential conflicts of interest with PBMs' TPP clients and the TPPs' members.

200. For both pass-through and spread pricing, reimbursement is based on the lesser of U&C or the negotiated price. Since there is no spread on claims submitted at the U&C price, PBMs do not receive a markup (i.e., "spread") on these claims. Therefore, PBMs benefit when pharmacies report a high U&C price.[194] , PBMs can use "spread pricing" to increase their profits by charging TPPs more for prescription drug products than the PBMs reimburse pharmacies for the same prescription drugs.[195]

201. As an additional incentive, PBMs may want to market their effectiveness by showing TPPs the difference between the pharmacy's U&C price and their negotiated rate paid to the pharmacy. The reported savings achieved by the PBM, therefore, look better when pharmacies submit artificially high U&C prices.

202. Third, granting a concession allowing pharmacies to manipulate U&C can be used by the PBMs as leverage in negotiating other reimbursement terms to their favor. For example, PBMs know that it is relatively easy for their TPP clients to compare the pharmacy

---



[193] Pass-through pricing is an arrangement in which the PBM "passes through" to the TPP the price that it paid the pharmacy for a prescription plus an agreed-upon administrative fee. Spread pricing is an arrangement in which the PBM charges the TPP a higher rate than what it actually paid the pharmacy.

[194] PBMs also generally do not receive rebates from manufactures for drugs reimbursed at U&C.

[195] Eban, Katherine, *Painful prescription: Prescription benefit managers make out better than their customers*, Fortune Magazine, Oct. 10, 2013 ("Generic prices are typically set through lists of maximum allowable costs (MAC), which the PBMs establish. The PBMs may use multiple MAC lists to maximize spread, giving one set of prices to pharmacies and another [set] to [their payer] clients.").

reimbursement terms (*i.e.*, drug cost reimbursement and dispensing fees) among competing bids for PBM services, so, to be competitive, PBMs strive to drive down the pharmacies' reimbursement as much as possible.  Pharmacies have very low margins already,[196] but may be able to accept lower drug cost reimbursement and dispensing fees if they can augment revenue from this hidden source (*i.e.*, manipulating the U&C price), thus giving PBMs with lower reimbursement terms a competitive advantage.

203.  Fourth, PBMs' charges for items, such as administrative fees, are easily comparable, but the financial benefits of allowing pharmacies to manipulate U&C pricing are not transparent to their TPP clients, such as Fund Plaintiffs.

204.  This manipulation of U&C pricing has resulted in litigation. For example:

- *Stafford v. Rite Aid Corp.*, No. 3:17-cv-01340-TWR-AHG (S.D. Cal.);

- Rahimi ex rel. United States v. Rite Aid Corp., No. 2:11-cv-11940-SJM-MAR (E.D. Mich.);

- *Monmouth v. Rite Aid Corp.*, No. 2:20-cv-02024-MSG (E.D. Pa.);

- *BCBS of N. C. v. Rite Aid Corp.*, No. 0:20-cv-01731-ECT-ECW (D. Minn.);

- *BCBS, Inc. v. Rite Aid Corp.*, No. 0:20-cv-02132-ECT-KMM (D. Minn.); and

- In addition, on April 25, 2022, an arbitrator in an individual action against Rite Aid brought by Humana– a single TPP – awarded approximately $122 million in damages and prejudgment interest and found that Rite Aid's Rx Savings Program prices were cash prices.  *Humana Health Plan, Inc. v. Rite Aid Hdqtrs. Corp*., No. 3:22-cv-00226-DJH, ECF 1-1 at 23, 49 Opinion and Final Award (W.D. Ky. Apr. 25, 2022).

**Declaration**

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and ability.

Dated: October 6, 2023

*Kenneth W Schafermyer*

Kenneth W. Schafermeyer, Ph.D.

---

[196]   The average pharmacy's net profit was 2.1% of sales in 2018.  National Community Pharmacists Association, *NCPA Digest* at 5 (2018), http://www.ncpa.co/images/digest/2018-Digest-Web.pdf.

**EXHIBIT A:**
*Curriculum Vitae*
*of*
**KENNETH W. SCHAFERMEYER**

Professor Emeritus
University of Health Sciences and Pharmacy in St. Louis*
One Pharmacy Place
St. Louis, MO 63110
(314) 446-8452
Ken.Schafermeyer@uhsp.edu

* (Please note the institution's name changed from St. Louis College of Pharmacy to the University of Health Sciences and Pharmacy in St. Louis in September 2020. As a college within the University structure, St. Louis College of Pharmacy remains home to UHSP's flagship Doctor of Pharmacy program.)

**ACADEMIC INTERESTS**
- **Teaching:** Economics, Pharmacy Management, Financial Management and Managed Health Care.

- **Research and Consultation:** Health economics, health systems management, financial analysis of pharmacy operations, Medicaid and managed care prescription programs, public policy issues related to medication usage and optimizing use of pharmacy technical support.

**EDUCATION**

| | |
|---|---|
| 1990 | Doctor of Philosophy in Pharmacy Administration, School of Pharmacy and Pharmacal Sciences, Purdue University, West Lafayette, Indiana. |
| 1983-1987 | School of Business, Washburn University, Topeka, Kansas (36 credit hours of business, economics and marketing). |
| 1979 | Master of Science in Pharmacy Administration, School of Pharmacy, University of Tennessee, Memphis, Tennessee. |
| 1976 | Bachelor of Science in Pharmacy, St. Louis College of Pharmacy, St. Louis, Missouri. |

**LICENSURE AND CERTIFICATION**

- Licensed as a pharmacist by examination in Missouri (1976) and by reciprocity in Tennessee (1978) and Virginia (1979).

- Designated as a "Certified Association Executive" by the American Society of Association Executives (1981).

**EMPLOYMENT HISTORY**

| | |
|---|---|
| 2022 – | Professor Emeritus, St. Louis College of Pharmacy at University of Health Sciences and Pharmacy |

| 201 -2022 | Professor of Pharmacy Administration and Director, Office of International Programs, St. Louis College of Pharmacy at University of Health Sciences and Pharmacy in St. Louis. |
|---|---|
| 2008 - | Owner, Pharmacy Administration Consultants, LLC. |
| 2007-2012 | Professor of Pharmacy Administration and Director, Liberal Arts and Administrative Sciences Division, St. Louis College of Pharmacy. |
| 2001-2007 | Professor of Pharmacy Administration and Director of Graduate Studies, St. Louis College of Pharmacy. |
| 2002-2003 | Senior Fellow, Institute for the Advancement of Community Pharmacy (sabbatical assignment July 1, 2002 to June 30, 2003). |
| 1996-2001 | Associate Professor of Pharmacy Administration and Director of Graduate Studies, St. Louis College of Pharmacy. |
| 1995-1996 | Associate Professor of Pharmacy Administration, St. Louis College of Pharmacy. |
| 1990-1995 | Assistant Professor of Pharmacy Administration, St. Louis College of Pharmacy. |
| 1988-1990 | Graduate Teaching Assistant and Research Assistant, Purdue University School of Pharmacy and Pharmacal Sciences. |
| 1982-1987 | Executive Director, Kansas Pharmacists Association; Executive Director, Kansas Pharmacy Foundation; Executive Vice President, Kansas Society of Hospital Pharmacists; and Executive Director, Kansas Pharmacy Service Corporation. |
| 1979-1982 | Executive Director, Virginia Pharmaceutical Association; and Executive Director, Virginia Pharmaceutical Association Research and Education Foundation. |
| 1978-1979 | Assistant Executive Director, American College of Apothecaries; Graduate Teaching Assistant, University of Tennessee School of Pharmacy; Staff Pharmacist, White Way Drug, Memphis, Tennessee; and Relief Pharmacist, various pharmacies in Memphis, Tennessee. |
| 1976-1978 | Director of Professional Relations, Missouri Foundation for Pharmaceutical Care; Staff Pharmacist, Kirkwood Drug, Kirkwood, Missouri; and Relief Pharmacist, various pharmacies in the St. Louis area. |
| 1973-1976 | Pharmacy Intern, Glasgow Pharmacy, St. Louis, Missouri. |

## ASSOCIATION MEMBERSHIPS

Academy of Managed Care Pharmacy (1994-~2014)
American Association of Colleges of Pharmacy (1990-2022)
American College of Apothecaries (1978-87)
American Pharmacists' Association (1973-2022)

American Society of Association Executives (1979-88)
American Society of Hospital Pharmacists (1988-93)
Consortium of Universities for Global Health (2016-2022)
Indiana Pharmacists' Association (1988-1990)
International Pharmacy Federation
International Society for Pharmacoeconomics and Outcomes Research (1995-2001)
Kansas Pharmacists' Association (Honorary Life Member)
Kansas Society of Association Executives (1982-88)
Lambda Chi Alpha Fraternity
Missouri Pharmacy Association
NAFSA: Association of International Educators (2013-2021)
National Community Pharmacists' Association (~1992-2022)
National Council of State Pharmaceutical Association Executives (1979-88)
National Organization for Competency Assessment (2006-09)
Phi Lambda Sigma Pharmacy Leadership Society
Rho Chi Pharmacy Honor Society
St. Louis Pharmacists' Association (1991-2008)
St. Louis College of Pharmacy Mortar and Pestle Club
Virginia Pharmaceutical Association (1979-82)
Virginia Society of Association Executives (1979-82)

## RESEARCH AND SCHOLARLY ACTIVITIES

### Books and Manuals

Plake KS, McCarthy RL and Schafermeyer KW, *Healthcare Delivery: A Primer for Pharmacists, 6th Edition*, Jones & Bartlett Publishers, 2017.

Fogerty TL, Boschmans SA, Schafermeyer KW and Williams BM, *The Southern African Pharmacy Technician Training Manual*, Pharmacy Administration Consultants and Nelson Mandela Metropolitan University, 2016.

Lukas SK, Fogerty TL, Boschmans SA, Schafermeyer KW, Svezia E, and Williams BM, Instructor's Guide for the *Southern African Pharmacy Technician Training Manual*, Pharmacy Administration Consultants and Nelson Mandela Metropolitan University Press, 2016.

Schafermeyer KW and Williams BM, *National Pharmacy Technician Learning Program, 8th Edition*, Assessment Technologies Institute (a division of Jones and Bartlett Publishers), 2014.

McCarthy, RL and Schafermeyer KW (eds.).  *Introduction to Health Care Delivery: A Primer for Pharmacists, Fifth Edition* (Sudbury, MA: Jones and Bartlett, 2012).

Schafermeyer, KW and Williams BM, *The National Pharmacy Technician Training Program, 7th Edition* (St. Charles, MO: Medical Certification Institute, 2010).

Schafermeyer, KW, *The National Pharmacy Technician Training Program, 6th Edition* (St. Louis, MO: Medical Certification Institute, 2008).

McCarthy, RL and Schafermeyer KW (eds.). *Introduction to Health Care Delivery: A Primer for Pharmacists*, *Fourth Edition* (Sudbury, MA: Jones and Bartlett, 2007).

Schafermeyer, KW. *The National Pharmacy Technician Training Program*, *Fifth Edition* (St. Louis, MO: Medical Certification Institute, 2007).

Schafermeyer, KW. *The Virginia Pharmacy Technician Training Program*, *Third Edition* (St. Louis, MO: Medical Certification Institute, 2007).

Schafermeyer KW. *Prescription Insurance Specialist Training Program,* (Alexandria, VA: Institute for the Advancement of Community Pharmacy, 2005). [Published electronically on the website of the National Association of Chain Drug Stores (www.nacds.org)].

McCarthy, RL and Schafermeyer KW (eds.). *Introduction to Health Care Delivery: A Primer for Pharmacists*, *Third Edition* (Sudbury, MA: Jones and Bartlett, 2004).

Schafermeyer KW. *The Pharmacy Technician Training Program* (Alexandria, VA: Institute for the Advancement of Community Pharmacy, 2003).

Schafermeyer KW. *The Virginia Pharmacy Technician Training Program* (Alexandria, VA: Institute fro the Advancement of Community Pharmacy, 2003).

McCarthy, RL and Schafermeyer KW (eds.). *Introduction to Health Care Delivery: A Primer for Pharmacists*, *Second Edition* (Gaithersburg, MD: Aspen Publications, 2001).

Schafermeyer KW and Hobson EH. *The Community Retail Pharmacy Technician Training Manual, Third Edition* (Alexandria, VA: National Association of Chain Drug Stores and National Community Pharmacists Association, 2000).

Schafermeyer KW and Hobson EH. *The Community Retail Pharmacy Technician Training Manual, Second Edition* (Alexandria, VA: National Association of Chain Drug Stores and National Community Pharmacists Association, 1997).

Schafermeyer KW and Hobson EH. *The Community Retail Pharmacy Technician Training Manual, First Edition* (Alexandria, VA: National Association of Chain Drug Stores and National Community Pharmacists Association, 1995).

Yates WN, Kuhn JJ, Thatcher K, and Schafermeyer KW (eds.). *The Return Goods Policy Manual, Fourth Edition* (Topeka, KS: Kansas Pharmacists Association, 1987).

Yates WN, and Schafermeyer KW (eds.). *Kansas Pharmacy and Related Laws, Eighth Edition* (Topeka, KS: Kansas Pharmacists Association, 1987).

Yates WN, and Schafermeyer KW (eds.). *Pharmacy Services in Kansas Adult Care Homes, Second Edition* (Topeka, KS: Kansas Pharmacists Association, 1987).

Yates WN, Thatcher K, and Schafermeyer KW (eds.). *The Return Goods Policy Manual*, *Third Edition* (Topeka, KS: Kansas Pharmacists Association, 1986).

Yates WN, and Schafermeyer KW (eds.). *Kansas Pharmacy and Related Laws, Seventh Edition* (Topeka, KS: Kansas Pharmacists Association, 1986).

Yates WN, Thatcher K, and Schafermeyer KW (eds.). *The Return Goods Policy Manual, Second Edition* (Topeka, KS: Kansas Pharmacists Association, 1985).

Yates WN, and Schafermeyer KW (eds.). *Kansas Pharmacy and Related Laws, Sixth Edition* (Topeka, KS: Kansas Pharmacists Association, 1985).

