# EXHIBIT 7

Exhibit 7
Page 133

AMERICAN ARBITRATION ASSOCIATION
AAA NO. 01-19-0000-4057

HUMANA HEALTH PLAN, INC., HUMANA INSURANCE COMPANY,
and HUMANA PHARMACY SOLUTIONS, INC.,
Represented by Crowell & Moring, LLP

Claimants,

vs.

RITE AID HDQTRS. CORP. and RITE AID CORPORATION,
Represented by Morgan, Lewis & Bockius

Respondents.

**OPINION AND FINAL AWARD**

Exhibit 7
Page 134

the issue was reached or not, but only that it was not deemed essential to support the rulings in this Opinion and Award.

I hereby find and conclude as follows:

A. Background Facts

Humana is comprised of Humana Health Plan, Inc., a health maintenance organization; Humana Insurance Co., an insurance company that provides health insurance and prescription drug coverage; and Humana Pharmacy Solutions, Inc., a pharmacy benefits manager (PBM) that manages pharmacy benefits for Humana members. Rite Aid Hdqtrs. Corp. and Rite Aid Corporation own and operate a large retail drugstore chain in the United States.

Since the early 2000s, Rite Aid contracted with Humana to accept claims for prescription benefits under Humana insurance plans and to be reimbursed by Humana subject to the terms of reimbursement provided for in the contracts.

In 2006, the pharmacy landscape changed drastically when Medicare Part D went into effect, providing millions of Medicare beneficiaries with prescription benefit assistance for the first time. In response to Medicare Part D, many big-box stores, including Walmart, Target, Kroger, and Costco, began offering generic drug discount programs, which lowered prices to as low as $4 for certain prescription drugs. These discount programs were available to all customers, whether insured or uninsured, and thus the pharmacies generally reported the discounted prices as the U&C charge. Given the low prices and ease with which customers could obtain the discounted prices, stores like Walmart and Target began to attract and obtain a significant market share of the uninsured and underinsured pharmacy customers.

Several pharmacies sought to regain some of that market share by implementing their own discount drug programs. In September 2008, Rite Aid launched a membership program called the RX Savings Program ("RSP"). The RSP was designed to attract cash-paying customers by offering discounted pricing for certain prescription drugs to its members. To enroll in the program, a customer had to sign an enrollment form and agree to several terms, including a marketing consent that permitted Rite Aid to use the customer's personal information to send direct,

Moreover, this exact argument was analyzed and rejected by *Garbe*. There, the court found Kmart's adjudication process, which is similar to Rite Aid's adjudication process, to be a "sham" and concluded that it had no impact on Kmart's U&C. *Garbe*, 824 F.3d, at 636. In line with this view, Rite Aid's own expert witness, Ms. Graeff, conceded that "███████████████████████████████████████████████████████████████████████████████" Tr. 3111:5-3112-1. Accordingly, I do not find this adjudication process to be a characteristic of the RSP that distinguishes its members from ordinary cash customers such that the NCPDP definition of U&C would not apply to the RSP.

(b)     Course of Performance

Rite Aid further disputes Humana's assertion that the parties adopted the NCPDP definition of U&C, claiming that Humana developed this theory during litigation. Rite Aid insists that Humana's conduct – as shown through testimony and internal emails and memoranda – establishes that Humana and Rite Aid always shared an understanding that RSP prices did not constitute U&C.

Rite Aid first notes that Humana knew about the RSP since its inception – a point that Humana does not dispute. Rite Aid also identifies several internal emails in the months after the RSP launched which, Rite Aid asserts, demonstrate that Humana knew RSP prices were not reported as U&C:

- In a March 2009 email chain, Humana personnel discussed a complaint by a Humana member that was not permitted to use his Humana Flexible Savings Account card at a Rite Aid pharmacy with the RSP, and was told that Rite Aid could "████████████████████████████████████████" Ex. R138. Within that chain, Terry Spicer noted that "██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Both Mr. Spicer and Carrie Lovell acknowledged that this issue did not occur with other providers, like Walmart, Kroger, Target, and K-Mart ████████████████████ and they "███████████████████████████████████████"

- In a June 2009 email, Mr. Spicer acknowledged that while "████████████████████████████████████████████████████████████████████████████████" Ex. R153. He further explained that "█████████████" *Id.*

25

Exhibit 7
Page 136

Three Logic," in which it defined U&C to be "█████████████████████████ █████████████████████" Ex. R.102, at 675. Terry Spicer, a former Humana employee and author of the paper, testified that this definition reflected Humana's understanding of the purpose of U&C – to ensure that insured customers did not pay more for their prescription than an uninsured customer. Tr. 1171:10-19, 1174:17-1175:4, 1216:24-1217:8.

Humana also relies heavily on a February 2010 email exchange between Laura White, Humana's Director of Pharmacy Contracting, and Dianne Mason, Rite Aid's Director of Managed Care Services, to justify its belief that RSP prices constituted U&C. Ms. Mason testified that she was "███████████████████████████████" and worked on "█████████████████ ██████████████," including the contracts between Rite Aid and Humana. Tr. 32:18-33:13. In this email exchange, Ms. White informed Ms. Mason that a Humana member "████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████" Ex. H29 at 980.