Yates WN and Schafermeyer KW (eds.). *The Return Goods Policy Manual, First Edition* (Topeka, KS: Kansas Pharmacists Association, 1984).

Yates WN, and Schafermeyer KW (eds.). *Kansas Pharmacy and Related Laws, Fifth Edition* (Topeka, KS: Kansas Pharmacists Association, 1984).

Yates WN, and Schafermeyer KW (eds.). *Pharmacy Services in Kansas Adult Care Homes, First Edition* (Topeka, KS: Kansas Pharmacists Association, Second Edition, 1983).

Yates WN, and Schafermeyer KW (eds.). *Kansas Pharmacy and Related Laws, Fourth Edition* (Topeka, KS: Kansas Pharmacists Association, 1983).

Yates WN, and Schafermeyer KW (eds.). *Kansas Pharmacy and Related Laws, Eighth Edition* (Topeka, KS: Kansas Pharmacists Association, 1987).

Schafermeyer KW, and Graham AG. *A Century of Virginia Pharmacy* (Richmond, VA: Virginia Pharmaceutical Association, 1980).

Swafford WB, Schafermeyer KW and White BD. *A Compilation of Third-Party Program Litigation* (Memphis, TN: American College of Apothecaries, 1980).

**Chapters in Other Books**

Schafermeyer KW, "The Impact of Managed Care on Pharmacy Practice," in Navarro RP (ed.) *Managed Care Pharmacy Practice, Second Edition* (Sudbury, MA: Jones and Bartlett, 2008).

Schafermeyer KW, Khan S, and Scott DM, "Insurance and Managed Care" Chapter 9 in Hurd PD and Levin BL in *Pharmacy and Public Health*, (Sudbury, MA: Jones and Bartlett, 2007).

Schafermeyer KW, "Managed Health Care and Pharmacy Services," Chapter 3 in Smith MI, Wertheimer AI and Fincham JE, *Pharmacy and the U.S. Health Care System, Third Edition* (Binghampton, NY: Pharmaceutical Products Press, 2005).

Schafermeyer KW, "Delegation and Technician Training," Chapter in Jackson RA (ed.) *Effective Pharmacy Management, Ninth Edition* (Alexandria, VA: The NCPA Foundation: 2003).

Schafermeyer KW, "Managed Prescription Drug Programs," Chapter 8 in Knight W (ed.) *Managed Care Contracting Handbook* (Gaithersburg, MD: Aspen Publishers, 1997): 229-246.

Schafermeyer KW, "Third-Party Prescription Program Evaluation," Chapter 10 in *Effective Pharmacy Management, Eighth Edition* (Alexandria, VA: NARD, 1996): 317-354.

Schafermeyer KW, "Overview of Pharmacy in Managed Health Care," Chapter 2 in Ito SM and Blackburns (eds.), *A Pharmacist's Guide to Principles and Practices of Managed Care Pharmacy* (Alexandria, VA: Foundation for Managed Care Pharmacy, 1995): 15-26.

Schafermeyer KW, "Third-Party Prescription Program Evaluation," Chapter 11 in *Effective Pharmacy Management, Seventh Edition* (Alexandria, VA: NARD, 1994): 343-381.

**Periodicals Edited**

*RxExplorer Newsletter* (St. Louis College of Pharmacy, Office or International Programs, quarterly, 2015-present).

*Journal of Managed Care Pharmacy* -- Contributing Editor for "Practitioner Update" column. (Alexandria, VA: Academy of Managed Care Pharmacy, bimonthly, 1995-2000).

*KPhA Update Newsletter*, (Topeka, KS: Kansas Pharmacists Association, monthly, 1982-1987).

*Drug Utilization Review Newsletter*, (Topeka, KS: Kansas Pharmacy Foundation, monthly 1982-1987).

*KSHP Newsletter*, (Topeka, KS: Kansas Society of Hospital Pharmacists, bimonthly, 1982-1987).

*The Journal of Kansas Pharmacy*, (Topeka, KS: Kansas Pharmacists Association, bimonthly, 1982-1987).

*The Virginia Pharmacist*, (Richmond, VA: Virginia Pharmaceutical Association, monthly, 1979-1982).

*The Voice of the Pharmacist*, (Memphis, TN: American College of Apothecaries, monthly, 1978-1979).

*ACA Newsletter*, (Memphis, TN: American College of Apothecaries, monthly, 1978-1979).

*The MFPC Third Party Issue*, (St. Louis, MO: Missouri Foundation for Pharmaceutical Care, monthly, 1976-1978).

**Monographs and Research Reports**

Collins AN, Oginni, O, and Schafermeyer KW, "Employment Survey of the 2018  Graduates of St. Louis College of Pharmacy," April 2019

Russell MB, Collins AN, and Schafermeyer KW, "Employment Survey of the 2017 Graduates of St. Louis College of Pharmacy," April 2018

Russell MB, Collins AN, and Schafermeyer KW, "Employment Survey of the 2016 Graduates of St. Louis College of Pharmacy," April 2017

Russell MB, Scimio CL, and Schafermeyer KW, "Employment Survey of the 2015 Graduates of St. Louis College of Pharmacy," March 2016.

Scimio CL, Thomas M, and Schafermeyer KW, "Employment Survey of the 2014 Graduates of St. Louis College of Pharmacy," March 2015.

Griggs SK, Patterson ME, Schafermeyer KW, Liu Y, Brown WM, and Rasu RS, *An Analysis of the Cost of Dispensing Prescriptions in Missouri: Final Report, December 31, 2014* for the Missouri Department of Social Services.

Scimio C and Schafermeyer KW, "Employment Survey of the 2013 Graduates of St. Louis College of Pharmacy," May 2013.

Scimio C, Scimio KN, and Schafermeyer KW, "Employment Survey of the 2012 Graduates of St. Louis College of Pharmacy," May 2013.

Scimio C, Scimio KN, and Schafermeyer KW, "Employment Survey of the 2011 Graduates of St. Louis College of Pharmacy," May 2012.

Scimio KN, Scimio C, and Schafermeyer KW, "Employment Survey of the 2010 Graduates of St. Louis College of Pharmacy," May 2011.

Schnur , Evan Schnur, Scimio KN, Schafermeyer KW and Kilgore K, "Employment Survey of the 2009 Graduates of St. Louis College of Pharmacy," May 2010

Schnur E, Williams B, Schafermeyer KW and Kilgore K, "Employment Survey of the 2008 Graduates of St. Louis College of Pharmacy," May 2009

Schafermeyer KW and Ancypowic R.  *Module 1 – The Business of Pharmacy* in the *Prescription Insurance Specialist Training Program*, (Alexandria, VA: National Association of Chain Drug Stores and the National Community Pharmacists Association, 2005.)

Schafermeyer KW and Beach B.  *Module 2 – Data Entry Basics* in the *Prescription Insurance Specialist Training Program*, (Alexandria, VA: National Association of Chain Drug Stores and the National Community Pharmacists Association, 2005.)

Schafermeyer KW, Shapiro R and Beach B.  *Module 3 – Advanced Data Entry* in the *Prescription Insurance Specialist Training Program*, (Alexandria, VA: National Association of Chain Drug Stores and the National Community Pharmacists Association, 2005.)

Shapiro R, Schafermeyer KW, Heckman HE and Beach B.  *Module 4 – Post Third-Party Processing Issues* in the *Prescription Insurance Specialist Training Program*, (Alexandria, VA: National Association of Chain Drug Stores and the National Community Pharmacists Association, 2005.)

Ancypowic R and Schafermeyer KW.  *Module 5 – Insurance Plans – Advanced* in the *Prescription Insurance Specialist Training Program* (Alexandria, VA: National Association of Chain Drug Stores and the National Community Pharmacists Association, 2005.)

Halford T, Schafermeyer KW and Kirk KW.  *Employment Survey of 2004 Pharmacy Graduates*. (St. Louis, MO: St. Louis College of Pharmacy, June, 2005).

Stratman R, Schafermeyer KW and Kirk KW. *Employment Survey of 2003 Pharmacy Graduates.* (St. Louis, MO: St. Louis College of Pharmacy, June, 2004).

Sheffer L, Schafermeyer KW and Kirk KW. *Survey of 2001 StLCOP Graduates.* (St. Louis, MO: St. Louis College of Pharmacy, June, 2002).

Kirk KW, Sheffer L and Schafermeyer KW. *Survey of 2000 StLCOP Graduates.* (St. Louis, MO: St. Louis College of Pharmacy, June, 2001).

Schafermeyer KW. *Formulary Management*, teaching module for the *Managed Care & Pharmacy Teaching Tool Project* sponsored by Aventis Pharmaceuticals, 2000.

Kirk KW, Mody PN, Klazynski B, and Schafermeyer KW. *Survey of 1999 StLCOP Graduates.* (St. Louis, MO: St. Louis College of Pharmacy, May, 2000).

Schafermeyer KW, Motheral BR, Mody PN and Thalmann T. *Final Report: The Financial Implications of Inappropriate Preparation of Growth Hormone Products.* (Bridgewater NJ: Pharmacia & Upjohn, 1999).

Kirk KW, Mody P, and Schafermeyer KW. *Survey of 1998 StLCOP Graduates.* (St. Louis, MO: St. Louis College of Pharmacy, May, 1999).

Schafermeyer KW, Lough LC and Cahill JA. *Background Paper: Certification for Managed Care Pharmacists.* (Alexandria, VA Academy of Managed Care Pharmacy, September, 1998).

Kirk KW, Mody P, and Schafermeyer KW. *Survey of 1997 StLCOP Graduates.* (St. Louis, MO: St. Louis College of Pharmacy, April, 1998).

Kirk KW, Mody P, and Schafermeyer KW. *Survey of 1996 StLCOP Graduates.* (St. Louis, MO: St. Louis College of Pharmacy, March, 1997).

Schafermeyer KW, Newell M, Chereson RS, and Wuller CA. *St. Louis Area Manpower Survey.* (St. Louis, MO: St. Louis College of Pharmacy, November 1996).

Schafermeyer KW and Mody PN. *Comparison of Tuition Rates for Private Colleges of Pharmacy.* (St. Louis, MO: St. Louis College of Pharmacy, November, 1996).

Gwyn BC, Malone DC, Valuck RJ and Schafermeyer KW. *1996 Colorado Cost of Dispensing Survey.* (Denver, CO: Colorado Medicaid Program, October, 1996).

Schafermeyer KW. *How to Effectively Train and Manage Technicians in the Prescription Department.* (Atlanta, GA: Mercer University Center for Pharmacy Management, August 1996).

Schafermeyer KW. *Chain Pharmacist Manpower Survey.* (Alexandria, VA: National Association of Chain Drug Stores, April 1996).

Schafermeyer KW. *Analysis of Selected Chain Pharmacies' Costs of Dispensing, 1995.* (Alexandria, VA: National Association of Chain Drug Stores, November 1995).

Schafermeyer KW and Wuller CA.  *Economic Comparison of Compounded Intravenous Medications: Prefilled Syringes versus Multiple-Dose Vials and Ampules.*  (South El Monte, CA: International Medication Systems, Ltd., January 1995).

Schafermeyer KW, and Cataldo R.  *A Comparison of Medicaid Reimbursement and Market Prices for Prescriptions Dispensed by Community Pharmacies.*  (Alexandria, VA: National Association of Chain Drug Stores, August 1993).

Schafermeyer KW.  *A Study of Changes in Medicaid Utilization and Expenditures Associated With an Expanded Drug Formulary.*  (Arlington, VA: American Association of Colleges of Pharmacy, 1993).

Bourikas C, Boyd KL and Schafermeyer KW, "Factors Influencing Medication Information Requests by Patients," (Alexandria, VA: NARD Foundation, 1992).

Schafermeyer KW, and Cataldo R.  *An Analysis of the Cost of Dispensing Third Party and Private Pay Prescriptions in Rhode Island: Final Report, July, 1991.*  (Pawtucket, RI: Rhode Island Pharmaceutical Association).

Schafermeyer KW.  *Managed Health Care: Impact on Pharmacy Education, Practice and Regulations* in *Proceedings of the District VI Sixty-Fifth Annual Meeting of the National Association of Boards of Pharmacy and American Association of Colleges of Pharmacy* (Jefferson City, MO: Missouri Board of Pharmacy, 1991): 59-71.

Schafermeyer KW, Schondelmeyer SW, and Thomas J.  *An Assessment of Chain Pharmacies' Costs of Dispensing a Third Party Prescription: Final Report.*  (Alexandria, VA: National Association of Chain Drug Stores, 1990).

Schafermeyer KW.  *An Analysis of Chain Pharmacies' Costs of Dispensing a Third-Party Prescription.*  Doctoral Dissertation, Purdue University, 1990.

Schondelmeyer SW, Mason HL, Schafermeyer KW, and Kibbe AH.  *Final Report of the National Pharmacists' Compensation Survey: 1988.*  (Washington, DC: American Pharmaceutical Association, 1990).

Schafermeyer KW.  The Effect of Copayment on Prescription Size Under a Prepaid Prescription Program.  Master's Thesis, University of Tennessee, 1979.

**Monographs Edited**

McCarthy RL and O'Conner PJ, *Designing a Residency Program in Managed Care Pharmacy,* (Boston, MA: Massachusetts College of Pharmacy and Allied Health Sciences, 1997).

**Journal Articles**

Schafermeyer KW, Brown JA and Griggs SK, "2021 UHSP PharmD Graduates Report Tightening Job Market and Lower Starting Salaries."  *Illinois Pharmacist Online*, June 2022. Available at: 2021 UHSP PharmD Graduates Report Tightening Job Market and Lower Starting Salaries.pdf (memberclicks.net)

Qu J, Zuo W, Took RL, Schafermeyer KW, Lukas S, Wang S, Du L, Liu X, Gao Y, Li J, Pan H,

Du X, Mei D, and Zhang B, "Evaluating Physician's and Pharmacists' Knowledge, Perceptions, and Practices Concerning Generic Medicines in China." *Health Policy*, 2021 (under review)

Qu J, Zuo W, Wang S, Du L, Liu X, Gao Y, Li J, Pan H, Du X, Mei D, Took RL, Schafermeyer KW, Lukas S and Zhang B, "Knowledge, Perceptions,, and Practices of Pharmacists Regarding Generic Substitution in China: A Cross-Sectional Study." *BMJ Open* 2021;11:e051277. doi: 10.1136/bmjopen-2021-051277

Franco F, Plaster A, Akhtar J, Bazle R, Schafermeyer KW and Patel R, "Needs Assessment and the Development of Teaching Materials for Pharmaceutical Safety Education for Informal Healthcare Providers and Villagers in rural Northeastern Bangladesh." *Pharmacy Education*, 2016: 16(1) 131-133.