In her response, Ms. Mason stated: "████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████" Ex. H29 at 979.

Two minutes after her response to Ms. White, Ms. Mason forwarded the email to William Wolfe, Rite Aid's Senior Vice President of Government affairs, stating: "████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████" Ex. H29 at 979.

While I disagree with Humana that this email is dispositive proof of Rite Aid's intent, I do find it to be significant, particularly Ms. Mason's use of the word "████" and her testimony that she used the word "████" because it was more succinct than saying "████████████ █████████████████████" Tr. 260:2-17. I am, candidly, troubled by that testimony given the volume of evidence suggesting that Rite Aid never intended to disclose that it was not reporting RSP prices as U&C.

- In August 2011, Express Scripts, a PBM, directly asked Ms. Mason " ███████████ " Ex. R269. Ms. Mason told Express Scripts that Rite Aid did not view the RSP as U&C because it was "a ███████████ " Ex. H57. She further explained that the contract language excluded " ███████████ " in the " ███████████ " of U&C. Id. Tr. 2565:12-2566:10, 2601:12-19.

- In 2012, Rite Aid relaunched the RSP with " ███████████ " Ruth Lightner admitted that the revision was designed for the purpose of mitigating U&C risk. Tr. 2630:16-2631:8

In sum, I am unable to reconcile Rite Aid's current confident assertion that RSP prices do not constitute U&C with its failure to convey that position with equal clarity to its contractual partners, including Humana, when it mattered most – and when confronted with a direct inquiry. To the contrary, Rite Aid never disclosed to Humana that it did not consider RSP prices to be U&C and did not report those prices as U&C. Rite Aid further confirmed in this arbitration that it never intended to disclose this information because it was not obligated to do so. Tr. 2962:5-2964:3, 1556:1-21.

After listening to all of the evidence presented, and upon making credibility determinations as I am required to do, I believe the evidence demonstrates that Rite Aid sought to conceal this information from Humana with the intent to realize higher profits. I do not accept Rite Aid's contention that Humana knew about its reporting practices and shared the understanding and belief that RSP prices were excluded from U&C.

In light of the foregoing, I further conclude Humana has credibly demonstrated that the language of the Agreements, combined with the documentary and testimonial evidence, support the conclusion that the parties adopted the NCPDP definition of U&C. As such, I find that Rite Aid's interpretation of U&C as the "usual and customary *retail* price" or "the shelf or list price paid by a customer who pays without any sort of benefit program, whether insurance or a membership program" is inaccurate, unsupported by the record, and does not provide a justifiable defense for excluding RSP prices from U&C.

Finally, and critically, Rite Aid has failed to demonstrate how its "retail" prices constitute U&C when the evidence establishes that it sold prescriptions at RSP prices five times more often than at retail prices, and in certain years, fourteen to fifteen times more often. Tr. 2211:6-11;

2214:10-12. Specifically, the cash transaction data produced by Rite Aid for 2009 through 2019 reveals that Rite Aid sold more than 140 million prescriptions at RSP prices, compared to the 28 million prescriptions at the "retail" price. H147. I find that Rite Aid's exclusion of RSP data from its U&C price indisputably compromised the accuracy of U&C.

Based on the foregoing, I conclude that the documentary and testimonial evidence presented in this matter demonstrate that Humana has satisfied its burden of proving, by a preponderance of the evidence, that Rite Aid breached the 2008 Agreement and the 2013 Agreement. By virtue of Rite Aid's breach, which resulted in inaccurate claim submissions to Humana for over a decade, it is clear that Humana suffered damages from the breach, which will be addressed in detail *infra*, in Section 4.

### iii. Voluntary Payment Doctrine

Rite Aid argues that even if Humana's interpretation of the Agreements is correct, Humana's breach of contract claim is barred by the Voluntary Payment Doctrine. Briefly stated, this doctrine requires a showing that Humana possessed full knowledge of the facts and nonetheless proceeded with Rite Aid's understanding of U&C.

I find that the evidence demonstrates, unequivocally, that Humana had knowledge of: (1) the existence of the RSP; (2) public information, including publicly advertised formulary lists; and (3) Rite Aid's claim submissions to Humana.

I further find that Humana's witnesses credibly argued that Humana lacked the information and ability to obtain information necessary to ascertain Rite Aid's true U&C prices. Specifically, although Humana had a "small window" into what Rite Aid submitted for Humana members, Humana needed Rite Aid's cash transaction data, to which it had no access, to determine what prices cash customers were actually paying. Tr. 563:1-564:8; 1444:5-1445:14. To that point, Humana refuted Rite Aid's position that the Agreements provided Humana with audit rights to determine if it was overpaying Rite Aid. In particular, Section 5.2 of the Agreements, which grants Humana the right to review and audit pharmacy records, is expressly " ███████████ ███████████████████████████████ " Thus, while Humana certainly could have invoked this audit provision to examine records pertaining to Humana members, it could not, as