Griggs SK, Patterson ME, Schafermeyer KW, Liu Y, Brown WM, and Rasu RS, "An Analysis of the Cost of Dispensing Prescriptions in Missouri," Missouri Pharmacist, 2015; 89 (3):20-25.

Boschmans SA, Fogerty TL, Schafermeyer KW, and Mallinson RK, "Practice Analysis for Mid-Level Pharmacy Workers in South Africa," *Pharmacy Education*, 2015; 15 (1) 31-38.

Reid LD, Huston SA, Kucukarslan SN, Sogol EM, Schafermeyer KW and Sansgiry SS. "The Risks Benefits and Issues in Creating a Behind-the-Counter Class of Medications, *Journal of the American Pharmacists Association* 2011; 51(1):26-39.

Schafermeyer KW, "What is the Impact of Direct-to-Consumer Marketing," *St. Louis Post Dispatch*, July 25, 2007, pB3.

Schafemeyer KW, "A Study of the Additional Costs of Dispensing Workers' Compensation Prescriptions," *Research in Social and Administrative Sciences* 2007; 3:123-136.

Schafermeyer KW, book review of *How to Develop a Business Plan for Clinical Pharmacy Services: A Guide for Managers and Clinicians* by Schumock GT in the *American Journal of Pharmaceutical Education* 2004; 68(2): 82.

Johnsrud M and Schafermeyer KW, "Measuring Adherence and Persistence in Drug Therapy," *Journal of Managed Care Pharmacy* 2002; 8:204-206

Nasr SM and Schafermeyer KW, "The Quality of Health Care Challenge," *Journal of Managed Pharmaceutical Care* 2001, 1(4):59-71.

Nasr SM and Schafermeyer KW, "The Health Insurance Portability and Accountability Act: Administrative Simplification Provisions," *Journal of Managed Pharmaceutical Care* 2001, 1(4):17-27.

Schafermeyer KW, "The Impact of Managed Care on Pharmacy Practice," Pharmacy Practice Management Quarterly 2000;19:99-116.

Schafermeyer KW, "Health Economics I: Basic Economic Principles." *Journal of Managed Care Pharmacy* 2000; 6:43-50.

Schafermeyer KW, "Health Economics II: Some Unique Aspects of Health Economics." *Journal of Managed Care Pharmacy* 2000; 6:173-178.

Schafermeyer KW, "College Offers Certified Managed Care Pharmacist Program." *Journal of Managed Care Pharmacy* 2000; 6:262-263.

Schafermeyer KW, book review of *A Road Map to a Profession's Future - The Millis Study Commission on Pharmacy*, Worthen DB, in *American Journal of Pharmaceutical Education* 2000;64:216.

Schafermeyer KW, Mody PN and Kirk KW, "Pharmacy Graduates' Salaries Increase: Job Opportunities Abound." *The Missouri Pharmacist* 73 1999;73:8-12 and *The Illinois Pharmacist* 1999;61:12-14, 17.

Schafermeyer KW, "Should Third Parties Care About Reimbursement Rates?" *Journal of the American Pharmaceutical Association* 1999;39:318-320.

Niecko TE, Schafermeyer KW and Martin BC, "The Health Insurance Portability and Accountability Act of 1996: The Issue of Portable Health Care Coverage." *Journal of Managed Care Pharmacy* 1999;5: 81,85-88.

Walker SE, Hurd PD, Schafermeyer KW and Rickert DR, "Perceptions of Pharmacists as Managers by Top Executives in the Pharmaceutical Industry." *Journal of the American Pharmaceutical Association* 1999;39:41-44.

Schafermeyer KW, book review of *Managed Care: What It Is and How It Works*, Knight W, in *American Journal of Pharmaceutical Education* 1999;63:368.

Cooke C, Cohen P, Dole E, McCarthy R, Patry R, Rivkin S and Schafermeyer KW, "Report of the Task Force on Managed Care Pharmacy." *American Journal of Pharmaceutical Education* 1998;62:31S-33S.

Schafermeyer KW and Hurd PD, "Research Methodology: Designing a Research Study." *Journal of Managed Care Pharmacy* 1998;4:504-514.

Schafermeyer KW "How to Effectively Train Community Pharmacy Technicians." *Pharmacy Management Advisor* 1998;6.

Graden SE and Schafermeyer KW, "Performance Reporting for Managed Care Prescription Programs." *Journal of Managed Care Pharmacy* 1998;4:160-166,170.

Gwyn BC, Malone DC, Valuck RJ and Schafermeyer KW, "1996 Colorado Cost of Dispensing Survey." *Colorado Pharmacist* 1997;28:15-17.

Stanic DJ, Goodspeed D, Stembler LA, Schlesinger M and Schafermeyer KW, "The National Council for Prescription Drug Programs: Setting Standards for Electronic Transmission of Pharmacy Data." *Drug Benefit Trends* 1997;9:29-32,35.

Motheral BR, Fairman KA, Teitelbaum FT, Schafermeyer KW, Parker AR and Barrow SM, "Pharmacy Benefit Management: Factors Influencing Utilization and Costs in a Pharmacy Benefit Program." *Drug Benefit Trends* 1996;8:10-13,15-18,34.

Schafermeyer KW and Motheral BR, "Managed Care Pharmacy at the St. Louis College of Pharmacy." *Journal of Managed Care Pharmacy* 1996;2:439,442.

Robinson ET and Schafermeyer KW, "Cross Training of Hospital Pharmacy Technicians." *Pharmacy Practice Management Quarterly* 1996;16:72-78.

Schafermeyer KW, "Basics of Managed Care Claims Processing: From Claims Payment to Outcomes Management." *Journal of Managed Care Pharmacy* 1995;1:200-205.  (Reprinted in three parts in the *Council Connection* 1996;2 (January/February, March/April and May/June).

Schafermeyer KW, "Survey Indicates Misunderstanding and Misuse of DAW Codes." *Council Connection* 1995;1:6-7.

Hobson EH and Schafermeyer KW, "Writing and Critical Thinking: Writing-to-Learn in Large Classes." *American Journal of Pharmaceutical Education* 1994;58:423-427.

Schafermeyer KW and Little LL, "StLCoP Tuition Still One of the Lowest." *The Pharmakon* 1994;30:5.

Becker ES, and Schafermeyer KW, "Educational Care 101: Prerequisite for Pharmaceutical Care." *Journal of Pharmacy Teaching* 1993;3:3-14.

Miller JC, and Schafermeyer KW, "Study Finds StLCoP Tuition One of the Lowest." *The Pharmakon* 1993;29 5.

Schafermeyer KW, Schondelmeyer SW, Thomas J, and Proctor KA, "An Analysis of the Cost of Dispensing Third Party Prescriptions by Chain Pharmacies." *Journal of Research in Pharmaceutical Economics* 1992;4:3-24.

Schafermeyer KW, "PMA Coordinated Industry Program for Pharmacy Faculty: Perspective from the Administrative Sciences Area." *American Journal of Pharmaceutical Education* 1992;56:475-476.

Schafermeyer KW, and McCann, SD, "Point-of-Sale Processing of Medicaid Prescription Claims." *Missouri Pharmacist* 1992;66:14-17.

Schafermeyer KW, and Cataldo R, "The Cost of Dispensing Third Party and Private Pay Prescriptions in Rhode Island." *The Rhode Island Pharmacist* 1992;30:5-12.

Schafermeyer KW, Schondelmeyer SW, and Wilson GT, "The FDA Orange Book: Expectations Versus Reality." *Journal of Pharmacy and Law* 1992;1:13-26.

Schafermeyer KW, and McCann SW, "Medicaid Task Force Recommends Policies on Prior Authorization." *Missouri Pharmacist* 1992;66:7-9.

Schafermeyer KW, and Schondelmeyer SW, "Pharmacists Value Added Services: What Are Their Costs?" *Wellcome Trends in Pharmacy* 1991;13:CE1-12.

Schondelmeyer SW, Mason HL, Schafermeyer KW, and Kibbe AH, "Pharmacists' Compensation and Work Patterns: Overview of 1988 National Survey." *American Pharmacy* 1989;NS29:25-30.

Schafermeyer KW, Thomas, J and Schondelmeyer SW, "NACDS Third Party Impact Study: Executive Summary." *Perspectives in Pharmacy Economics* 1989;1:2-3.

Schafermeyer KW, "The Usefulness of the FDA Orange Book as a Guide for Drug Product Selection Decisions." *NABP Newsletter* (August 1989).

Hovanscak C, Schafermeyer KW, and Yates WN, "Study Shows DUR Effective in Improving Patient Quality Care." *Kansas Drug Utilization Review Newsletter* 1984;6:1-4.

Schafermeyer KW, "Doctor Merchants: A Growing Problem." *Journal of Kansas Pharmacy* 1987;61:12-13.

Schafermeyer KW, and Kelly RL, "Pharmacist Prescribing." *Virginia Pharmacist* 1980;64:7.

Schafermeyer KW, and White BD, "Consumer Representation on State Boards of Pharmacy: A Survey and Suggestions." *Pharmacy Management* 1980;152:40-46.

Schafermeyer KW, Huffman DE, Huffman DC Jr., and Roberts KB, "The Effects of Copayment on Prescription Size Under a Prepaid Prescription Program." *Contemporary Pharmacy Practice* 1983. (Article accepted and scheduled for publication when the American Pharmaceutical Association decided to ceased publication.)

**Presentations**

Brown JA, Griggs SK and Schafermeyer KW, "2021 UHSP Pharm.D. Report Moderate Job Satisfaction but Lower Employment and Starting Salaries." Poster presented at STLCOP Student Research Symposium, April 2022.

Qu J, Zuo W, Took RL, Schafermeyer KW, Lukas S, Wang S, Du L, Liu X, Gao Y, Li J, Pan H, Du X, Mei D, and Zhang B, "Evaluating Physician's and Pharmacists' Knowledge, Perceptions, and Practices Concerning Generic Medicines in China," poster presented at the American Society of Health Systems Pharmacy Midyear Clinical Meeting (virtual), December 6-10, 2020.

Lukas S, Peters GL and Schafermeyer KW, "Overcoming Regulatory Hurdles to Allow International Pharmacists and Students to Engage in Clinical Pharmacy Rotations." Poster at Illinois Pharmacists Association and Missouri Pharmacy Association Joint Annual Meeting, St. Louis, MO, September 20, 2020.

Collins AN, Oginni OA and Schafermeyer KW, Job market found to be tightening for 2019 graduates of the St. Louis College of Pharmacy. Poster presented at STLCOP Student Research Symposium, April 2020.

Lukas SK, Ryan RR and Schafermeyer KW, "An Optional Pharmacy Focus in a Global Health Master's Program. Poster accepted for Consortium of Universities for Global Health Conference, Chicago, IL, April 2020.

Jinghan Qu, Wei Zuo, Shaohong Wang, Liping Du, Xin Liu, Yang Gao, Jiantao Li, Hui Pan, Xiaoli Du, Dan Mei, Roxane L.Took,  Kenneth W. Schafermeyer, Stephanie Lukas, and Bo Zhang. Knowledge, perceptions and practices of pharmacists regarding generic substitution in China: A cross-sectional study. Poster for International Pharmacy Federation Congress,

September 2020.

Desai VH, Parab R, Joshi M, Schafermeyer KW and Lukas S, "Collaborative Learning Experiences Between Goa College of Pharmacy, Panaji, Goa & St. Louis College of Pharmacy, St. Louis, Missouri, USA."  Poster, Goa College of Pharmacy Conference, Panaji, Goa, India, December 2019.

Lukas S, Peters GL and Schafermeyer KW, "Overcoming Regulatory Hurdles to Allow International Pharmacists and Students to Engage in Clinical Pharmacy Rotations."  Poster at American College of Clinical Pharmacy Annual Meeting, New York, NY, October 27, 2019.

Lukas S, Ryan RR and Schafermeyer KW, "Using Oral, Visual and Written Assignments to Enhance International Experiential Education."  Poster at International Pharmacy Federation Congress, Abu Dhabi, United Arab Emirates, September 23, 2019.

Pieper JA, Lukas S, Craig B, Gleason BL, Schafermeyer KW, Sass M and Flabiano H, "Development of Bachelor and Master Degree Programs in Global Health." Poster at the Tenth Biennial Monash Pharmacy Education Symposium, Prado, Italy, September, 2019.

Lukas S, Ryan RR, Peters, GL, Tiemeier AM and Schafermeyer KW, "Global Outreach at St. Louis College of Pharmacy."  Poster at American Association of Colleges of Pharmacy Annual Meeting, Chicago, IL, July 14, 2019.

Collins AN, Oginni O, and Schafermeyer KW, "Employment Survey of the 2018 Graduates of St. Louis College of Pharmacy."  Poster at STLCOP Student Research Symposium, April 2019.

Lukas SK, Peters GL, Joshi M and Schafermeyer KW, "Use of Work Plans to Guide Collaboration Between United States and India Schools of Pharmacy." Poster at Consortium of Universities for Global Health Conference, Chicago, IL, March 2019.

Peters GL, Joshi M, Lukas S, Vaidya R, and Schafermeyer KW, "Enhancing Over-the-Counter Medication Knowledge for Pharmacists in Goa, India.  Poster at American College of Clinical Pharmacy International Conference, Seattle, WA, October 22, 2018.

Schafermeyer KW, "Transforming Outcomes: the Pharmabridge Experience."  International Pharmacy Federation Annual Meeting, Glasgow, Scotland, September, 2018.

Lukas SK and Schafermeyer KW, "Preparing Students for International Experiential Education."  Poster at International Pharmacy Federation Annual Meeting, Glasgow, Scotland, September 2018.

Russell MB, Collins AN, and Schafermeyer KW, "Employment Survey of the 2017 Graduates of St. Louis College of Pharmacy."  STLCOP Student Research Symposium, April 2018.

Lukas SK, Boschmans SA, Fogarty TL and Schafermeyer KW, "Collaboration for the Training of Pharmacy Technicians in South Africa."  Poster presented at Midwest Universities for Global Health Meeting, St. Louis, MO, December 1, 2017.

Schafermeyer KW and Lukas SK, "Managing Risk in Global Health Programs."  Poster presented at Midwest Universities for Global Health Meeting, St. Louis, MO, December 1,

2017.

Schafermeyer KW (panelist) "Faculty Professional Development in Global Health. Midwest Universities for Global Health Meeting, St. Louis, MO, December 1, 2017.

Schafermeyer KW, "Global Engagement Opportunities for Students and Alumni." STLCOP Alumni Association, November 16, 2017.

Lukas SK and Schafermeyer KW, "Pharmacy Technicians: A Multi-Faceted Approach to Developing a New Cadre of Pharmacy Support Personnel in South Africa."  Presentation at the International Pharmacy Federation World Congress of Pharmacy and Pharmaceutical Sciences, Seoul, South Korea, September 2017.

Lukas SK and Schafermeyer KW, "Planning and Executing a Service Learning Course." Roundtable session at the American Association of Colleges of Pharmacy Annual Meeting, Nashville, TN, July 17, 2017.

Schafermeyer KW and Lukas SK, "Drug Abuse: An International Perspective."  Presentation to the International Students Organization and Students Organization for Drug and Alcohol Awareness, St. Louis College of Pharmacy, April 6, 2017.

Malotra J, Schafermeyer KW and Williams D, "Training Opportunities and Experiences for Hosting Global Pharmacist Colleagues."  Webinar hosted by the American Association of Colleges of Pharmacy, December 15, 2016.

Schafermeyer KW and Lukas SK, "Participating in the International Pharmacy Federation's Pharmabridge Program."  Presented at the Strategies for New Opportunities Worldwide (SNOW) Conference, Denver, CO, December 10, 2016.

Lukas SK and Schafermeyer KW, "Pharmacy Capacity Building – Comparison of Programs in Africa."  Presentation at the Strategies for New Opportunities Worldwide (SNOW) Conference, Denver, CO, December 10, 2016.

Schafermeyer KW and Lukas SK, "Managing Risk in Study Abroad and International Service Programs." Poster presented at the Strategies for New Opportunities Worldwide (SNOW) Conference, Denver, CO, December 10, 2016.

Lukas SK and Schafermeyer KW, "New Directions for Addressing the HIV/AIDS Crisis in Southern Africa." Presentation to the Student National Pharmacists Association STLCOP Chapter, December 1, 2016.

Boschmans SA, Fogarty TL, Schafermeyer KW, Lukas SK and Mallinson RK, "Pharmacy Technician Training in South Africa: Improving Access to Antiretrovirals." Presentation to the Board of Directors of the American International Health Alliance, Washington, DC, September 27, 2016 and webinar hosted by the U.S. Department of Health and Human Services, Health Resources Services Administration, Rockville, MD, September 28, 2016.

Schafermeyer KW, "Hospital Formulary Management and Decision Making."  Beijing Pharmaceutical Association, Beijing, China, September 9, 2016.

Schafermeyer KW, "The Pharmacoeconomic Basis for Hospital Formulary Management."  First

People's Hospital of Yunnan Province, Kunming, China, September 7, 2016

Lukas SK, Peters GL, Mezgebe HB, and Schafermeyer KW, "U.S. and Ethiopian Schools of Pharmacy Partner to Enhance Pharmacy Education."  Poster presented at the International Pharmacy Federation Annual Meeting, Buenos Aires, Argentina, September 1, 2016.

Schafermeyer KW, "Pharmacoeconomics Review," Board of Pharmaceutical Specialties Review Course, St. Louis College of Pharmacy, August 18, 2016.

Schafermeyer KW and Lukas SL, "Internationalization of Pharmacy Education." Presentation at Rhodes University, Grahamstown, South Africa, July 13, 2016.

Lukas SK, Fogarty TL, Boschmans, SA, Tiemeier A, Mallinson RK, and Schafermeyer KW, "Pharmacy Technicians: Improving Access to Antiretrovirals and Other Mediations in South Africa."  Poster presentation at the Global Health and Infectious Disease Conference, Washington University in St. Louis, April 2016.

Russell MB, Collins AN, and Schafermeyer KW, "Employment Survey of the 2016 Graduates of St. Louis College of Pharmacy."  Poster presented at the STLCOP Student Research Symposium, April 8, 2017.

Schafermeyer KW, "Global Perspective on HIV/AIDS."  Presentation Schafermeyer KW, "Global Health Economics."  Presentation to the National Student Pharmacists Association, St. Louis College of Pharmacy, December 1, 2015.

Griggs SK, Schafermeyer KW, Hanks C, and Park T, "Baseline Factors Related to Cultural Competence among Pharmacy Students at a Midwestern College in the United States." Poster presented at the International Pharmacy Federation Annual Meeting, Dusseldorf, Germany, October 1, 2015.

Griggs SK, Patterson ME, Schafermeyer KW, Liu Y, Brown WN and Rasu RS, "An Analysis of the Cost of Dispensing Prescriptions in Missouri."  Poster presentation at the Midwest Pharmacy Conference and Expo, Overland Park, KS, September 13, 2015.

Schafermeyer, KW, "Group Purchasing Organizations: Applying Lessons Learned in the U.S. to Pharmaceutical Purchasing in China."  Presentation to Beijing Hospital Pharmacists Association and Peking Union Medical College Hospital, Beijing, China, September 7, 2015.

Schafermeyer KW, "Fundamentals of Exam Psychometrics" Blueprint, Exam Construction and Item Analysis." Presentation at Nelson Mandela Metropolitan University, Port Elizabeth, South Africa, June, 2015.

Schafermeyer KW, "Global Health Economics."  Presentation to the Washington University School of Medicine, Global Health Scholars Lecture Series, St. Louis, MO, May 11, 2015.

Duong N, Pham E, Huber A, Cho S, Griggs SK, Schafermeyer KW and Park T, "Ongoing Assessment of Cultural Competence among St. Louis College of Pharmacy Students: Baseline and Longitudinal Data." Poster presentation at the STLCOP Student Research Symposium, April 18, 2015.

Scimio C, Thomas M, and Schafermeyer KW, "Employment Survey of the 2014 Graduates of

St. Louis College of Pharmacy." Poster presentation at the STLCOP Student Research Symposium, April 18, 2015.

Franco FM, Plaster A, Patel R and Schafermeyer KW, "Harmful Prescribing Practices and Medication Use among Pregnant Women and Children in the Flooded Regions of Northeast Bangladesh: Implications for a Teaching Program." Poster presented at Washington University School of Medicine, Third Annual Global Health and Infectious Disease Conference, St. Louis, MO, April 9-10, 2015.

Owens L, Stoner C and Schafermeyer KW, "Pharmacy Students Train Healthcare Workers in Swaziland." Poster presented at Washington University School of Medicine, Third Annual Global Health and Infectious Disease Conference, St. Louis, MO, April 9-10, 2015.

Schafermeyer KW, "Evolution of Health Care and Health Insurance: Impact on Hospital Pharmacies."  Presentation to the Beijing Pharmaceutical Association Annual Meeting, Beijing, China, December 20, 2014.

Schafermeyer KW, "Economic Trends in Health Care: Impact on Us Pharmacies."  Presentation to Eastern Asia University, Bangkok, Thailand, September 2014.

Schafermeyer KW, "Preparation and Implementation of an International Pharmacy School Collaboration."  Presentation at the International Pharmacy Federation Annual Meeting, Bangkok, Thailand, September 2014.

Schafermeyer KW, "Impact of Economic Trends in Health Care: A Comparison of the U.S. and India." Presentation to the Goa, India Pharmacy Council, Panaji, India, September 2014.

Lee SY, Griggs SK and Schafermeyer KW, "An Assessment of Cultural Competence among Pharmacy Students."  Poster for American Association of Colleges of Pharmacy Annual Meeting, Grapevine, TX, July 2014.

Scimio KN, Cho S, Powell J, Griggs SK, Lee SY and Schafermeyer KW, "An Initial Assessment of Cultural Competence Among St. Louis College of Pharmacy Students."  Poster for STLCOP Student Research Symposium, April 2014.

Berry TM, Griggs SK, McMurphy T, Pearce EF, Peters G, Schafermeyer KW, Simmons KL, Tiemeier AM, "From the College Community to International Partnerships: The Ripple Effect of STLCOP Community Engagement." Poster for American Association of Colleges of Pharmacy Annual Meeting, Grapevine, TX, 2014.

Panelist, "Research: How Do I Get Started," STLCOP Student Research Symposium, April 2014.

Panelist, "Missouri Pharmacy Association Pre-Legislative Day Expert Panel," St. Louis College of Pharmacy, March 25, 2014.

Schafermeyer KW, "Cultural Competence and International Service for Pharmacy Students," presentation at the Veteran Pharmacists Group of the STLCOP Alumni Association, April 24, 2014.

Peters GL, Lee SY and Schafermeyer KW, "A Collaborative Effort to Develop Clinical Pharmacy

Services and Advanced Pharmacy Practice Experience (APPE) Student Exchange Programs in Ethiopia and China."  Poster presentation at the American College for Clinical Pharmacy Annual Meeting, Albuquerque, NM October 2013.  Abstracted in *Pharmacotherapy* 2013; 33(10)e182-e299.  Abstract #254.

Schafermeyer KW, "To Error is Human: Strategies for Decreasing Medication Errors."  Presentation to medical and nursing staff at Raleigh Fitkin Memorial Hospital, Manzini Swaziland, June 14, 2013.

Schafermeyer KW, "STLCOP Office of International Programs," St. Louis College of Pharmacy Alumni Association Annual Meeting, May 16, 2013

Scimio KN and Schafermeyer KW, "A Study of Gender Differences in Employment of Recent Pharmacy Graduates." Poster presentation at the International Pharmacy Federation Annual Meeting, Amsterdam, Netherlands, October 5, 2012.

Schafermeyer KW, "Health Care Reform: Myths vs. Realities."  St. Louis College of Pharmacy Alumni Association, St. Louis, MO, September 29, 2012.

Schafermeyer KW, Health Care Reform: Impact on Pharmacy, McKesson Regional Meeting, St. Louis, MO, November 10, 2010.

Schafermeyer KW, Marshal P and Konieczny N, "Health Care Reform: Facts vs. Myths."  St. Louis College of Pharmacy Alumni Association, St. Louis, MO, November 4, 2010.

Schnur ES and Schafermeyer KW, "The Importance and Level of Coverage of Practice Management in a Pharmacy Curriculum," Poster, International Pharmacy Federation Annual Meeting, Lisbon Portugal, August 30, 2010.

Schafermeyer KW, "Job Enrichment: How to Enhance Your Job as a Pharmacy Technician," Missouri Pharmacy Association Annual Meeting, Branson, MO, June 11, 2010.

Schafermeyer KW, "On-the-Job Training for Pharmacy Technicians," National Community Pharmacists Association Annual Meeting, New Orleans, LA, October 19, 2009.

Schafermeyer KW and Tadrus C, "One Size Does Not Fit All: A Focus on Pharmacy Technician Training and Certification Programs in the Community Setting," National Community Pharmacists Association Annual Meeting, Tampa, FL, October 12, 2008.

Schafermeyer, KW, "Managing Your Boss and Managing Your Career," Missouri Pharmacy Association Annual Meeting, St. Louis, MO, June 13, 2008.

Schafermeyer KW, "Pharmacy Staffing: Optimizing the Use of Pharmacists and Technicians," Missouri Pharmacy Association Winter Meeting, Branson, MO, February 10, 2008.

Schafermeyer KW, "The Role of Pharmacy Benefit Managers," Southern Illinois University College of Pharmacy, Edwardsville, IL, November 10, 2006.

Schafermeyer KW, "Enhancing Your Career as a Pharmacy Technician," National Pharmacy Technician Association Annual Meeting, St. Louis, MO, August, 2006.

Schafermeyer KW, "Assessment of Pharmacy Technician Skills" National Community Pharmacists Association Annual Meeting, Las Vegas, NV, October 11, 2006.

Schafermeyer KW, "Enhancing Your Career as a Pharmacy Technician," Oregon State Pharmacy Association Annual Meeting, Salem, OR, September 16, 2006.

Schafermeyer KW, "Pharmacy Benefit Management Companies" Health Care Systems Course at Southern Illinois University – Edwardsville, November 2006.

Schafermeyer KW, "Pharmacy Technician Education and Training: A Need to Standardize?" at National Association of Boards of Pharmacy Educational Conference, Sunny Isles, FL, December 3, 2005.

Schafermeyer KW, "Pharmacy Benefit Management Companies" Health Care Systems Course at Southern Illinois University – Edwardsville, September 12, 2005.

Schafermeyer KW, "Should Managed Care Plans Care About Pharmacy Reimbursement?" Academy of Managed Care Pharmacy Chapter at Duquesne University School of Pharmacy, Pittsburgh, PA, September 22, 2004.

Schafermeyer KW, "Transparency of PBMs: What Employer Groups Don't Know About Rx Costs" Faculty and graduate students at Duquesne University School of Pharmacy, Pittsburgh, PA, September 22, 2004.

Stratman R and Schafermeyer KW, "Employment Survey of 2003 Pharmacy Graduates." Poster, Missouri Pharmacy Association Annual Meeting, St. Louis, MO June 19, 2004.

Schafermeyer KW, "Exploring Employment Options in Managed Care Pharmacy."  Roundtable discussion at Academy of Managed Care Pharmacy Educational Conference, Montreal, Canada, October 10, 2003.

Schafermeyer KW, "Training Pharmacy Technicians to Assume Managed Care Responsibilities."  Poster presentation at the International Pharmacy Federation Annual Congress, Sydney, Australia, September 5, 2003.

Schafermeyer KW, "Paradoxes of the U. S. Health Care System: What are the Real Issues?" Facts and Comparisons, St. Louis, MO, October 4, 2002.

Schafermeyer KW, "Delegation and Technician Training." Illinois Pharmaceutical Association Annual Meeting, St. Louis, MO, September 22, 2002.

Schafermeyer KW, "Using Business Plans to Teach Management Skills."  Poster presentation at the International Pharmacy Federation Annual Congress, Nice, France, September 1, 2002.

Schafermeyer KW, "Integration of Managed Care into the Pharmacy Curriculum." Lecture to faculty members of Port Elizabeth University and Rhodes University Colleges of Pharmacy, Port Elizabeth, South Africa, May 31, 2002.

Schafermeyer KW, "The Impact of Managed Health Care on Community and Hospital Pharmacy Practice."  Eastern Cape Section of the Pharmaceutical Society of South Africa, Port Elizabeth, South Africa, May 31, 2002.

Schafermeyer KW, "Hospital Contracting With Managed Care Organizations." Ohio State University Seminar, Columbus, OH, January 15, 2002.

Schafermeyer KW, "The Role of Pharmacy and Pharmaceuticals in the Health Care System." Lecture at Washington University, Health Services Administration, St. Louis, MO October 29, 2001.

Panel member, Patient, Physician and Society course at St. Louis University School of Medicine, October 11, 2001.

Schafermeyer KW "Integration of Managed Care in the Pharmacy Curriculum." NABP/AACP Region VI Annual Meeting, Lawrence, KS, October 5, 2001.

Schafermeyer KW, "How Do Countries Differ Regarding Drug Policies?" International Students' Organization, St. Louis College of Pharmacy, September 18, 2001.

Schafermeyer KW, "Self Assessment of Learning in a Graduate Program in Managed Care Pharmacy." International Pharmaceutical Federation Annual Congress, Singapore, September 2, 2001.

Schafermeyer KW, Hurd PH and Rickert DR, "The Portfolio's Role in Changing Graduate Students' Perceived Self Efficacy." Poster, American Association of Colleges of Pharmacy Annual Meeting, Toronto, Canada, July 9, 2001.

Schafermeyer KW, "How to Enhance Your Career as a Pharmacy Technician." Missouri Pharmacy Association Annual Meeting, Osage Beach, MO, June 16, 2001.

Schafermeyer KW, "Development of a Formulary System." Kanartaka State Pharmacy Council, Bangalore, India, May 17, 2001.

Schafermeyer KW, "Evolution of Pharmacy Practice and Education in the United States: From Compounding to Pharmaceutical Care." Al-Ameen College of Pharmacy, Bangalore, India, May 21, 2001.

Schafermeyer KW, "Opportunities in Pharmacy Ownership." National Community Pharmacists Association Chapter at the St. Louis College of Pharmacy, September 7, 2000.

Schafermeyer KW, "How to Effectively Train Pharmacy Technicians." Missouri Pharmacy Association Annual Meeting, Osage Beach, MO, June 10, 2000.

Schafermeyer KW, "Cracking the Code: Understanding Third-Party Plans." National Community Pharmacists Association Annual Meeting, Las Vegas, NV, October 24, 1999.

Schafermeyer KW, "Pharmacy Law and You: Laws That Affect Your Day." National Community Pharmacists Association Annual Meeting, Technician Program, Las Vegas, NV, October 24, 1999.

Moderator for Giambrone A and Gordon DK, "Data Warehousing and Pharmacy: Integrating Information for Improved Decision Making." Academy of Managed Care Pharmacists Annual Meeting, Atlanta, GA, October 9, 1999.

Schafermeyer KW, "How to Effectively Train Your Pharmacy Technicians." Cardinal Health Retail Business Conference, Washington, DC, July 20, 1999.

Schafermeyer KW, "Managed Heath Care: A Primer for Pharmacy Technicians." Cardinal Health Retail Business Conference, Washington, DC, July 19, 1999.

Rascati KL, Drugalis JR, Larson LN and Schafermeyer KW, "Pharmacoeconomic Education in Colleges of Pharmacy: A Panel Discussion." American Association of Colleges of Pharmacy Annual Meeting, Boston, MA, July 7, 1999.

Moderator for Bertin RJ and Bond WE, "Credentialing: Documenting Pharmacists' Knowledge and Skills." Academy of Managed Care Pharmacy Annual Meeting, Minneapolis, MN, April 30, 1999.

Schafermeyer KW and Chereson RS, "Be Prepared: Pharmacy Technician Certification Exam Review." National Community Pharmacists Association Annual Meeting, St. Louis, MO, October 17, 1998.

Schafermeyer KW, "Advancing Your Career as a Pharmacy Technician." National Community Pharmacists Association Annual Meeting, St. Louis, MO, October 17, 1998.

Schafermeyer KW, "Ask the Experts: Round Table Discussion for Pharmacy Students." Academy of Managed Care Pharmacy Educational Conference, Chicago, IL, October 9, 1998.

Schafermeyer KW, "Master of Science Courses in Managed Care Pharmacy." Poster, American Association of Colleges of Pharmacy Annual Meeting, Snowmass, CO, July 21, 1998.

Schafermeyer KW, "Round Table Discussion for Pharmacy Students: Graduate Study in Managed Care Pharmacy." Academy of Managed Care Pharmacy Educational Conference, Chicago, IL, October 8, 1998.

Moderator for Sorensen TD, "Expectations of a Managed Care Student Clerkship Rotation." Academy of Managed Care Pharmacy Educational Conference, Chicago, IL, October 8, 1998.

Schafermeyer KW, "Preparing Abstracts and Presentations." Academy of Managed Care Pharmacy Annual Meeting, Philadelphia, PA, May 1, 1998.

Schafermeyer KW, "Training Your Pharmacy Technicians." National Community Pharmacists Association Rx Expo, Pittsburgh, PA, May 8, 1998.

Schafermeyer KW, "Opportunities in Managed Care," NCPA Career Round Tables, NCPA Annual Meeting, Denver, CO, October 26, 1997.

Wagner MA and Schafermeyer KW, "Introduction of the NACDS Technician Competency Exam." National Association of Chain Drug Stores Pharmacy Conference, Boston, MA, August 25, 1997.

Schafermeyer KW, "Role of the Technician in Patient-Focused Care." Wisconsin Pharmacists Association Annual Meeting, Madison, WI, August 16, 1997.

Schafermeyer KW, "Technician Training." Wisconsin Pharmacists Association Annual Meeting, Madison, WI, August 16, 1997.

Hobson EH, Holiday-Goodman MG, Schafermeyer KW and Smith RE, "Taking the Plunge: Introducing Writing in Pharmacy Courses."  American Association of Colleges of Pharmacy Annual Meeting, Indianapolis, IN, July 15, 1997.

Schafermeyer KW and Hobson EH, "Business Plans: A Tool to Teach Entrepreneurial and Communication Skills."  Poster, American Association of Colleges of Pharmacy Annual Meeting, Indianapolis, IN, July 15, 1997.

Schafermeyer KW, Hurd PD and Motheral BR, "Managed Care Pharmacy: M.S. Degree and Certificate Program."  Poster, American Association of Colleges of Pharmacy Annual Meeting, Indianapolis, IN, July 13, 1997.

Dolinsky D, Brushwood D, Desselle S, Mount J, Schafermeyer K and Stratton T, "Social and Administrative Sciences Instructional Modules for the Delivery of Pharmaceutical Care-1997."  Poster, American Association of Colleges of Pharmacy Annual Meeting, Indianapolis, IN, July 15, 1997.

Schafermeyer KW, "Writing to Learn Workshop." North Dakota State University Faculty Retreat for Colleges of Pharmacy and Nursing, Fargo, ND January 6, 1997.

Schafermeyer KW and West DS, "Independent Pharmacy Career Roundtable."  NARD Annual Meeting, New Orleans, LA, October 13, 1996.

Motheral BR and Schafermeyer KW, "Using Claims Databases for Pharmacoeconomic Analysis and Outcomes Management."  Academy of Managed Care Seminar titled "Linkages for Quality: Information Management for Managed Care Pharmacy," Chicago, IL, September 16, 1996.

Schafermeyer KW, "How to Train and Manage Pharmacy Technicians."  Georgia Pharmacists' Association Annual Meeting, Savannah, GA, June 18, 1996.

Schafermeyer KW and Motheral B, "Pharmacoeconomics: Basic Principals."  SmithKline Beecham Pharmaceuticals Regional Managers Meeting, Memphis, TN, December 4, 1995.

Schafermeyer KW, "Training Your Pharmacy Technician: A Tool for Building a Better Team."  NARD Annual Meeting, Las Vegas, NV October 10, 1995.

Chereson RS, Bilger R, Miller B, Schafermeyer KW, "Pharmacy Practitioners' Perceptions of the Pharmaceutics Curriculum."  Poster, Annual Meeting of the American Association of Colleges of Pharmacy, Philadelphia, PA, July 1995.

Schafermeyer KW, "The Pharmacy Technician's Role in Enhanced Patient Care."  NARD Rx Expo, Dallas, TX, May 6, 1995.

Schafermeyer KW, "Patient Outcomes Measurement and Pharmacoeconomics: Basic Principals."  Sixth Annual Charles C. Rabe Symposium, St. Louis, MO, April 25, 1995.

Schafermeyer KW, "Reforming Mental Health Care Prescription Coverage."  First Annual Meeting of the Psychopharmacy Pharmacists, St. Louis, MO, November 5, 1994.

Schafermeyer KW, "Health Care Reform: The State Challenge."  Illinois Pharmacists Association Annual Meeting, St. Louis, MO, September 30, 1994.

Schafermeyer KW, "Pharmacy Education Reform:  Consequence of Health Care Reform."  Faculty Retreat of the St. Louis College of Pharmacy, Grafton, IL, August 17, 1994.

Schafermeyer KW, "Using Spreadsheets for Case Studies in Pharmacy Management." American Association of Colleges of Pharmacy Annual Meeting, Section of Social and Administrative Sciences, session titled "Round Tables on Educational Strategies and Innovations." Albuquerque, NM, July 17, 1994.

Hobson EH and Schafermeyer KW, "Writing and Critical Thinking: Writing to Learn."  American Association of Colleges of Pharmacy Annual Meeting, Special Session titled "Classroom Strategies for Developing Critical Thinking."  Albuquerque, NM, July 19, 1994.

Schafermeyer KW, Hobson E, Goodwin SA, and Tadrus CS, "Writing-to-Learn in Large Classes: Student and Instructor Benefits."  American Association of Colleges of Pharmacy Annual Meeting, Albuquerque, NM, July 19, 1994.  Also presented at the Second International Writing Centers Conference, St. Louis, MO, September 28, 1995.

Schafermeyer KW, "Health Care Reform: Implications for Pharmacy."  Connecticut Pharmacists Association Annual Meeting, Southbury, CT, June 18, 1994.

Schafermeyer KW, "Seeds of Change: State Initiatives to Health Care Reform."  Continuing education program for the St. Louis College of Pharmacy Alumni Association, St. Louis, June 5, 1994.

Schafermeyer KW, "Marketing of Pharmaceuticals to Physicians."  Jewish Hospital Therapeutic Conference, St. Louis, MO, June 1, 1994.

Cataldo R and Schafermeyer KW, "Advanced Techniques for Managed Care Pharmacists."  Academy of Managed Care Pharmacy post-meeting seminar, Boston, MA, May 10-11, 1994.

Schafermeyer KW, "Value of Prescription Drug Therapy: Costs vs. Quality."  Meeting of Nurses' Advanced Practice-Missouri, St. Louis, MO March 14, 1994.

Schafermeyer KW, "Health Care Reform: Implications for Pharmacy Education."  St. Louis College of Pharmacy Symposia, October 7, 1993.

Schafermeyer KW, "Health Care Reform: Changing the Face of Pharmacy."  St. Louis Pharmacists Association, November 16, 1993.

Schafermeyer KW, "Health Care Reform." St. Louis College of Pharmacy Alumni Association, Columbia, MO, September 8, 1993

Schafermeyer KW, "A Study of the Changes in Medicaid Utilization and Expenditures Associated With an Expanded Drug Formulary."  Poster, Annual Meeting of the American Association of Colleges of Pharmacy, San Diego, CA, July 13, 1993.

Bot JA, and Schafermeyer KW, "Perceived Needs of Pharmacy Students and Recent Graduates for Pharmacy Management Proficiency." Poster, American Association of Colleges of Pharmacy Annual Meeting, San Diego, CA, July 13, 1993.  Also presented at the Fourth Annual Research/Scholarly Activity Poster Presentation Day, St. Louis College of Pharmacy, April 23, 1993.  (Received "Best Poster Award".)

Schafermeyer KW, "How Pharmacists Can Help Protect Your Health." St. Louis Rotary Club, June 3, 1993.

Schafermeyer KW, "Implications of OBRA '90 for Pharmacy Practice." Academy of Students of Pharmacy, St. Louis, September 22, 1992.

Schafermeyer KW, "Perspectives on the PMA-Coordinated Industry Program for Pharmacy Faculty."  American Association of Colleges of Pharmacy Annual Meeting, Washington, DC, July 14, 1992.

Becker ES, Coley RM, McKinnon G, Grotpeter P, and Schafermeyer KW, "The Development of a Convocation Series Designed to Enhance Student Professionalism." American Association of Colleges of Pharmacy Annual Meeting, Washington, DC, July 14, 1992.

Schafermeyer KW, "The U.S. Health Care System: Paradox and Alternatives." Current Topics Discussion Group, Chesterfield, MO, May 17, 1992.

Moderator, Third Annual Charles C. Rabe Seminar, St. Louis, MO, April 23, 1992.

Bourikas C, Boyd KL, and Schafermeyer KW, "Factors Influencing Medication Information Requests by Patients." Third Annual Research/Scholarly Activity Poster Presentation Day, St. Louis College of Pharmacy, St. Louis, April 22, 1992.

Schafermeyer KW, and Cataldo R, "An Analysis of the Cost of Dispensing Third-Party and Private-Pay Prescriptions in Rhode Island." Poster, American Pharmaceutical Association Annual Meeting, Section of Economic, Social and Administrative Sciences, San Diego, CA, March 15, 1992.

Schafermeyer KW, "Graduate School Opportunities." Rho Chi luncheon, St. Louis College of Pharmacy, December 6, 1991.

Schafermeyer KW, "Prescription Program Cost Containment: Strategies that Work." Southern Illinois Coal Company Benefits Meeting, Mt. Vernon, IL, May 8, 1991.

Schafermeyer KW, Schondelmeyer SW, Thomas J, and Proctor KA, "Analysis of Chain Pharmacies' Costs of Dispensing a Third Party Prescription." American Association of Colleges of Pharmacy Annual Meeting, Salt Lake City, UT, July 8, 1990.  Also presented at the Annual Research/Scholarly Activity Poster Presentation Day, St. Louis College of Pharmacy, April 24, 1991.

Schafermeyer KW, Schondelmeyer SW, Thomas KA, and Proctor KA, "Comparison of Prescription Department Cost Allocation Methods." American Pharmaceutical Association Annual Meeting, Section of Economic, Social and Administrative Sciences, New Orleans, LA, March 10, 1991.

Schafermeyer KW, "The Impact of Managed Health Care on Pharmacy Practice and Education." District VI AACP/NABP Annual Meeting, St. Louis, MO, October 7, 1990.  Also presented at the Meeting of the Board of Trustees of the St. Louis College of Pharmacy, October 16, 1990.

Schafermeyer KW, "The Usefulness of the FDA Orange Book as a Guide for Drug Product Selection Decisions." American Society for Pharmacy Law Annual Meeting, Anaheim, CA, April 10, 1989.

Schafermeyer KW, "The Impact of the Medicare Catastrophic Health Care Act on Pharmacy Practice." Indiana Pharmacists Association Midyear Meeting, Indianapolis, IN, April 2, 1989.

Schafermeyer KW, "How to Produce Professional and Profitable Association Publications." National Council of State Pharmaceutical Association Executives Annual Meeting, Chicago, IL, March 27, 1987.

Schafermeyer KW, "Marketing of a Provider-Sponsored Prescription Drug Program." National Association of Retail Druggists' PSAO Conference, Kansas City, MO, May, 1986.

Schafermeyer KW and Gee MA, "Report on State Pharmacy Association-Sponsored Volume Purchasing Programs and Pharmacy Services Administrative Organizations." National Council of State Pharmaceutical Association Executives Annual Meeting, San Francisco, CA, March, 1986.

Schafermeyer KW, "The National and Local Scene on Pharmacy Preferred Provider Organizations and Buying Groups."  Missouri Valley Drug Associates Meeting, Kansas City, MO, December, 1985.

Yates WN, Schafermeyer KW and Hovancsak C, "A Study of the Effectiveness of Drug Utilization Review in Improving the Quality of Patient Care."  American Pharmaceutical Association Annual Meeting, San Antonio, TX, February 1985.

Schafermeyer KW, Huffman DE, Huffman DC Jr. and Roberts KB, "The Effect of Copayment on Prescription Size under a Prepaid Prescription Program." American Association of Colleges of Pharmacy Annual Meeting, Scottsdale AZ, June 29, 1981.

Schafermeyer KW and White BD, "Consumer Representation on State Boards of Pharmacy: A Survey and Suggestions."  American Society for Pharmacy Law Annual Meeting, Anaheim, CA, April 24, 1979.

Schafermeyer KW and Huffman DC, "An Analysis of Select Practitioner Organizations' Positions on the Basic Degree Required for Licensure as a Pharmacist." Joint Commission of Pharmacy Practitioners, Washington, DC, July, 1978.

**Global Health Grants**

Padidar S, Lukas S and Schafermeyer KW, "Southern African Snakebite Treatment, Education and Prevention Project (Southern African STEP Project)."  Submitted to Consortium of Universities for Global Health, October 2020. ($8,542 – Under Review.)

Lukas S, Teshome B, Berhane H, Schafermeyer KW, Gattas N, Stevens A, Peters GL, Yohannes B and Solomon G, "Optimizing Pharmacists' Impact to Improve Patient Care in Ethiopia."  Proposal for STAR Grant sponsored by USAID and Consortium of Universities for Global Health, August 2019. ($15,000 – not funded)

Schafermeyer KW, Joshi M, Lukas S, Peters GL, Park T, Micek ST, Teshome B, Desai VH and Vaidya R, "Promotion of Antibiotic Stewardship in Goa, India."  Proposal for STAR Grant sponsored by USAID and Consortium of Universities for Global Health, August 2019. ($15,000 – not funded)

Lukas SK and Schafermeyer KW, "Determining the Long-Term Impacts of Pharmacy student Participation in International Service and Learning Opportunities."  Sponsored by the Faculty Research Incentive Fund Grant, St. Louis College of Pharmacy.  ($2,555)

Schafermeyer KW and Lukas SK, "Proposal to Increase Pharmacy Student Involvement in Study Abroad Programs."  Sponsored by the U.S. Department of State and administered by Partners of the Americas, Washington, DC, August 2016 ($36,334).

Schafermeyer KW and Griggs SK, "A Study of Missouri Pharmacies' Costs of Dispensing Prescriptions."  Missouri Department of Social Services, December 2013. ($150,500 – subcontract through University of Missouri-Kansas City for $55,000)

Lee SY, Griggs SK and Schafermeyer KW, "The Assessment of Cultural Competency among Pharmacy Students.  Funded by STLCOP Research Incentive Fund, October 2012 ($10,000).  [Renewed in 2013 and 2014 for $5,000 and $6,000, respectively.]

Schafermeyer KW and Mallinson K, "Proposal for a Partnership to Support Mid-level Pharmacy Professionals in South Africa by Strengthening the Pharmacy Technician Program at Nelson Mandela Metropolitan University."  Sponsored by the U.S. Department of Health and Human Services, Health Resources and Services Administration, administered by the American International Health Alliance, February 2013 ($80,000) [Renewed for FY 2014-15, $80,000 plus $22,499 subgrant; renewed for FY 2015-16, ~ $80,000 and for FY 2016-17 ~$80,000]

Schafermeyer KW, "Practice Analysis for Mid-Level Pharmacy Practitioners in South Africa."  Research conducted for Nelson Mandela Metropolitan University School of Pharmacy, Port Elizabeth, South Africa.  August 2013.

## PROFESSIONAL SERVICE ACTIVITIES

### Academic

Referee
- *AAPS PharmSci* (1 manuscript)
- *American Journal of Health-System Pharmacists* (7 manuscripts)
- *American Journal of Pharmaceutical Education* (15 manuscripts)
- *The Consultant Pharmacist* (1 manuscript)
- *Clinical Therapeutics* (5 manuscripts)
- *Drug Intelligence and Clinical Pharmacy* (1 manuscript)
- *Journal of the American Pharmaceutical Association* (8 manuscripts)
- *Journal of Managed Care Pharmacy* (21 manuscripts)
- *Journal of Managed Pharmaceutical Care* (1 manuscript)
- *Journal of Pharmaceutical Marketing and Management* (7 manuscripts)
- *Journal of Pharmacy Teaching* (1 manuscript)
- *Journal of Research in Pharmaceutical Economics* (1 manuscript)
- *Pharmacy Education* (the Journal of the International Pharmacy Federation) (5 manuscripts)
- *Research in Social and Administrative Pharmacy* (6 manuscripts)
- Reviewer, "A Manual of Experiential Learning in a Managed Care Pharmacy," Academy of Managed Care Pharmacy, 2000.

- Reviewer, "Accreditation Standards and Learning Objectives for Residency Training in Managed Care Pharmacy," Academy of Managed Care Pharmacy and the American Society of Health-Systems Pharmacy.
- Reviewer, teaching module on Quality Assurance for the *Managed Care & Pharmacy Teaching Tool Project* sponsored by Hoechst Marion-Roussel.
- Member, Editorial Advisory Board, American Association of Pharmaceutical Scientists.
- Abstract reviewer for the Annual Meeting of the American Pharmaceutical Association, Section of Economic, Social and Administrative Sciences, 1994.
- GAPS Review Panel, American Association of Colleges of Pharmacy, 1992.
- Outside Reviewer for West Virginia University Senate Grant for Research or Scholarship, 1999.
- Outside Reviewer for Promotion and Tenure Committees: Drake University, 1999, 2005 and 2010, Virginia Commonwealth University, 2001, Duquesne University, 2001 and 2005, University of Texas, 2006, University of Oklahoma, 2010, University of Arizona, 2013, and Rhodes University, 2016.
- Reviewer, Knowlton C and Penna R, *Pharmaceutical Care, Second Edition* (Washington DC: American Pharmaceutical Association).

Medical College of Virginia School of Pharmacy:
- Appointed as Practitioner/Teacher, 1979-1981.
- Appointed as Clinical Instructor in Pharmacy, 1981-1982.

University of Kansas School of Pharmacy:
- Member, Dean's Advisory Council, 1983-1987.
- Instructor for seven graduate students enrolled in the University of Kansas' Master of Science program in Hospital Pharmacy, 1983-1986.

St. Louis College of Pharmacy:
- Faculty Senate, 2015-2018.
- Faculty Promotion and Tenure Committee, 2015-2018.
- Department Promotion and Tenure Committee, 2018-19.
- International Travel Oversight Committee (chair) 2015-Present .
- Strategic Planning Update Committee, 2016.
- Office of International Programs Strategic Planning Committee (co-chair), 2016-17.
- Academic Planning Committee, 2000.
- Ad hoc Committee on Academic Progression, 1999, 2001-02.
- Ad hoc Committee to Develop a Consulting/Service Organization, 1990.
- Ad hoc Committee to Develop Criteria for the Student Enrichment Award, 1998.
- Ad hoc Committee on Intercultural Issues, 2001-02
- Ad hoc Committee on Mathematics Proficiency (chairman), 2004.
- Administrative Review Committee for Dean of Students, 1996.
- Administrative Review for Vice President of Academic Affairs, 2000.
- Admissions Committee 1993-2000 (Chairman 1993-1995).
- Advisory Committee for B.S. in Pharmaceutical Sciences, 2001.
- Assessment Committee, 1995-1998.
- Assessment Council for Biostatistics Course, 1996.
- Clerkship Review Task Force, 1997.
- Committee on Continuing Education, 1994-1996.
- Committee to Enhance Professionalization, 1991-1992.
- Committee on Research, 1992.
- Curriculum Committee, 1996-2000, 2007-2012 (Chairman 1998-1999).

- Course Review Team for Externships and Clerkships (Chairman) 1997-1998.
- NABPLEX Subcommittee, 1997-1998.
- Guidelines for Elective Designations Subcommittee, 1999.
- Subcommittee on Student Retention Policies, 1994.
- Subcommittee on Patient Outcomes Management/Pharmacoeconomics, 1994-1995.
- Subcommittee on Policies and Procedures
- Practice Management, Population Health and Information Master Domains, (chair) 2010-11.
- Subcommittees on professional program, co-curricular program and elective tracks (2011-12).
- Critical Thinking Steering Committee, Fourth Year Team (Chairman) 1992.
- Dean's Selection Advisory Committee, 1995.
- Executive Committee, 2004 – 2012.
- Faculty Advisor, Delta Sigma Theta Fraternity, 1991-2002.
- Faculty Advisor, National Community Pharmacists Association (formerly NARD) Chapter, 1992-present.
- Faculty Advisor, Lambda Chi Alpha Fraternity, 2006-present.
- Faculty Affairs Committee, 1999-2003; chairman 2001-02.
- Faculty Governance Committee, 2004-2008, 2014-15.
- Faculty Research Incentive Fund, reviewer, 1997.
- FIPSE Grant Advisory Team (Title: "St. Louis College of Pharmacy Peer Education Program"), 1994-1996.
- FIPSE Grant Faculty Member (Title: "A Multi-Institutional Assessment Center Model to Facilitate Expansion of Ability-Based Education in Schools of Pharmacy"), 1993-1996.
- Graduate Studies Committee, 1990-present (Chairman 1996-present).
- Insurance Advisory Committee, 1992.
- Master Plan Technology Subcommittee, 2000.
- Peer Review Team (for various faculty members) 1994-1995.
- Pharmaceutical Care Laboratory Ad Hoc Planning Committee, 1997.
- Pharmacy Technician Training Advisory Committee, (Chairman) 1998-1999.
- "President's Cabinet" (Capital Giving Campaign), 1993.
- Promotion and Tenure Committee (chairman) 2004-2007, department chair, (2014-15), member 2015-2018.
- Search Committee for StLCOP President, 1993-1994.
- Search Committee for a part-time economics professor, (Chairman) 1992.
- Self Study Steering Committee, 2001-02.
- Sociology Course Review, 1992.
- Spirit of Inquiry Ad Hoc Committee, 1990.
- Division Committee to Stimulate Student/Faculty Research and Scholarly Activity, 1991-92.
- Strategic Planning Committee's Enrollment Management Task Force, 1996.
- Strategic Planning Committee, Subcommittee for the External Environment (Chairman) 1992-1993.
- Strategic Planning Writing Committee, 2004
- Strategic Planning Subcommittee on Fundraising, 2005.
- Student Faculty Liaison Committee, 1990-1992.
- Student Status and Advancement Committee, 1991.
- Technology Committee, 2004-2007.
- International Travel Oversight Committee, 2014-15 (Chaiman)
- Faculty Senate, 2014-18.
- Department P&T Committee, 2018-Present
- Ad hoc Committee on Developing New Department P&T System, 2019-Present

St. Louis Community College
• Member, Pharmacy Technician Program Advisory Committee

Washington University in St. Louis, School of Medicine
• Member, Advisory Board for Global Health Scholars in Medicine

**Associations**

Academy of Managed Care Pharmacy:
• Contributing Editor for *Journal of Managed Care Pharmacy*, 1995-1998.
• Member, Editorial Advisory Board, 1995-1998.
• Member, Schools of Pharmacy Relations Committee, 1997-1998.
• Member, Special Projects Committee, 1998-2000 (Chairman, 1999-2000).
• Member, Educational Affairs Committee, 2001-2004 (Chairman 2003-2004).
• Member, Nominating Committee, 2004.
• Member, Fellow Selection Committee, 2004.
• Diplomat, St. Louis College of Pharmacy.

American Association of Colleges of Pharmacy:
• Chair, Social and Administrative Sciences Section, 2005-06
• Chair-Elect, Social and Administrative Sciences Section, 2004-05
• Graduate Research Liaison for the St. Louis College of Pharmacy, 1999-2001.
• Member, Ad Hoc Committee on Mentoring, Section of Teachers of Pharmacy Administration, 2000-2001.
• Member, Curriculum Development Committee, Section of Teachers of Pharmacy Administration, 1993-1996.
• Member, Health Organization and Government Affairs Committee, 1997-1998.
• Alternate Delegate, Council of Faculties, 1996, 1999.
• Member, Web Resources Committee, 1999-2000

American College of Apothecaries:
• Member, Third Party Committee, 1979-1987.

American Pharmaceutical Association
• Books and Electronic Products Editorial Advisory Board, 2003-06.

American Society of Association Executives:
• Chairman, Certified Association Executives' Exam Study Committee for Kansas, 1983.

Indiana Pharmacists Association:
• Member, Association Affairs Committee, 1989.
• Representative to Indiana Department of Public Welfare's Medicaid Pharmacy Reimbursement Task Force, 1989.

Iowa and Wisconsin Pharmacists Associations:
• Member, Pharmacy Technician Certification Review Series Advisory Committee

Kansas Society of Association Executives:
• Member, Board of Directors, 1987.
• Member, Annual Meeting Committee, 1986.
• Chairman, Strategic Planning Committee, 1985.

Missouri Pharmacy Association:
- Member, Nominating Committee, 2016-17.
- Member, Convention Planning Committee, 2004-2006, 2010-11.
- Chairman, Bylaws Committee, 1994-98, member 1992-1994.
- Member of MPA Council (Board of Directors), 1975-1976.
- Member of MPA Education Committee, 2007-2009, 2012.
- Reviewer, Student Business Plan Competition, 2014.
- Member, Development Workgroup for Missouri Care Network

National Community Pharmacists Association (formerly National Association of Retail Druggists):
- Member, Consumer Affairs and Public Relations Committee, 1987.
- Member, Third Party Steering Committee, 1986.
- Member, Third Party Committee, 1985.
- Faculty Advisor, 1992-present.

National Council of State Pharmaceutical Association Executives:
- Chairman, Program Committee, 1987.
- Member, Board of Directors, 1986 and 1987.
- Member, Program Committee, 1986.
- Member, Third Party Task Force, 1985 and 1986.

St. Louis College of Pharmacy Alumni Association:
- Member, Board of Directors 2009 - 2017
- Member, Budget and Financial Development Committee, 1991-1994, 2004-05, 2009-10.
- Member, Bylaws Revision Committee, 1992.
- Member, Fund for Excellence Committee, 1993-1994.
- Member, Mortar and Pestle Society Advisory Committee, 1998.
- Member, Student Affairs Committee, 1994-2000.
- Co-chairman, Community Service Committee
- Class Representative for Class of 1976 Reunion.
- Member, Nominations Committee, 2000-2002, 2015-16.
- Member, Governance Committee, 2013-2017.
- Member, Community Affairs Committee, 2012-2015.

St. Louis Pharmacists' Association
- Chairman of the Board, 2004
- President, 2003
- Secretary, 2001-02.
- Member, Board of Directors, 1996-2000.
- Co-chairman, Charles C. Rabe Scholarship Committee, 1997.

State Pharmaceutical Editorial Association:
- Vice-President, 1982.

Student American Pharmaceutical Association:
- Chapter President, St. Louis College of Pharmacy, 1975-1976.
- Region VI Coordinator, 1975.

Virginia Society of Association Executives:
- Member, Strategic Planning Committee, 1982.

**Consultation**

- Xcenda/Genentech Advisory Board, "Cost Effectiveness of Breast Cancer Treatments,"

2012-2013.

- Director of Education, Institute for the Certification of Pharmacy Technicians, 2005-2010.

- Board of Advisors, PharmAccount, Inc., 2004-2009.

- Consultant for Third Party Solutions, Inc. in Minnesota workers' compensation prescription reimbursement appeal.

- Senior Fellow for Institute for the Advancement of Community Pharmacy, "Optimizing Community Pharmacy Effectiveness," 2001-02.

- National Association of Chain Drug Stores, 2000.  (Scope of Consultation: update test bank for the Community Retail Pharmacy Technician Exam and revise the third edition of the *Community Retail Pharmacy Technician Training Manual*.)

- Academy of Managed Care Pharmacy.  Served as featured expert for the "Ask Your Colleague" page on the AMCP web site.  Topic: Provider Profiling.  May 16-31, 2000.

- Academy of Managed Care Pharmacy, 1998.  (Scope of consultation: development of a background paper on certification for managed care pharmacists).

- National Association of Chain Drug Stores, 1997-2000.  (Scope of consultation: preparation and analysis of multiple versions of the Community Pharmacy Technician Examination).

- Iowa Pharmacists Association and Wisconsin Pharmacists Association, 1997-1998.  (Scope of consultation: reviewed pharmacy technician training manual and videotape program.)

- University of Colorado College of Pharmacy, 1996.  (Scope of Consultation: cost of dispensing study for Colorado Medicaid program.)

- National Association of Chain Drug Stores, 1996.  (Scope of consultation: Analysis of chain pharmacy manpower needs.)

- SmithKline Beecham Pharmaceuticals, 1995.  (Scope of consultation: Conference on pharmacoeconomics and outcomes management.)

- National Association of Chain Drug Stores, 1995.  (Scope of consultation: Analysis of chain pharmacies' costs of dispensing.)

- Proctor and Gamble Pharmaceuticals, 1994-1995.  (Scope of consultation:  Managed care reimbursement for controlled-release products.)

- Calgon Vestal Laboratories, 1994.  (Scope of consultation: Marketing to managed care organizations and application of pharmacoeconomic principals to marketing efforts.)

- National Association of Chain Drug Stores, 1994.  (Scope of Consultation: External reviewer for "Community Retail Pharmacy Technician Training Manual.")

- Catholic Materials Management Alliance, 1994. (Scope of Consultation: Analysis of "Pharmacy Services Survey" for 125 Catholic hospitals in the U.S.)

- General American Life Insurance Company, 1994.  (Scope of consultation: pricing of injectable drugs for Medicare Part B claims.)

- International Medication Systems, Ltd., 1994. (Scope of consultation: Pharmacoeconomic Analysis of Parenteral Drug Delivery Systems.)

- Express Scripts, Inc., 1991-1993.  (Scope of consultation: prescription utilization analysis, formulary management and drug utilization review.)

- Missouri Department of Administration, Division of Purchasing, 1992.  (Scope of consultation: member of evaluation team reviewing proposals to conduct a therapeutically oriented drug use review program for the Missouri Medicaid prescription program.) (RFP B300627)

- Southern Illinois Coal Company Benefits Committee, 1991.  (Scope of consultation: cost containment of drug benefit program and improvement of utilization and patient compliance.)

- Missouri Department of Family Services, Division of Medical Services, Medicaid Prior Authorization Task Force, Chairman, 1991.  (Scope of consultation: formulary recommendations for exclusion and prior authorization of drugs in the Missouri Medicaid program.)

- Illinois Pharmaceutical Association, 1991.  (Scope of consultation: reviewed and commented on a draft of an Employee Pharmacist Manual.)

- Rhode Island Pharmaceutical Association, 1990-1991.  (Scope of consultation: conducted a study of pharmacies' costs of dispensing third party prescriptions and provided individual pharmacy analyses on request.)

- Pharmacy Network of Indiana, 1989-1990.  (Scope of consultation:  prepared a response to a request for proposal from Blue Cross/Blue Shield of Indiana for the establishment, operation and management of a pharmacy preferred provider program.)

- Indiana Department of Public Welfare, Medicaid Pharmacy Reimbursement Task Force Member, 1989.  (Scope of consultation: analysis of cost savings from formulary decisions and other cost containment measures; recommendation of cost containment strategies.)

- Georgia Pharmaceutical Association, 1987.  (Scope of consultation: development of a nonprofit Research and Education Foundation.)

- Kansas Optometric Association, 1985.  (Scope of consultation: evaluation of association structure, programs and activities according to guidelines recommended by the American Society of Association Executives.)

- Virginia General Contractors' Association, 1981. (Scope of consultation: evaluation of association structure, programs and activities according to guidelines recommended by the American Society of Association Executives.)

- Virginia Coalition for Prevention of Venereal Disease, Board of Directors, 1979-1981.


**Testimony Given at Trial or Deposition** (in last five years)

- *Humana Health Plan, Inc.: Humana Insurance Company; and Humana Pharmacy Solutions, Inc. v. Walgreens Co., 2022*
- *Humana Health Plan, Inc.: Humana Insurance Company; and Humana Pharmacy Solutions, Inc. v. Rite Aid HDQTRS Corp. and Rite Aid Corp, 2021*

- *Humana Health Plan, Inc.: Humana Insurance Company; and Humana Pharmacy Solutions, Inc. v. CVS and CVS Health Corporation*, 2021
- Confidential arbitration on behalf of Maine Community Health Options v. a PBM, 2021
- Confidential arbitration on behalf of Kentucky Health Cooperative , Inc. v. a PBM, 2021
- *Christopher Corcoran, et al. v. CVS Pharmacy, Inc.*, 2021
- *United States ex rel. Penelow, et al. v. Janssen Products, LP*, 2020


## TEACHING RESPONSIBILITIES
**Undergraduate:**
- Advanced Pharmacy Practice Experience (APPE) Rotations, 2010-present
- WE 3570 – Personal Financial Management for the Healthcare Professional; fall, 2005-07.
- PSEL 4100 / WE 3735 – International Service Learning 2011-12 (Costa Rica), 2012-13 (Guatemala), 2013 (Poland), 2013-14 (Guatemala), 2014 (Romania), 2015 (Macedonia), 2016 (Guatemala), 2017 (Guatemala and Portugal), 2018 (Guatemala and Romania).
- Special Projects – Leadership in International Service 2015-present
- SP 4720 – Special Projects: Pharmacy Business Planning, fall, 2005.
- PA 5120 – Health Systems Management: Economic Aspects, spring and fall 2005-present.
- UMKC Course – The Economics of Health and Medicine (Live Distance Learning), fall 2004.
- PA 4102 and PA 3002 - Pharmacy Management, spring 1991-2002, Fall 2000-03.
- WE 4770 - Introduction to Pharmacy Entrepreneurship, fall 1996-2000, 2012.
- SS 2111 and SS 2511 - Economics, fall 1990-1995, 2003, fall and spring 2004-2010.
- SS 2111 (Barnes College of Nursing) - Economics, spring 1992 and fall 1993.
- PA 2112 - Health Care Systems, spring 1991-1993.
- PA 5701 - Special Projects (Intro. to Community Pharmacy Ownership), fall 1991.
- ST 5700 - Selected Topics - Community Pharmacy Ownership, fall 1993-1994.
- Research Method Methods – Pharm. D., guest lectures, spring 1991.
- SS 1100 - Freshman Seminar, guest lectures, fall 1993.
- TH 5002 - Therapeutics IV, guest lecturer on managed care, spring 1997.
- Clinical Seminar Course, guest lecturer, spring 2006, 2007.
- Preceptor, Administrative Rotation, STLCOP Experiential Program, 2007.

**Graduate:**
- PA 6190 - Managed Care Pharmacy, Trimester II (Jan-Mar) 1998, 2000, 2002, 2004, 2006.
- PA 6180 - Managed Health Care, Trimester III (Apr-June) 1997, 1999, 2001, 2004, 2006, Trimester II, 2005.
- PA 6770 - Financial Management, Trimester I (Sep-Nov) 1996, 1998, 1999, 2001, 2003, 2005, 2007.
- PA 6802 - Pharmacy Marketing, Trimester II (Jan-Mar) 1991 and 1995, Trimester I (Sep-Nov) 1992.
- PA 6517 - General Research Methods (assisted), Trimester I (Sep-Nov) 1990, Trimester III (Apr-June) 1993 and 1994.
- PA 6722 - Health Care and Public Policy, Trimester I (Sep-Nov) 1991, 1993, 1995. Trimester II (Jan-Mar) 1997, 1999, 2001, 2003, 2005.
- PA 6101 - Management of Human Resources, Trimester II (Jan-Mar) 1992.
- PA 6160 - Pharmacy Policy and Planning, Trimester III (Apr-June) 1994 and 1995.


## PUBLIC SERVICE
- Better Healthcare for Africa (supporting Medical Missions at St. Albert's Mission Hospital in Zimbabwe)
  - Member, Board of Directors (2010 – present)
- Walbridge Settlement Foundation (supporting a medical clinic in Kyekyewere, Ghana)
  - Secretary, Board of Directors (2008- 2016)
- Leukemia and Lymphoma Society
  - Member, Patient Services Committee, 2001-2006

- Sponsor, Light the Night Walk, 2002-2009
- Participant, First Connection Program 2001 – 2006 (Chairman, 2003-05)
• Habitat for Humanity – St. Louis, local volunteer, 2001 - present
• Habitat for Humanity International, Global Village Missions (2001 – present)
  - Bangalore, India 2001
  - Durban, South Africa 2002 (Crew Leader)
  - Asuncion, Paraguay 2003
  - Gangwon-do, South Korea 2003
  - Ulan Bator, Mongolia 2003
  - Nicoya, Costa Rica 2004 (Team Leader)
  - Belize City, Belize 2004
  - Cartago, Costa Rica 2005 (Team Leader)
  - Barahona, Dominican Republic 2005
  - Temuco, Chile, 2006
  - Kumasi, Ghana, 2007 (Team Leader)
  - Cochabamba, Bolivia 2008
  - Gabarone, Botswana 2009 (Co-leader)
  - My Tho, Vietnam 2011 (Co-leader)
  - Leogane, Haiti 2011
  - La Cruz, Costa Rica, 2012 (Team Leader)
  - Beius, Romania, 2012
  - Jutiapa, Guatemala, 2013 (Team Leader)
  - Katowice, Poland, 2013 (Team Leader)
  - Tecpan, Guatemala, 2014 (Team Leader)
  - Raduati, Romania, 2014 (Team Leader)
  - Veles, Macedonia, 2015 (Team Leader)
  - Cape Town, South Africa, 2015
  - Retalhuleu, Guatemala, 2016 (Team Leader)
  - San Lucas Toliman, Guatemala, 2017 (Team Leader)
  - Braga, Portugal, 2017 (Team Leader)
  - Quetzaltenagro, Guatemala, 2018 (Team Coordinator)
  - Constanta, Romania, 2018 (Team Leader)
  - El Progresso, Guatemala, 2019 (Team Coordinator)
  - Gliwice, Poland, 2019 (Team Coordinator)
  - Zacapa, Guatemala, 2020 (Team Coordinator)
• Medical Missions
  - Brace for Impact 46 and Pittsburg Kids Foundation, CHIDA Hospital and Clinic, Cap Haitien, Haiti, August, 2018.
  - Pittsburg Kids Foundation, Health needs assessment, CHIDA Hospital and Clinic, Cap Haitien, Haiti, October, 2015.
  - Raleigh Fitkin Memorial Hospital, Manzini, Swaziland, 2012, 2013.
  - Friends in Village Development, Bangladesh, Sylhet, Bangladesh, 2014.
• American International Health Alliance (supporting capacity building efforts of Nelson Mandela Metropolitan University School of Pharmacy, Port Elizabeth, South Africa) 2013 - present.


**HONORS AND AWARDS**
• Professor Emeritus, University of Health Sciences and Pharmacy, June 2022.
• Distinguished Service Award, Mortar and Pestle Society of the University of Health Sciences and Pharmacy, June 2022.
• Distinguished Alumnus, STLCOP Alumni Association, November 10, 2017.
• Bowl of Hygeia Award (from the American Pharmacists Association, APhA Foundation, National Association of State Pharmacy Associations, and the Missouri Pharmacy Association) June 2013

- Outstanding Educator Award – Teacher of the Year, St. Louis College of Pharmacy, 2012.
- Emerson Excellence in Teaching Award, 2012.
- STLCOP Alumni Association Community Service Award, September, 2011
- STLCOP Faculty Member of the Year Award, Missouri Pharmacy Association, June, 2009
- Faculty Advisor of the Year, St. Louis College of Pharmacy, May, 2009.
- Fellow of the American Pharmacists Association, March, 2008.
- Student Enrichment Award, St. Louis College of Pharmacy, 2006.
- Fellow of the Academy of Managed Care Pharmacy, March, 2003.
- Senior Fellow, Institute for the Advancement of Community Pharmacy, July 1, 2002 to June 30, 2003.
- Missouri Pharmacy Association "Making a Difference Award," June 15, 2002.
- Honorary Member, Phi Lambda Sigma Pharmacy Leadership Society, February, 2001.
- Outstanding Achievement Award, St. Louis College of Pharmacy Alumni Association, October, 2000.
- Life Membership, Mortar and Pestle Society, St. Louis College of Pharmacy, 1999.
- Faculty Award for Excellence in Pharmacy Administration, National Community Pharmacists Association Foundation, 1998.
- Faculty Mentor Award, NACDS Education Foundation Community Pharmacy Essay Contest, May 1998. (For mentoring student Paul M Husemann with his second-place essay "Paving the Way to Pharmaceutical Care: A Chain-Sponsored Education Program.")
- Outstanding Educator of the Year, St. Louis College of Pharmacy, 1996.
- Emerson Electric Excellence in Teaching Award, November 17, 1996.
- NCPA Chapter of the Year Award, 1996 and 1997; Chapter of the Year Runner-Up, 1995, 1998, 1999 (Faculty Advisor).
- Missouri Pharmacy Association President's Award, June, 1995.
- New Investigator Grant, American Association of Colleges of Pharmacy, 1991.
- Jenkins/Knevel Award for Excellence in Research, 1990, Purdue University, finalist.
- Pfizer-AFPE Pharmacy Administration/Pharmaceutical Marketing Fellow, 1989/1990.
- First place, National Association of Boards of Pharmacy Foundation Scholarship Competition, January, 1989.
- Member, Rho Chi National Pharmaceutical Honor Society.
- Honorary Life Membership, Kansas Pharmacists Association, December, 1987. (Only the second person to have been awarded this honor.)
- First prize, Sandoz Tenth Annual Medical Journalism Competition, 1985.
- McKesson & Robbins Leadership Award, May, 1976.

7/22

**EXHIBIT B:**
**MATERIALS RELIED IN EXPERT REPORT**
**OF KENNETH W. SCHAFERMEYER, Ph.D.**

| Production Documents |
|---|
| CAREMARK_STAFFORD-000193 |
| ORx_Stafford_002753 |
| Rite_Aid_Humana_00256702 |
| Rite_Aid_Humana_00262738 |
| RiteAid00001101 |
| RiteAid00001487 |
| RiteAid00218632 |
| RiteAid00214514 |
| RiteAid00215844 |
| RiteAid00217983 |
| RiteAid00219464 |
| RiteAid00220297 |
| RiteAid00220916 |
| RiteAid00231297 |
| RiteAid00231373 |
| RiteAid00231805 |
| RiteAid00232296 |
| RiteAid00241547 |
| RiteAid00242487 |
| RiteAid00259715 |
| RiteAid00273199 |
| RiteAid00273556 |
| RiteAid00273580 |
| RiteAid00273600 |
| RiteAid00273607 |
| RiteAid00273609 |
| RiteAid00273634 |
| RiteAid00273945 |
| RiteAid00274541 |
| RiteAid00274913 |
| RiteAid00274917 |
| RiteAid00275151 |

**EXHIBIT B:**
**MATERIALS RELIED IN EXPERT REPORT**
**OF KENNETH W. SCHAFERMEYER, Ph.D.**

| Production Documents |
|---|
| RiteAid00275154 |
| RiteAid00275481 |
| RiteAid00275485 |
| RiteAid00275679 |
| RiteAid00275723 |
| RiteAid00275774 |
| RiteAid00275802 |
| RiteAid00276006 |
| RiteAid00276266 |
| RiteAid00276293 |
| RiteAid00276583 |
| RiteAid00276586 |
| RiteAid00277367 |
| RiteAid00277369 |
| RiteAid00277396 |

| Deposition Transcripts |
|---|
| July 17, 2020 Deposition of Alison Farrell |
| March 13, 2023 Deposition of Ruth Lightner |
| February 28, 2023 Deposition of Robert Thompson |
| June 15, 2023 Deposition of William Wolfe |

| Manuals |
|---|
| Centers for Medicare & Medicaid Services (CMS), "Adopted Standards and Operating Rules," https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/HIPAA-ACA/AdoptedStandardsandOperatingRules.html |
| Illinois Department of Healthcare and Family Services, *Handbook for Providers of Pharmacy Services*, Chapter P-200 (Nov. 2010) |
| Magellan Pharmacy Solutions, *Participating Pharmacy Agreement for Ambulatory and Long Term Care Pharmacy Providers* (TDCI TennCare Div. Apr. 1, 2013). |
| Medicare Prescription Drug Benefit Manual, Ch. 14 – Coordination of Benefits, Section 50.4.2., https://www.cms.gov/Medicare/Prescription-Drug-Coverage /PrescriptionDrugCovContra/Downloads/Chapter-14-Coordination-of-Benefits-v09-17-2018.pdf |

**EXHIBIT B:**
**MATERIALS RELIED IN EXPERT REPORT**
**OF KENNETH W. SCHAFERMEYER, Ph.D.**

| Manuals |
| --- |
| Memorandum from Cynthia Tudor, Director of the CMS Medicare Drug Benefit Group and CMS (Oct. 11, 2006), https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/QADiscountsandTrOOP_100606.pdf |
| National Association of Chain Drug Stores, *The Chain Pharmacy Industry Profile* (2006) |

| Pleadings |
| --- |
| Arbitration Hearing Transcript, *Humana Health Plan, Inc. v. Rite Aid Headquarters*, (W.D. Ky.), (AAA No. 01-19-0000-4057) (excerpted) |
| Fourth Amended Class Action Complaint for: (1) Violations of the California Unfair Competition Law; (2) Violations of the California Consumer Legal Remedies Act; (3) Unjust Enrichment; and (4) Negligent Misrepresentation (May 2, 2023) |

| Publications |
| --- |
| Katherine Eban, *Painful prescription: Prescription benefit managers make out better than their customers*, Fortune Magazine, Oct. 10, 2013, https://fortune.com/2013/10/10/painful-prescription/ |
| National Community Pharmacists Association, *NCPA Digest* (2009) |
| Robert P. Navarro, *Managed Care Pharmacy Practice*, chs. 7, 16 (2d ed. 2009) |
| Robert Garis, *et al.*, *Examining the Value of Pharmacy Benefit Management Companies*, 61 Am. J. of Health Sys. Pharmacy 1 (2004) |
| Stanic DJ, et al., "The National Council for Prescription Drug Programs: Setting Standards for Electronic Transmission of Pharmacy Data." *Drug Benefit Trends* |

| Publicly Available |
| --- |
| 10 Colo. Code Regs. §2505-10:8.800 |
| 42 C.F.R. §447.512 |
| 42 C.F.R. §447.502 |
| 45 C.F.R. §162 |
| 55 Pa. Code §1121.2 |
| Agency for Healthcare Research and Quality, "United States Health Information Knowledgebase," https://www.ahrq.gov/data/ushik.html |
| AHCCCS, NCPDP Post Adjudication History 2.2 Companion Document for Encounter Transactions (Sept. 2016) |
| Alaska Admin. Code tit. 7 §145.400 (h) |

**EXHIBIT B:**
**MATERIALS RELIED IN EXPERT REPORT**
**OF KENNETH W. SCHAFERMEYER, Ph.D.**

| Publicly Available |
| --- |
| Academy of Managed Care Pharmacy, "AMCP Guide to Pharmaceutical Payment Methods" (Oct. 2007) https://www.amcp.org/sites/default/files/2019-03/Full-Pharmaceutical-Guide-%283.0%29.pdf |
| Academy of Managed Care Pharmacy, "AMCP Guide to Pharmaceutical Payment Methods, 2013 Update" (2013) https://www.amcp.org/sites/default/files/2019-03/Full-Pharmaceutical-Guide-%283.0%29.pdf |
| Cal Code Regs. tit. 22, §51480 |
| Federal Register, Volume 65, Number 160, August 17, 2000 |
| Government Accountability Office, "Prescription Drugs: Trends in Usual and Customary Prices for Commonly Used Drugs," *GAO Reports* (Feb. 10, 2011), https://www.gao.gov/assets/gao-11-306r.pdf |
| *Humana Health Plan, Inc. v. Rite Aid Headquarters*, 2022 WL 2128075, (W.D. Ky. Apr. 22, 2022), Opinion and Final Award, (AAA No. 01-19-0000-4057) |
| IDAPA 16.03.09.655 |
| Investopedia.com, "What is a Price Ceiling?" https://www.investopedia.com/terms/p/price-ceiling.asp |
| Investopedia.com, "What is Negotiation?" https://www.investopedia.com/terms/n/negotiation.asp |
| Jill Disis, "Walgreens finally buys Rite Aid stores in a diminished deal," Sept. 19, 2017), https://www.investopedia.com/terms/n/negotiation.asp |
| Johnsen M, Rite Aid adds RX Savings Card discount program chain wide. *Drug Store News* (Sep. 24, 2008) https://drugstorenews.com/pharmacy/rite-aid-adds-rx-savings-card-discount-program-chain-wide |
| National Community Pharmacists Association, *NCPA Digest* (2018), http://www.ncpa.co/images/digest/2018-Digest-Web.pdf |
| National Community Pharmacists Association, *NCPA Digest* (2019) |
| NCPDP, "Data Dictionary" (Sept. 1999) |
| NCPDP, "Data Dictionary" (Sept. 2007) |
| NCPDP, "External Code List" (Jan. 2017) |
| NCPDP, "Pharmacy: A Prescription for Improving the Healthcare System," October 2009 |
| NCPDP, "Recommendations for Use of the NCPDP Telecommunication Standard to Prevent Use of Copayment Coupons by Medicare Part D Beneficiaries and Applicability to other Federal Programs, Version 1.1" (May 2017), https://ncpdp.org/NCPDP/media/pdf/WhitePaper/Recommendations-Telecomm-Standard-Prevent-Copayment-Coupons-by-Part-D.pdf?ext=.pdf |

**EXHIBIT B:**
**MATERIALS RELIED IN EXPERT REPORT**
**OF KENNETH W. SCHAFERMEYER, Ph.D.**

| Publicly Available |
|---|
| NCPDP, "Telecommunication Standard: Implementation Guide Version D.0," August 2010 |
| NCPDP, "Telecommunications Version 5: Questions, Answers and Editorial Updates" (Nov. 2010), https://www.ncpdp.org/NCPDP/media/pdf/Version5-Editorial.pdf |
| NCPDP, Who We Are, https://www.ncpdp.org/Who-We-Are.aspx |
| Or. Admin. R. 410-121-0000 (3)(ee) |
| Rite Aid website, "2213 Rite Aid Stores in the United States." https://www.riteaid.com/locations/index.html |
| *United States ex rel. Garbe v. Kmart Corp.*, 73 F. Supp. 3d 1002 (S.D. Ill. 2014). |
| *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632-645 (7th Cir. 2016) |
| *United States v. SuperValu, Inc.*, No. 11-3290, 2019 WL 3558483 (C.D. Ill. Aug. 5, 2019) |
| Wash. Admin Code §182-530-1050 |